

**Orrick, Herrington & Sutcliffe LLP**

2100 Pennsylvania Avenue, N.W.
Washington, DC 20037

+1 202 339 8400
**orrick.com**

**Mark S. Davies**

E  mark.davies@orrick.com
D  +1 202 339 8631
F  +1 202 339 8500

May 28, 2024

*Via CM/ECF*

Jarrett B. Perlow
Circuit Executive & Clerk of the Court
United States Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC  20439

      Re:    *AliveCor, Inc. v. Apple Inc.*, No. 23-1512

Dear Mr. Perlow:

      Pursuant to Fed. R. App. P. 28(j), Apple notifies the Court of new authority that issued after briefing in this appeal concluded:  *Apple, Inc. v. AliveCor, Inc.*, IPR2022-01560, Paper 37 (P.T.A.B. April 8, 2024) ("'956 Decision), and *Apple, Inc. v. AliveCor, Inc.*, IPR2022-01562, Paper 37 (P.T.A.B. April 8, 2024) ("'415 Decision").[1]

      In these decisions, which involve two AliveCor patents related to or similar to the patents on appeal, the Board held that Apple had no obligation to affirmatively raise the secondary considerations arguments previously credited by the ITC.  In so holding, the Board credited Apple's "reasonable" assessment of relevance, and explained:

> We do not fault Petitioner for omitting discussion of secondary considerations in its Petition where the evidence of secondary considerations set forth on the full record is not persuasive of non-obviousness in the first place.

'956 Decision at 61; '415 Decision at 64.  This reasoning undercuts AliveCor's argument (AliveCor Br. 56-61) that Apple breached its "routine discovery" obligations:  If Apple had no obligation to raise secondary considerations arguments even *after* they were credited by the ITC, it certainly had no obligation to produce

---

[1]  AliveCor's requests for Director review of these decisions remain pending. Apple is submitting the public versions of these decisions because not all counsel of record in this appeal are covered under the relevant protective order.



May 28, 2024
Page 2

such evidence as "routine discovery" *before* any tribunal deemed it relevant, and without being asked by AliveCor.  *See* Apple Br. 72-79.

The Board also rejected AliveCor's argument that Apple engaged in discovery misconduct by failing to produce certain documents from the ITC proceeding.  '956 Decision at 46-49; '415 Decision at 49-52.  The Board criticized AliveCor for failing to "move to compel production" of the documents, observed that AliveCor's failure to timely raise the issue "deprived [the Board] of the opportunity to resolve what appears to be a simple discovery dispute though means short of sanctions," and noted that AliveCor likely could have produced the information itself.  *Id.*  Here, AliveCor similarly failed to raise a "simple discovery dispute" until far too late in the game.  *See* Apple Br. 72-74, 75 n.10.

Respectfully,

*/s/ Mark S. Davies*
Mark S. Davies
*Counsel for Appellee Apple Inc.*

*Apple, Inc. v. AliveCor, Inc.*,
IPR2022-01560, Paper 37
(P.T.A.B. April 8, 2024)
(“'956 Decision)

<span style="color:green">PUBLIC VERSION</span>

Trials@uspto.gov                                                    Paper 37
571-272-7822

Date: April 08, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

ALIVECOR, INC.,
Patent Owner.

———————————

IPR2022-01560
Patent 9,420,956 B2

———————————

Before JEFFREY N. FREDMAN, ERIC C. JESCHKE, and
DAVID COTTA, *Administrative Patent Judges.*

COTTA, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-01560
Patent 9,420,956 B2

I.     INTRODUCTION

On September 26, 2022, Apple Inc. ("Petitioner")[1] filed a Petition to institute *inter partes* review of claims 1–21 of U.S. Patent No. 9,420,956 B2 (Ex. 1001, "the '956 patent").  Paper 2 ("Pet." or "Petition").  AliveCor, Inc. ("Patent Owner")[2] filed a Preliminary Response.  Paper 8.  Taking into account the arguments and evidence presented, we determined that the information presented in the Petition established that there was a reasonable likelihood that Petitioner would prevail in demonstrating unpatentability of at least one challenged claim of the '956 patent, and we instituted this *inter partes* review as to all challenged claims.  Paper 10.

After institution, Patent Owner filed a Patent Owner Response (Paper 19, "PO Resp."), Petitioner filed a Reply to the Patent Owner Response (Paper 23, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 29, "PO Sur-reply").[3]  In addition, Patent Owner and Petitioner each filed motions to seal.  Paper 18 (Patent Owner Motion to Seal ("PO Mot.")); Paper 24 (Petitioner's Motion to Seal ("Pet. Mot.")); Paper 32 (Patent Owner's Second Motion to Seal) ("PO 2nd Mot.").

An oral hearing was held on January 10, 2024, and a transcript of the hearing is included in the record.  Paper 35 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6.  This decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of claims

---

[1] Petitioner identifies itself as the real party-in-interest.  Pet. 73.
[2] Patent Owner identifies itself as the real party-in-interest.  Paper 4, 1.
[3] Patent Owner's Response and Petitioner's Reply were filed under seal. Patent Owner provided a redacted public version of its Response in Paper 21 and Petitioner provided a redacted public version of its Reply in Paper 25.

IPR2022-01560
Patent 9,420,956 B2

1–21 of the '956 patent. For the reasons discussed below, we hold that Petitioner has demonstrated by a preponderance of the evidence that claims 1–14 and 18–21 are unpatentable, but that Petitioner has not demonstrated by a preponderance of the evidence that claims 15–17 are unpatentable. In addition, for the reasons discussed below, we grant the parties' motions to seal.

*A.    Related Matters*

Petitioner states that it is "not aware of any disclaimers, reexamination certificates or petitions for *inter partes* review for the '956 patent" and that it "is further not aware of any active litigation alleging infringement or non-infringement of the '956 patent." Pet. 73.

Patent Owner identifies the following IPRs as having been requested by Petitioner Apple Inc. against AliveCor patents: IPR2022-00872 (U.S. Patent No. 8,509,882); IPR2022-00873 (U.S. Patent No. 10,342,444); IPR2022-01173 (U.S. Patent No. 11,103,175); IPR2022-01297 (U.S. Patent No. 8,301,232); IPR2022-01186 (U.S. Patent No. 9,649,042); and IPR2022-01562 (U.S. Patent No. 10,159,415). Paper 9, 1–2. Patent Owner does not indicate whether or how any of the patents challenged in these proceedings are related to the '956 patent. *See generally id*.

Petitioner asserts that "[t]he '956 Patent is in the same family as patents for which the Board has previously instituted IPR" and that "the claims of the '956 Patent recite many limitations substantively identical to claims of U.S. Patent No. 9,572,499," which was challenged in IPR2021-00970. Pet. 5. We further note that the '956 patent is related by a chain of continuation applications to U.S. Patent Nos. 10,159,415 and 10,595,731, at

IPR2022-01560
Patent 9,420,956 B2

issue in IPR2022-01562 and IPR2021-00971, respectively.  Ex. 1001,
code (21); IPR2022-01562, Ex. 1001, code (63); IPR2021-00971, Ex. 1001,
code (63).

> B.    *Technological Background*

Electrocardiography measures "the electrical activity of the heart,
which can be indicative of underlying heart disease."  Ex. 1003 ¶ 29
(Chaitman Decl.).  "In conventional clinical practice, ECG
[electrocardiograms] and telemetry are used to diagnose cardiac
arrhythmias."  *Id.* ¶ 31.

An ECG represents "electrical activity of the heart based on
depolarization and repolarization of the atria and ventricles, which typically
show up as five distinct waves on [an] ECG readout –      P-wave, Q-wave,
R-wave, S-wave, and T-wave."  *Id.* ¶ 30.  "An R-R interval represents a time
elapsed between successive R-waves of a QRS complex[4] of the ECG that
occur between successive heart beats."  *Id.*  "If [the] R-R interval durations
over a time period are close to one another in value, then ventricular rhythm
is understood to be 'regular.'  In contrast, if there are significant variations in
the R-R interval durations over a time period, then the ventricular rhythm is
understood to be 'irregular.'"  *Id.* (internal citations omitted).

"Photoplethysmography (PPG) is a simple noninvasive optical
technique" that uses a "light source to illuminate subcutaneous tissue and a
photo detector with spectral characteristics matching those of the light

---

[4] "A QRS complex is a combination of the Q, R, and S waves occurring in
succession and represents the electrical impulse of a heartbeat as it spreads
through the ventricles during ventricular depolarization."  Ex. 1003 ¶ 30.

IPR2022-01560
Patent 9,420,956 B2

source" to "monitor[] beat-to-beat relative blood volume changes in the microvascular bed of peripheral tissues." *Id.* ¶ 32. According to Petitioner's expert, Dr. Chaitman, the "information derived from RR intervals of ECG can also be derived from the pulse period of a PPG reading." *Id.* ¶ 33. PPG is "sometimes . . . referred to as blood oxygen saturation, pulse oximeter, oximetry, and SpO2." *Id.* ¶ 32.

Heart rate variability ("HRV") is defined as "the variation of RR intervals with respect to time and reflects beat-to-beat heart rate (HR) variability." *Id.* ¶ 36. It "can be accurately determined based on either ECG data or PPG data." *Id.* ¶ 37. With respect to the former, this involves measuring RR intervals. *Id.* ¶ 37. According to Dr. Chaitman, "HRV analysis is an important tool in cardiology to help diagnose various types of arrhythmia." *Id.* ¶ 36.

C.    *The '956 patent*

The '956 patent discloses that "[a]rrhythmia is a cardiac condition in which the electrical activity of the heart is irregular or is faster (tachycardia) or slower (bradycardia) than normal." Ex. 1001, 1:30–34. "Atrial fibrillation is the most common cardiac arrhythmia" and occurs when "electrical conduction through the ventricles of [the] heart is irregular and disorganized." *Id.* at 1:34–37. The '956 patent explains that atrial fibrillation is associated with "palpitations, shortness of breath, fainting, chest[] pain or congestive heart failure" as well as "atrial clot formulation . . . and stroke." *Id.* at 1:37–41.

Patients with arrhythmia or atrial fibrillation are often "monitored for extended periods of time to manage the disease." *Id.* at 1:50–52. "Current

ambulatory electrocardiography devices such as Holter monitors, however, are typically bulky and difficult for subjects to administer without the aid of a medical professional." *Id.* at 1:56–59.  Such monitoring devices can "impede the activities of the subject, including their natural movement, bathing, and showering." *Id.* at 1:59–64.  Further, once such devices generate an ECG, it must be sent to the patient's physician for analysis, with the result that "many patients do not receive feedback in an expedient manner." *Id.* at 1:64–2:2.

The '956 patent discloses "a cardiac disease and/or rhythm management system . . . [that] allows a user to conveniently document their electrocardiograms (ECG) and other biometric data and receive recommendation(s) and/or goal(s) generated by the system or by a physician in response to the documented data." *Id.* at 2:8–15.  The system "can be loaded onto a local computing device of the user," such as a head-worn computing device (like the Google Glass), a wrist-worn computing device (like a smart watch), a tablet computer, or a smart phone. *Id.* at 2:14–24. The '956 patent teaches that its system can be used to continuously record "parameters such as heart rate (HR), heart rate variability (R-R variability or HRV), and heart rate turbulence (HRT)." *Id.* at 2:46–49.  "These parameters and further parameters may be analyzed to detect and/or predict one or more of atrial fibrillation, tachycardia, bradycardia, bigeminy, trigeminy, or other cardiac conditions." *Id.* at 2:49–52.

Figure 1 of the '956 patent is reproduced below.

IPR2022-01560
Patent 9,420,956 B2



*FIG. 1*

Figure 1, above, "shows a system for cardiac disease and rhythm management." *Id.* at 5:32–33. System 100 includes local computing device 101 that can be "a computing device worn on the body" such as a smart watch or smartphone. *Id.* at 6:32–39. Local computing device 101 is in wired or wireless communication with handheld ECG monitor 103, wrist-worn biometric sensor 105, another biometric device (such as a personal scale or a blood pressure monitor 107), another local computing device 109

7

IPR2022-01560
Patent 9,420,956 B2

(such as a personal computer of the user), and a remote server or cloud-based service 113. *Id.* at 6:22–7:35. Local computing devices 101 and 109 both communicate with remote server or cloud-based service 113 through internet 111. *Id.* at 7:17–7:35. "Other users," including the user's physician, "may access the patient data through the remote server or cloud-based service 113." *Id.* at 7:36–41.

Figure 14, reproduced below, shows an embodiment of a body-worn device. *Id.* at 6:4–6.



Figure 14, shows "smart watch 1400 which includes at least one heart rate monitor 1402 and at least one activity monitor 1404," such as an accelerometer. *Id.* at 24:20–45. Analysis of signals from these monitors can be used to "determine if heart rate and activity measurements represent an advisory condition for recording an ECG," and trigger signals for recording an ECG if an advisory condition is detected. *Id.* at 24:27–33.

Figure 10, reproduced below, shows another embodiment employing a body-worn device. *Id.* at 5:54–56.

IPR2022-01560
Patent 9,420,956 B2



Figure 10 illustrates "a method for monitoring a subject to determine when to record an electrocardiogram (ECG)." *Id*. at 22:43–45. According to the Specification:

> In FIG. 10, a subject is wearing a continuous heart rate monitor (configured as a watch 1010, including electrodes 1016), shown in step 1002. The heart rate monitor transmits (wirelessly 1012) heart rate information that is received by the smartphone 1018, as shown in step 1004. The smartphone includes a processor that may analyze the heart rate information 1004, and when an irregularity is determined, may indicate 1006 to the subject that an ECG should be recorded.

*Id*. at 22:45–52. In some embodiments, the ECG device is "present in a smart watch band or a smart phone." *Id*. at 24:56–57. "The ECG, heart rate, and rhythm information can be displayed on the computer or smartphone, stored locally for later retrieval, and/or transmitted in real-time to a web server." *Id*. at 25:1–4.

### D. Challenged Claims

The '956 patent includes 21 claims, all of which are challenged in the Petition. Claims 1 and 12 are independent claims and read as follows:

1. A method of evaluating health of a heart of a user, the method comprising

IPR2022-01560
Patent 9,420,956 B2

> receiving heart rate information from a heart rate sensor located on a surface of a wearable computing device worn by a user;
>
> transmitting said heart rate information to a processor of said wearable computing device; determining an irregular heart rate variability (HRV) value, with said processor, in response to said received heart rate information; and
>
> sensing an electrocardiogram of said user with said wearable computing device in response to said irregular HRV value.

12.    A method of determining a presence of an arrhythmia of a user, said method comprising

> receiving heart rate information from a heart rate sensor located on a surface of a wearable computing device worn by a user;
>
> transmitting said heart rate information to a processor of said wearable computing device;
>
> determining an heart rate variability (HRV) value, with said processor, in response to said received heart rate information;
>
> determining a presence of an atrial fibrillation of said user in response to said determined heart rate variability (HRV) value; and
>
> sensing an electrocardiogram with said wearable computing device in response to said presence of said atrial fibrillation.

Ex. 1001, 25:46–58, 26:25–41.

IPR2022-01560
Patent 9,420,956 B2

> E.    *Asserted Grounds of Unpatentability*

Petitioner asserts four grounds of unpatentability in the Petition

(Pet. 1), which are provided in the table below:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 4, 5, 7, 9–13 | 103 | Shmueli,[5] Almen[6] |
| 2, 3, 6, 8, 14 | 103 | Shmueli, Almen, Ong[7] |
| 14–17 | 103 | Shmueli, Almen, Asl[8] |
| 18–21 | 103 | Shmueli, Almen, Osorio[9] |

Petitioner relies on the declaration of Dr. Bernard R. Chaitman (Ex.

1003), among other evidence.  Patent Owner relies on the declaration of Dr.

Igor Efimov (Ex. 2001), among other evidence.

II.    ANALYSIS

> A.    *Legal Standards*

"In an [*inter partes* review], the petitioner has the burden from the

onset to show with particularity why the patent it challenges is

unpatentable."  *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed.

---

[5] Shmueli et al., International Publication No. WO 2012/140559 A1,
published Oct. 18, 2012 (Ex. 1004, "Shmueli").

[6] U.S. Patent No. 7,460,899 B2, issued Dec. 2, 2008 (Ex. 1005, "Almen").

[7] Ong et al., U.S. Patent Publication No. 2014/0257122 A1, published Sept.
11, 2014 (Ex. 1006, "Ong").

[8] Asl, B.M., et al., *Support vector machine-based arrhythmia classification
using reduced features of heart rate variability signal*, 44 ARTIFICIAL
INTELLIGENCE IN MEDICINE 51–64 (2008) (Ex. 1007, "Asl").

[9] U.S. Patent Publication No. 2014/0275840 A1, published Sept. 18, 2014
(Ex. 1008, "Osorio").

IPR2022-01560
Patent 9,420,956 B2

Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")).

To show obviousness under 35 U.S.C. § 103, the differences between the subject matter sought to be patented and the prior art must be such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which that subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) secondary considerations of nonobviousness when presented. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

"[W]hen a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." *Id.* at 417 (quoting *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282 (1976)). But in analyzing the obviousness of a combination of prior art elements, it can also be important to identify a reason that would have prompted one of skill in the art "to combine . . . known elements in the fashion claimed by the patent at issue." *Id.* at 418. A precise teaching directed to the specific subject matter of a challenged claim is not necessary to establish obviousness. *Id.* Rather, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a

IPR2022-01560
Patent 9,420,956 B2

reason for combining the elements in the manner claimed." *Id.* at 420. Accordingly, a party that petitions the Board for a determination of unpatentability based on obviousness must show that "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016). Under the proper inquiry, "obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007).

B.    *Level of Ordinary Skill in the Art*

In determining the level of skill in the art, we consider the problems encountered in the art, the art's solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field. *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986).

Petitioner asserts:

Consistent with what the Board has previously found, a person of ordinary skill in the art of the '415[10] patent is "a multidisciplinary team comprising persons with advanced degrees in electrical engineering, mechanical engineering, biomedical engineering, computer science, and/or cardiology."

---

[10] This appears to be a typographical error. U.S. Patent No. 10,159,415, presumably the '415 patent in the above quote, is challenged in IPR2022-01562. IPR2021-00970, which is also referenced in the above quote, relates to U.S. Patent No. 9,572,499. *See* Pet. 5.

IPR2022-01560
Patent 9,420,956 B2

> *See* Paper 10, IPR2021-00970 (PTAB December 8, 2021). A
> person of ordinary skill in the art could comprise a member of
> such a team, such as a[] cardiologist, with at least a
> combination of a Bachelor's Degree (or similar higher degree)
> in an academic area emphasizing health science, or a related
> field, and two or more years or work experience with cardiac
> monitoring technologies.

Pet. 6. Patent Owner does not offer a definition of the person of ordinary
skill in the art ("POSA" or "POSITA"). PO Resp. 3.

Consistent with Petitioner's proposal, we find that a POSA would be a
member of an interdisciplinary team including persons with backgrounds in
electrical engineering, mechanical engineering, biomedical engineering,
computer science, and/or cardiology, and having at least two years of
relevant work experience designing, using, or analyzing data from, cardiac
monitoring devices.[11]  This definition is generally consistent with the level
of skill reflected in the specification and in the cited prior art.  *See Okajima
v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (explaining that specific
findings regarding ordinary skill level are not required "where the prior art
itself reflects an appropriate level and a need for testimony is not shown")
(quoting *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158,
163 (Fed. Cir. 1985)).

C.    *Claim Construction*

We interpret a claim "using the same claim construction standard that
would be used to construe the claim in a civil action under 35 U.S.C.

---

[11] This definition is identical to the definition we applied in the *inter partes*
review challenging U.S. Patent No. 9,572,499, which claims similar subject
matter.  *See* IPR2021-00970, Paper 43, 25 (PTAB Dec. 6, 2022) (Final
Written Decision).

IPR2022-01560
Patent 9,420,956 B2

282(b)."  37 C.F.R. § 42.100(b) (2021).  Under this standard, we construe

the claim "in accordance with the ordinary and customary meaning of such

claim as understood by one of ordinary skill in the art and the prosecution

history pertaining to the patent."  *Id.*

Petitioner does not identify any claim terms that require construction.

*See generally* Pet.  Patent Owner also does not identify any claim terms that

require construction, but argues that "Petitioner's attempts to map the prior

art to the challenged claims are at odds with their plain language."  PO Resp.

3.  Patent Owner provides one example: "certain dependent claims that

recite receiving heart rate from a 'plurality of users.'"  *Id.*  According to

Patent Owner, "Petitioner provides no explanation as to why its positions on

unpatentability comport with the plain and ordinary meaning of this term."

*Id.*

We address the "plurality of users" limitation *infra,* (*see* § II.F.2) and,

for purposes of this Decision, do not find it necessary to expressly construe

this claim term.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor

Co. Ltd.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe

terms 'that are in controversy, and only to the extent necessary to resolve the

controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200

F.3d 795, 803 (Fed. Cir. 1999))); *Wellman, Inc. v. Eastman Chem. Co.*, 642

F.3d 1355, 1361 (Fed. Cir. 2011) ("[C]laim terms need only be construed 'to

the extent necessary to resolve the controversy.'").  Nor do we find it

necessary to construe any other claim terms.  *Id.*

IPR2022-01560
Patent 9,420,956 B2

     D.    *Overview of the Asserted Prior Art*

       1.   <u>Shmueli</u>

Shmueli is an international application published on October 18, 2012. Ex. 1004, code (43). Petitioner asserts that Shmueli is prior art under 35 U.S.C. § 102(a)(1). Pet. 1. Shmueli, titled "Pulse Oximetry Measurement Triggering ECG Measurement," addresses "[s]olutions . . . for monitoring infrequent events of irregular ECG." Ex. 1004, 2.[12] According to Shmueli, "[t]he present invention preferably performs measurements of intermittent irregular heart-related events without requiring the fixed wiring of the ECG device to the patient." *Id.* at 8.

Shmueli discloses body-worn cardiac monitoring devices "equipped with two types of sensing devices: an oximetry ($SpO_2$) measuring unit and an ECG measuring unit." *Id.* at 9.[13] Shmueli's Figures 1A and 1B, reproduced below, exemplify one embodiment (annotations by Petitioner in red):

---

[12] Throughout this Decision, we refer to native pagination wherever it is available. For clarity with respect to citations to Shmueli, we understand the native pagination to be the numbers at the top of each page.

[13] As used by Shmueli, "the terms 'oxygen saturation in the blood', 'blood oxygen saturation', 'pulse oximeter', oximetry, $SpO_2$, and photoplethysmography have the same meaning and may be used interchangeably, except for those places where a difference between such terms is described." Ex. 1004, 7.

IPR2022-01560
Patent 9,420,956 B2



Pet. 8.  Figures 1A and 1B show two views of a wrist-mount heart monitoring device having three ECG electrodes 14 and a PPG sensor 13. Ex. 1004, 6, 9–10.  Figure 1A shows two of the ECG electrodes, 14/16, on the face of the device.  *Id.* at 9.  Figure 1B shows a third ECG electrode, 14/15, along with PPG sensor 13, on the back of the device.  *Id.*  Petitioner annotates each of Figures 1A and 1B with arrows identifying the ECG electrodes.  Pet. 8.  Petitioner has also annotated Figure 1B with an arrow identifying PPG sensor 13.  *Id.*  In connection with these devices, Shmueli discloses

> a method for triggering measurement of electrocardiogram (ECG) signal of a subject, the method including the steps of: continuously measuring SpO2 at least one of a wrist and a finger of the subject, detecting an irregular heart condition from the SpO2 measurement, notifying the subject to perform an ECG measurement, and initiating ECG measurement at least partially at the wrist.

Ex. 1004, 2; *see id.* at code (57).

Shmueli explains that "[d]eriving heart beat rate from oximetry, as well as other artifacts of the heart activity and blood flow, is . . . known in

IPR2022-01560
Patent 9,420,956 B2

the art," as are various body-worn oximetry devices. *Id.* at 8. Shmueli further explains that the use of oximetry in combination with ECG measurements is also known in the art. *Id.* Shmueli states, for example, that "US patent No. 7,598,878 (Goldreich) describes a wrist mounted device equipped with an ECG measuring device and a $SpO_2$ measuring device." *Id.* However, Shmueli notes "Goldreich does not teach interrelated measurements of ECG and $SpO_2$" and, thus, does not "enable a patient to perform ECG measurement as soon as an irregular heart activity develops and without requiring the ECG to be constantly wired to the patient." *Id.* According to Shmueli:

> The present invention resolves this problem by providing a combined oximetry and electrocardiogram measuring system and a method in which the oximetry measurement is performed continuously and/or repeatedly, and the ECG measurement is triggered upon detection of an intermittent irregular heart-related events . . . without requiring the fixed wiring of the ECG device to the patient.

*Id.* Consistent with this disclosure, Shmueli's claims:

> 1.    A method for triggering measurement of electrocardiogram (ECG) signal of a subject, the method comprising the steps of:
>     continuously measuring $SpO_2$ at least one of a wrist and a finger of said subject;
>     detecting an irregular heart condition from said $SpO_2$ measurement;
>     notifying said subject to perform an ECG measurement; and
>     initiating ECG measurement at least partially at said wrist.

*Id.* at 16.

IPR2022-01560
Patent 9,420,956 B2

Shmueli Figure 7 is reproduced below:



"Fig. 7 is a simplified flow chart of a software program preferably executed by the processor of the wrist-mounted heart monitoring device." *Id.* at 7; *see also id.* at 12–13 (further describing the steps of the software program illustrated in Figure 7).

2.    Almen

Almen is a U.S. patent issued on December 2, 2008.  Ex. 1005, code (45).  Petitioner contends that Almen is prior art under 35 U.S.C. § 102(a)(1).  Pet. 2.  Almen "relates generally to monitoring heart rate variability [HRV] using a wrist worn monitor."  Ex. 1005, 1:13–14.  Almen explains that "[h]eart rate variability refers to the variability of the time interval between heartbeats and may be mathematically defined as the one-sigma standard deviation of the heart rate about the mean heart rate value"

19

IPR2022-01560
Patent 9,420,956 B2

and that "[a] heart rate variability test is a reflection of a person's current health status." *Id.* at 1:18–22.

Almen discloses "a wrist worn or arm worn heart rate variability monitor that is capable of detecting certain cardiovascular conditions such as arrhythmia." *Id.* at 2:54–58. With Almen's device, a user can "choose to have an HRV test performed using an input button," causing "[a]n HRV test [to] be performed in as little as ten seconds." *Id.* at 4:59–62. The user will "be able to easily view information gathered by the internal device on [Almen's] device's display." *Id.* at 6:65–66. By using "HRV test data," the device can detect or assist in "diagnosing various heart maladies and/or conditions," including arrhythmias and atrial fibrillation. *Id.* at 7:26–32. By using "pattern recognition and pre-event milestone recognition based on the HRV test results," the device can also "alert the user" of an upcoming event or an event in progress. *Id.* at 7:54–59. Data from the device may be transferred to the user's physician or health care professional "so that they may take appropriate action or obtain information that will assist in the diagnosis of any condition that may exist." *Id.* at 8:3–7.

Almen discloses that via "pulse oximetry, an infra-red sensor may be used to obtain or measure the heart rate." *Id.* at 6:3–4; *see also id.* at 9:19–22 ("To pick up heartbeats, and thus measure the rate, it is contemplated that a variety and/or a plurality of sensors may be advantageously deployed, using optic, pressure, ultrasonic, and[] electrical means."), 10:29–31 ("Other embodiments may use an optical sensor to detect . . . heart rate variability."). Almen further discloses that its monitor can also detect heart rate via at least

IPR2022-01560
Patent 9,420,956 B2

one sensor that detects electrical signals generated by the heart, such as "electrocardiograph (ECG) signals." *Id.* at 8:62–9:1.

        3.   <u>Ong</u>

Ong is a U.S. patent publication published on September 11, 2014. Ex. 1006, code (43). Petitioner asserts that Ong is prior art under 35 U.S.C. § 102(a)(2). Pet. 2. Ong discloses "a system and method of determining a risk score for triage" to provide "an assessment of risk of a cardiac event for a patient." Ex. 1006, code (57). The system "includes an input device for measuring physiological data based vital signs parameter of the patient" such as "a twelve-lead electrocardiogram (ECG) device." *Id.* Ong explains that "[t]he development of scoring systems relies on the appropriate selection of variables or parameters with which prediction outcomes are associated." *Id.* ¶ 4. Thus, Ong provides a system that includes

> an ECG extraction module to extract at least one ECG parameter from the ECG; a heart rate variability (HRV) analysis module for determining a HRV analysis from the ECG, the HRV analysis including at least one HRV parameter; and an ensemble-based scoring system, including: a plurality of weighted classifiers for providing a risk score calculation, the plurality of weighted classifiers established based on past patient data in a database of accumulated past patient data; and an analysis module for receiving the first input parameter, the at least one HRV parameter, and the at least one ECG parameter which are communicated or transmitted to the ensemble-based scoring system, wherein the analysis module determines a risk score by comparing the first input parameter, the at least one HRV parameter, and the at least one ECG parameter to corresponding weighted classifiers.

*Id.* ¶ 6. The scoring system "utilizes a unique machine learning structure, with which reliable decisions can be expected." *Id.* ¶ 148.

IPR2022-01560
Patent 9,420,956 B2

    4.   <u>Asl</u>

Asl is a 2008 journal article titled "Support vector machine-based arrhythmia classification using reduced features of heart rate variability signal." Ex. 1007, 51. Petitioner contends that Asl is prior art under 35 U.S.C. § 102(a)(1). *Id.*; Pet. 2. Asl "presents an effective cardiac arrhythmia classification algorithm using the heart rate variability (HRV) signal." Ex. 1007, 51. Fifteen different features are extracted from an input HRV signal "by means of linear and nonlinear methods." *Id.* The algorithm can "identify six different and more frequently occurring types of cardiac arrhythmia." *Id.* at 52. The HRV data used in Asl's study "is generated from the ECG signals provided by the MIT-BIH Arrhythmia Database." *Id.* at 53.

    5.   <u>Osorio</u>

Osorio is a U.S. Patent Publication published on September 18, 2014. Ex. 1008, code (43). Petitioner asserts that Osorio is prior art under 35 U.S.C. § 102(a)(2). Pet. 2. Osorio "relates to medical device systems and methods capable of detecting a pathological body state of a patient, which may include epileptic seizures, and responding to the same." Ex. 1008 ¶ 2. Although broadly referencing "a pathological body state," Osorio repeatedly exemplifies such conditions in terms of detecting epileptic events. *See, e.g., id.* ¶ 37 (referencing values that may "be indicative of a certain pathological state (e.g., epileptic seizure)"), ¶ 46 ("In one embodiment, the pathological state is an epileptic event, e.g., an epileptic seizure."), ¶ 56 ("HRV range may be taken as an indication of an occurrence of a pathological state, e.g., an epileptic seizure."), ¶ 66 ("The dynamic relationship between non-

pathological HRVs and activity levels may be exploited to detect pathological states such as epileptic seizures . . . .").

Consistent with the broad disclosure and narrow exemplification in the body of its specification, Osorio's claim 1 is directed to "[a] method for detecting a pathological body state of a patient," whereas claim 7 limits the pathological state to an epileptic event. *Id.* at claim 1, claim 7; *compare id.* at claim 14, *with* claim 17 (similarly limiting a pathological state to an epileptic event).

According to Osorio, the disclosed methods, systems, and related devices, detect a pathological state of a patient by determining when a body data variability value, or "BDV," is outside of a "value range," and where the threshold levels of that range vary in response to the patient's physical activity (measured by, e.g., an accelerometer) or mental/emotional state. *See, e.g.*, *id.* at code (57), ¶¶ 3–8, 28, 33, 35. In this respect, Osorio states that "false negative and false positive detections of pathological events may be reduced by dynamically determining pathological or non-pathological ranges for particular body indices based on activity type and level or other variables (e.g., environmental conditions)." *Id.* ¶ 36.

IPR2022-01560
Patent 9,420,956 B2

Osorio's Figure 1 is reproduced below.



FIG. 1

Figure 1 shows a schematic representation of medical device system 100, including kinetic sensor(s) 212 and body signal sensor(s) 282 connected to medical device 200 by leads 211 and 281, respectively. *Id.* ¶ 33. "[A]ctivity sensor(s) 212 may each be configured to collect at least one signal from a patient relating to an activity level of the patient," and include, for example, an accelerometer, an inclinometer, a gyroscope, or an ergometer. *Id.* Figure 1 also shows a current body data variability (BDV) module 265, which "may comprise an $O_2$ saturation variability (O2SV) module 330

24

IPR2022-01560
Patent 9,420,956 B2

configured to determine O2SV from $O_2$ saturation data" and "an HRV module 310 configured to determine HRV from heart rate data." *Id.* ¶¶ 10, 53, Fig. 2C. Osorio discloses that "medical device system 100 may be fully or partially implanted, or alternatively may be fully external." *Id.* ¶ 33.

Figure 8, reproduced below, shows one embodiment of Osorio's monitoring method.



FIG. 8

Figure 8 shows that an activity level is determined at 810, and a non-pathological BDV range is determined at 820 based on the activity level. *Id.* ¶ 77. A current BDV is determined at 840 and compared to the non-pathological BDV range at 850. *Id.* ¶ 78. If the current BDV is outside the non-pathological range, then a pathological state is determined at 860 and a

IPR2022-01560
Patent 9,420,956 B2

further action, such as warning, treating, or logging the occurrence and/or severity of the pathological state, is taken at 870. *Id.*

According to Osorio, body indices that may be the subject of BDV monitoring include:

> heart rhythm variability, a heart rate variability (HRV), a respiratory rate variability (RRV), a blood pressure variability (BPV), a respiratory rhythm variability, respiratory sinus arrhythmia, end tidal $CO_2$ concentration variability, power variability at a certain neurological index frequency band (e.g., beta), an EKG morphology variability, a heart rate pattern variability, an electrodermal variability (e.g., a skin resistivity variability or a skin conductivity variability), a pupillary diameter variability, a blood oxygen saturation variability, a kinetic activity variability, a cognitive activity variability, arterial pH variability, venous pH variability, arterial-venous pH difference variability, a lactic acid concentration variability, a cortisol level variability, or a catecholamine level variability.

*Id.* ¶ 43; *see also id.* ¶ 42 (similar), ¶¶ 45–46 (monitoring heart rate for episodes of tachycardia and bradycardia).  "In one embodiment, the severity [of a pathological state] may be measured by a magnitude and/or duration of a pathological state such as a seizure, a type of autonomic change associated with the pathological state (e.g., changes in heart rate, breathing rate, brain electrical activity, the emergence of one or more cardiac arrhythmias, etc.)." *Id.* ¶ 71.

With respect to HRV, in particular, Osorio teaches: "By monitoring the patient's activity level, HR, and HRV, it is possible to determine when the patient's HRV falls outside the non-pathological ranges as the patient's activity levels change over time." *Id.* ¶ 66.  Osorio's Figure 4A, reproduced

IPR2022-01560
Patent 9,420,956 B2

below, shows heart rate variability as a function of activity level. *See id.*
¶ 58.



FIG. 4A

Figure 4A plots a patient's heart rate (HR) on the Y-axis and a patient's
activity level on the X-axis. *Id.* at Fig. 4A. Markers A1 though A4
represent increasing activity from a sleep state (A1) through vigorous
activity (A4). *Id.* Boundary lines 410 and 420, respectively, represent the
upper and lower limits of non-pathological heart rate, and include
representative ranges R1 through R4. *Id.* According to Osorio,

> the upper and lower bounds of the non-ictal[14] HR region
> increase as activity level increases (e.g., from a sleep state to a
> resting, awake state) and reach their highest values for
> strenuous exertion. In addition, the width of the non-
> pathological HR ranges narrows as activity levels and heart

---

[14] "Ictal" refers to the active, middle stage of a seizure and corresponds with
intense electrical brain activity. Ex. 3001 (accessed on April 10, 2023 at
https://epilepsyfoundation.org.au/understanding-epilepsy/seizures/seizure-
phases/).

IPR2022-01560
Patent 9,420,956 B2

> rates increase, which is consistent with the known reduction in
> HRV at high levels of exertion. When the patient is in a non-
> pathological state (e.g., when an epileptic patient is not having a
> seizure), for a particular activity level the patient's HRV should
> fall within a non-pathological HRV range associated with that
> activity level.

*Id.* ¶ 58.

Osorio further presents Figure 11 as "depict[ing] pathological and
non-pathological BDV (e.g., HRV) value ranges." *Id.* ¶¶ 23, 91. In that
illustration, Osorio shows that HRV values falling below 0.5 bpm and above
4 bpm are always pathological when activity level is low (e.g., resting or
walking), whereas intermediate HRV values (0.5–4 bpm) may be
pathological when considered in light of the patient's activity level. *Id.*
Osorio further notes that the boundaries between normal and pathological
may be adjusted based on an individual's physiology. "For example, in an
epilepsy patient also suffering from tachycardia, and having base resting
heart rate of 100-110 bpm, a decline in heart rate to 70 bpm may be
indicative of a seizure slowing down the heart rate, even though a heart rate
of 70 bpm is generally 'normal' across a typical population." *Id.* ¶ 45.

   E.   *Ground 1*

Petitioner asserts that claims 1, 4, 5, 7, and 9–13 are unpatentable as
obvious over the combination of Shmueli and Almen. Petitioner contends
that the combination of Shmueli and Almen discloses or renders obvious
each element of claims 1, 4, 5, 7, and 9–13 and sets forth an element-by-
element comparison of the asserted art to the challenged claims. Pet. 7–44.
According to Petitioner, Shmueli discloses a wrist-worn "heart-monitoring
device" that "performs 'oximetry measurement[s]' 'continuously and/or

IPR2022-01560
Patent 9,420,956 B2

repeatedly,' and 'trigger[s] an ECG measurement . . . upon detection of an intermittent irregular heart-related event.'" *Id*. at 13–14 (citing Ex. 1004, 10) (alterations in original). Petitioner contends that Shmueli's oximetry measurements include heart rate and that a POSA would have understood that HRV was "a well-known way to calculate heart rate measurements to monitor a user's heart health." *Id.* at 14 (citing Ex. 1004, 10; Ex. 1003 ¶ 71). Petitioner also relies on Almen as disclosing HRV as "a way to monitor an 'individual's current health status' and 'detect[] certain cardiovascular conditions such as an arrhythmia . . . and monitoring treatment of same.'" *Id.* (citing Ex. 1005, 2:11–14, 2:53–58) (alterations in original). Petitioner thus asserts:

> given Almen's explicit teaching that HRV can be used to detect irregular heart-related events (including arrhythmia), given that Shmueli already discloses monitoring heart rate, and given Shmueli's explicitly-stated goal of triggering ECG upon detection of an irregular heart-related event, a POSITA would have readily recognized that implementing monitoring HRV as a trigger for an ECG in Shmueli would have been beneficial to achieving the stated goals of Shmueli.

*Id.* at 14–15.

In addition, Petitioner points to Almen's teaching to use an alarm to prompt users to obtain "information that will assist in the diagnosis of any condition that may exist" when its "device identifies an abnormal cardio event or the onset of such an event." *Id.* at 15 (citing Ex. 1005, 7:65–8:7). Petitioner contends that the POSA would have readily understood that "taking an ECG at the onset of an abnormal cardio event as indicated by an abnormal HRV measurement would be one example of information that could be gathered to better assist diagnosis." *Id.* (citing Ex. 1003 ¶ 73 (Dr.

IPR2022-01560
Patent 9,420,956 B2

Chaitman's testimony to that effect, further explaining that the POSA would seek to take an ECG as close in time as possible to a detected abnormal heart event)).

Patent Owner contends that Ground 1 fails because: 1) Almen does not disclose the use of optical sensors, derivation of HRV, and detection of arrhythmia together, 2) Almen is directed to monitoring HRV as it relates to respiratory and sleep conditions, whereas Shmueli is directed to measurements taken during normal everyday activities, and 3) Almen's disclosure is unreliable because many of the conditions it lists as detectable cannot be detected using HRV. PO Resp. 6–13. In addition, Patent Owner argues that objective indicia supports that the challenged claims would not have been obvious. *Id.* at 13–36.

We conclude, after considering the arguments and evidence in this proceeding, that Petitioner has established sufficiently that the combination of Shmueli and Almen discloses or renders obvious each element of claims 1, 4, 5, 7, and 9–13. We address the contested matters below.

1.    Almen's Disclosure of Optical Sensors, HRV, and
       Detection of Arrhythmia

Patent Owner argues that the Petition selectively relies on separate disclosures in Almen to support its position, arguing:

> [T]o the extent Almen may disclose certain aspects of the combination, such as the use of "optical sensors" (which Petitioner maps to PPG sensors generally and equates to Shmueli's SpO2 sensor specifically), derivation of HRV, and detection of an arrhythmia, at no point does Almen disclose implementing these features together, let alone implementing them in a system that is comparable to Shmueli's.

30

IPR2022-01560
Patent 9,420,956 B2

PO Resp. 8 (citing Ex. 2001 ¶ 57); *see also* PO Sur-reply 4 ("Petitioner
. . . cherry-pick[s] disclosures from Almen to derive an alleged suggestion
to the POSA to obtain HRV from heart rate information obtained by a PPG
sensor for arrhythmia.").  According to Patent Owner, "the instances where
Almen mentions arrhythmia do not state that an optical sensor (or more
particularly a PPG sensor) could be used for such detection."  PO Resp. 9
(citing Ex. 1005, 2:54–85, 7:26–53).  And, Patent Owner asserts, "while
Almen discloses a number of different sensor types that might be used to
derive HRV and, separately, a laundry list of medical conditions that might
potentially be detected based on HRV, it never states that optical sensor-
based HRV data can be used to detect arrhythmia, let alone atrial
fibrillation."  *Id.* at 10 (citing Ex. 2001 ¶¶ 61–62).  We do not find these
arguments persuasive.

Petitioner contends that Almen provides motivation to monitor HRV
as a trigger for an ECG.  Pet. 14.  According to Petitioner, Almen supports
this motivation by disclosing "HRV . . . as a way to monitor an 'individual's
current health status' and 'detect[] certain cardiovascular conditions such as
arrhythmia . . . and monitor[] treatment of same" and by disclosing a device
that prompts a user to obtain information that will assist in diagnosis when it
identifies an abnormal cardio event as indicated by an abnormal HRV
measurement.  *Id.* at 14–15, 27 (second and third alterations in original).
The record supports this.

Almen expressly discloses using HRV to detect arrhythmia.  Ex.
1005, 2:53–58 ("Another object of the present invention is to provide a wrist
worn or arm worn heart rate variability monitor that is capable of detecting

IPR2022-01560
Patent 9,420,956 B2

certain cardiovascular conditions such as arrhythmia and the onset of myocardial infarction."), 7:26–53 ("Using HRV test data, the inventive device may be capable of detecting and/or assisting in diagnosing various heart maladies and/or conditions.  Exemplary conditions that may be detected or diagnosed comprise . . . Arrhythmias [and] . . . Atrial Fibrillation.").  And Almen expressly discloses that HRV can be detected using optical sensors.  *Id.* at 9:17–22 ("To properly calculate HRV, a medically accurate measure of instantaneous and average heart rate must be determined.  To pick up heartbeats, and thus measure the rate, it is contemplated that a variety and/or a plurality of sensors may be advantageously deployed, using optic, pressure, ultrasonic, and[] electrical means."), 10:28–30 ("Other embodiments may use an optical sensor to detect the heart beat and measure heart rate variability. . . . The optical sensor may measure optical variations in tissue characteristics due to subcutaneous blood flow that may correlate with heart rate.").  We find that the POSA would have understood from these disclosures that arrhythmia can be detected using an optical sensor.

Dr. Chaitman testifies that Shmueli's PPG sensor is an example of a known optical sensor that could be used to measure HRV.  Ex. 1003 ¶¶ 49–51 (describing Almen's disclosure of measuring HRV using optical sensors and then explaining, "[o]ne such optical sensor known in the art is an infra-red pulse oximetry sensor that, like the sensor disclosed in Shmueli, 'picks up the pulsatile flow of blood through local capillaries'").  We credit this testimony.

IPR2022-01560
Patent 9,420,956 B2

The evidence thus supports that the POSA would have understood that Shmueli's PPG sensor could have been used to measure HRV and that HRV could have been used to detect arrhythmia.  Considering this evidence together with Shmueli's teaching to continuously take oximetry measurements and then take an ECG "upon detection of an intermittent irregular heart-related event" (Ex. 1004, 8), we agree with Petitioner and Dr. Chaitman that it would have been obvious to use HRV measurements as a trigger for taking an ECG.  *See* Ex. 1003 ¶ 72 (testimony of Dr. Chaitman that "although a PPG can be easily measured, an ECG provides more precise diagnostic parameters of the electrical activity of the heart and enhances the diagnostic capability to capture certain cardiac conditions").

2.    Almen's disclosure of monitoring sleep patterns

Patent Owner contends that "[a]t its core, Almen is directed to monitoring sleep patterns and detecting conditions relating to sleep, such as sleep apnea."  PO Resp. 8.  Based on this characterization, Patent Owner argues that "Petitioner fails to show that a POSA would have sought to apply that teaching [i.e., Almen's disclosure of using an optical sensor to detect arrhythmia] to a system like Shmueli's, given the differing uses of Almen and Shmueli."  *Id.* at 12.  According to Patent Owner, "the particular implementations described by Almen involve circumstances where the user is at rest with minimal motion (thereby, achieving more accurate data for HRV calculations . . . )" whereas "Shmueli is concerned with measurements being made during normal, everyday activities of the user, with the goal of detecting intermittent and transient cardiac events."  *Id.* at 12–13.  Patent Owner argues that "Petitioner fails to grapple with these distinct uses and

IPR2022-01560
Patent 9,420,956 B2

thus fails to show why a POSA would have viewed deriving HRV from PPG data as a solution in a device like Shmueli's in view of Almen's distinct teachings." *Id.* at 13. We do not find this argument persuasive.

Shmueli and Almen are both directed to wrist-worn devices that monitor heart health, and both references have the same goal of detecting irregular heart conditions. Ex. 1004, 4 ("According to yet another aspect of the present invention there is provided a wrist-mounted physiological parameters measuring device including: an SpO2 measuring unit attached to a wrist of a subject . . . and a processor . . . where the processor is operative to detect an irregular heart condition from the SpO2 measurement"); Ex. 1005, 2:53–58 ("Another object of the present invention is to provide a wrist worn or arm worn heart rate variability monitor that is capable of detecting certain cardiovascular conditions such as arrhythmia and the onset of myocardial infarction and monitoring treatment of same."). Both disclose using optical sensors to monitor heart beat rate. Ex. 1004, 8 (teaching that "[d]eriving heart beat rate from oximetry" is "known in the art" and disclosing "a method in which the oximetry measurement is performed continuously and/or repeatedly, and [an] ECG measurement is triggered upon detection of an intermittent irregular heart-related event"); Ex. 1005, 9:17–22 ("To pick up heartbeats, and thus measure the rate, it is contemplated that a variety and/or a plurality of sensors may be advantageously deployed, using optic, pressure, ultrasonic, and[] electrical means."). We agree with Petitioner and Dr. Chaitman that Shmueli and Almen are sufficiently related that the POSA would have considered the teachings of Almen as applicable to Shmueli and, more specifically, sought

IPR2022-01560
Patent 9,420,956 B2

to apply HRV measurements derived from PPG data in Shmueli's device. *See* Ex. 1003 ¶¶ 68–80 (Dr. Chaitman's testimony explaining how and why the POSA would have applied Almen's HRV teachings in Shmueli's device).

We recognize that almost all of Almen's embodiments, and the focus of its disclosure, relate to monitoring during sleep. However, the Almen reference is not limited to these teachings. *In re Mills*, 470 F.2d 649, 651 (CCPA 1972) ("[A] reference is not limited to the disclosure of specific working examples."); *In re Chapman*, 357 F.2d 418, 424 (CCPA 1966) ("A reference can be used for all it realistically teaches, and is not limited to the disclosures in its specific illustrative examples."). For example, Almen discloses that its device "monitors an individual's heart rate variability while the user is either at rest or asleep ***or physically active*** and records the results for up to 24 hours." Ex. 1005, 8:33–36 (emphasis added); *see also id.* at 2:59–63 ("Another object of the present invention is to provide a wrist worn or arm worn heart rate variability monitor that is capable of ***recording heart rate and expressing cardio work load in relation to exercise*** and calorie expenditure through heart rate data.") (emphasis added). At least in these embodiments, Almen's users cannot be distinguished from Shmueli's users on the basis that they are at rest. For this reason, we are not persuaded by Patent Owner's argument that the POSA would not have sought to combine Shmueli and Almen because they have different applications.

Even if Almen's disclosure were somehow limited to sleep monitoring, it would still have been obvious to apply Almen's HRV teachings to Shmueli. As Dr. Chaitman explains, "incorporating Almen's

IPR2022-01560
Patent 9,420,956 B2

teachings regarding calculating HRV and using HRV for the detection of
cardiac disease would result in a device better capable of accomplishing the
joint goals of [Shmueli and Almen]."  Ex. 1003 ¶ 69; *see also id.* ¶¶ 75–80.
And Shmueli already gathers the data from which HRV is calculated.  Ex.
1005, 9:17–18 ("To properly calculate HRV, a medically accurate measure
of instantaneous and average heart rate must be determined."); Ex. 1004, 12
(disclosing that in Shmueli's device, a software program "derive[s] from the
$SpO_2$ measurement physiological parameters such as pulse rate, pulse
amplitude, pulse shape, rate of blood flow, etc."); *see also* Ex. 1004, 8
(disclosing that heart beat rate and "other artifacts of the heart activity and
blood flow" can be measured using oximetry").  As Dr. Chaitman credibly
testifies, given that Shmueli already discloses determining heart beat rate,
"all that would be required to implement Almen's teachings concerning
HRV in the Shmueli heart monitor would be additional software
implementing the algorithms and/or calculations taught by Almen."  Ex.
1003 ¶ 77.

Patent Owner points to the testimony of Dr. Chaitman that he would
expect HRV measurements in a group of people who were 20 years old to
have "less motion artifact" and therefore better "fidelity of the signal" than a
group of people with Parkinson's disease.  PO Resp. 9–10 (citing Ex. 2012,
27:21–28:22).  It is not clear to what extent the "motion artifact" in
Parkinson's patients would apply to the users of Shmueli's device, some of
whose day-to-day routine may involve periods of relative inactivity.  But,
even accepting the premise that movement consistent with day-to-day
activities diminishes the fidelity of HRV measurements, we do not draw

from Dr. Chaitman's Parkinson's testimony the conclusion that Patent Owner suggests—i.e., that the POSA would have sought to implement HRV only in sleeping patients. *Id*. at 12–13.  That HRV can be measured more accurately when users are still or sleeping does not mean that the POSA would not have taken HRV measurements under less optimal conditions, such as, during day-to-day activities. *See In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012) ("[J]ust because better alternatives exist in the prior art does not mean that an inferior combination is inapt for obviousness purposes.").  This is particularly true here because Shmueli already relies on heart beat rate and the proposed Shmueli/Almen device would use the HRV measurement as a trigger for a more accurate ECG measurement.

For these reasons, we are not persuaded by Patent Owner's argument that Petitioner fails to show that a POSA would have sought to apply Almen's teachings "to a system like Shmueli's, given the differing uses of Almen and Shmueli."  PO Resp. 12.

### 3.    Reliability of Almen's Disclosure

Almen discloses that "[u]sing HRV test data, [its] device may be capable of detecting and/or assisting in diagnosing various heart maladies and/or conditions."  Ex. 1005, 7:26–28.  Almen then provides a long list of different conditions that its device may detect or assist in diagnosing, including arrhythmia and atrial fibrillation. *Id.* at 7:28–53.  Patent Owner argues that the list includes "conditions that even Dr. Chaitman acknowledges would not be detectable using HRV."  PO Resp. 11.  As an example, Patent Owner points out that Almen's list includes "bundle branch block," a condition "defined based on the QRS duration, which can only be

IPR2022-01560
Patent 9,420,956 B2

obtained through an ECG." *Id.* In addition, Patent Owner cites the testimony of Dr. Efimov that "most of the cardiac conditions listed by Almen cannot be diagnosed based on HRV and/or PPG, but require[] more advanced alternative methods." Ex. 2001 ¶ 62 (internal citation omitted) (cited at PO Resp. 11–12). Patent Owner contends that the POSA would have viewed Almen's disclosure with skepticism and that "[t]his skepticism undermines Petitioner's claims that a POSA would have picked out a specific teaching from Almen to derive HRV for arrhythmia detection using a PPG sensor." PO Sur-reply 5. We do not find this argument persuasive.

Almen summarizes its invention as being a "wrist-worn or arm band worn heart rate variability monitor." Ex. 1005, 2:11–12. Almen's disclosure of HRV is, thus, not an isolated specific teaching that the POSA would need to pick out from within a larger disclosure; it is central to Almen's invention. We find that the POSA would have readily identified HRV monitoring from Almen's disclosure. The POSA would have also readily connected Almen's HRV monitoring device with the detection of arrhythmia because Almen identifies arrhythmia detection as an "object of the present invention." *Id.* at 2:54–58 (identifying arrhythmia detection as an object of the invention); *see also* 2:33–3:4 (identifying a relatively limited number of additional objects of the invention, including: detecting sleep apnea, detecting sudden infant death syndrome, communicating with internal devices, monitoring heart rate in relation to exercise, assisting in sleep avoidance, and assisting in timed rest).

We recognize the evidence that certain of the other conditions that Almen identifies its device as capable of detecting may not be detectable

IPR2022-01560
Patent 9,420,956 B2

using HRV.  Ex. 2001 ¶ 62 (Dr. Efimov's testimony identifying conditions listed in Almen but not detectable by HRV); Ex. 2012, 47:11–49:18 (Dr. Chaitman's testimony acknowledging that bundle branch block, which is listed in Almen, can only be obtained through ECG), 49:22–52:2 (Dr. Chaitman's testimony that Almen's disclosure of conditions that can be detected is "ambitious" and that detecting aortic aneurysm, for example, "would be a bit of a stretch").  Although the POSA may have looked upon Almen's "ambitious" disclosure that its device could diagnose certain conditions with some degree of skepticism, we are not persuaded that such skepticism would extend to Almen's disclosure of using HRV to detect arrhythmia for several reasons.

First, as discussed above, HRV is central to Almen's device and detecting arrhythmia is one of the objects of Almen's invention.  Ex. 1005, 2:11–12, 2:54–58.  We find that the POSA would not have been skeptical that Almen's device could achieve one of the objects of its invention.  *Cf., In re Sasse*, 629 F.2d 675, 681 (CCPA 1980) (holding that prior art patent was presumed to be enabled); *see also In re Antor Media Corp.*, 689 F.3d 1282, 1288 (Fed. Cir. 2012) (holding that presumption of enablement extends to printed publications).

Second, the evidence of record supports that by December of 2013—when the earliest application in the '956 patent's priority chain was filed (Ex. 1001, code (60))—heart rate variability was, in the words of Patent Owner's expert, "well-developed" (Ex. 1043, 1294:21–1298:7 (testimony of Dr. Efimov).  Petitioner's expert, Dr. Chaitman, testifies that HRV analysis is "an important tool in cardiology used to diagnose various types of

IPR2022-01560
Patent 9,420,956 B2

arrhythmias." Ex. 1003 ¶ 36 (citing Ex. 1028, a 2004 article entitled "Automatic arrhythmia detection based on time and time-frequency analysis of heart rate variability," disclosing an "automatic arrhythmia detection system, which is based on heart rate features only," and teaching that HRV analysis became "a critical tool in cardiology for the diagnosis of heart diseases"); *see also* Ex. 1039, Abstract (2006 article also cited by Dr. Chaitman, disclosing that "HR variation analysis . . . has become a popular noninvasive tool for assessing the activities of the autonomic nervous system"). Further, the evidence supports that it was known that HRV could be derived from either ECG or PPG data. Ex. 1003 ¶ 37 (testimony of Dr. Chaitman supported by citation to articles). Given this background knowledge regarding the state of the art, we do not find Patent Owner's position that the POSA would have been skeptical that Almen's wrist-worn HRV monitor could have been used to detect arrhythmia adequately supported.

Third, Almen's disclosure of a wrist-worn HRV monitor and of using its device to detect arrhythmia is consistent with the disclosure in Shmueli. As discussed above, Shmueli discloses a method where an "oximetry measurement is performed continuously and repeatedly, and [an] ECG measurement is triggered upon detection of an intermittent irregular heart-related event." Ex. 1004, 8. We agree with Petitioner and Dr. Chaitman that the POSA would have understood "intermittent irregular heart-related event" to include an arrhythmia. Pet. 9; Ex. 1003 ¶¶ 44–45 (Dr. Chaitman's well-supported testimony on this point). Shmueli's disclosure of using oximetry to detect arrhythmia lends credence to the notion that Almen's wrist-worn

40

IPR2022-01560
Patent 9,420,956 B2

HRV monitor could have achieved its stated goal of detecting arrhythmia. This is particularly true given the evidence that the POSA would have understood "oximetry measurements" to "include measurements of, for example, heart beat rate" and that the POSA "would have understood HRV to be a well-known way to calculate heart rate measurements to monitor a user's heart health." Pet. 14; Ex. 1003 ¶ 71 (Dr. Chaitman's credible testimony on this point); Ex. 1004, 8 (Shmueli's disclosure that "[d]eriving heart beat rate from oximetry, as well as other artifacts of the heart activity and blood flow, is also known in the art").

For these reasons, we find that although the POSA may have looked upon Almen's "ambitious" disclosure that its device could diagnose certain conditions with some degree of skepticism, such skepticism would not extend to Almen's disclosure of using HRV to detect arrhythmia.

4.    Objective indicia of non-obviousness

Patent Owner contends that objective indicia demonstrate the non-obviousness of the challenged claims. Much of Patent Owner's argument focuses on the findings of the International Trade Commission ("ITC") with respect to three related patents, U.S. Patent Nos. 9,572,499 ("the '499 patent"), 10,595,731 ("the '731 patent"), 10,638,941 ("the '941 patent") in *In the Matter of Certain Wearable Electronic Devices with ECG Functionality and Components Thereof*, Investigation No. 337-TA-1266.[15]

---

[15] The '499 and '731 patents are part of the same patent family as the challenged '956 patent. The '941 patent is not part of the same family, but involves similar subject matter. Ex. 1001, codes (21) and (63) ('956 patent); Ex. 1010, codes (21) and (63) ('499 patent); Ex. 1047, codes (21) and (63) ('941 patent); IPR2021-00971 Ex. 1001, code (63) ('731 patent).

IPR2022-01560
Patent 9,420,956 B2

Accordingly, we begin our analysis with a brief summary of the ITC
proceeding. We then consider the impact of the ITC's findings on this case.
Next, we consider Patent Owner's evidence of nexus and the evidence of
record in this case. Finally, we consider whether Petitioner had an
obligation to address secondary considerations in its Petition.

>    a)    *The ITC's findings with respect to objective indicia*
>          *of non-obviousness*

Before the ITC, Petitioner argued that the '449, '731, and '941 patents
would have been obvious over the combination of AMON,[16] Almen, and
Kotzin.[17]  Ex. 2003, 71–97, 115–126, 146–151.[18]

With respect to the '941 patent, in its Initial Determination, the
Administrative Law Judge (ALJ) found that Petitioner had established a
*prima facie* case of obviousness for claims 12, 13, 16, 18–20, 22, and 23.[19]
*Id.* at 71–92.  The ALJ then considered objective indicia of non-obviousness,
finding that Patent Owner had "shown that KBS [Patent Owner's
KardiaBand product] practices claims 12, 16, 20, 22 and 23 and is therefore
entitled to a presumption of nexus" but that "KBS does not practice claims
13 or 19, which involve HRV, so there is no presumption of nexus."  *Id.* at

---

[16] AMON is an article entitled *AMON: A Wearable Multiparameter Medical
Monitoring and Alert System* published in December 2004.  PO Resp. 15 n.2
(citing Ex. 2003, 60).
[17] Kotzin is an international patent application WO 2004/012033, published
in February 2004.  PO Resp. 15 n.3 (citing Ex. 2003, 60).
[18] Petitioner also argued that each these patents was invalid as directed to
patent ineligible subject matter.  Ex. 2003, 61–71, 113–115, 141–146.
[19] The ALJ found that Petitioner had not established a *prima facie* case with
respect to claim 21.  Ex. 2003, 93.

IPR2022-01560
Patent 9,420,956 B2

93–94.  After finding a nexus with KBS, the ALJ found that the evidence of failure by others and of long-felt need did "not weigh in favor of obviousness," but that Patent Owner offered "evidence of commercial success," "strong evidence of industry praise," and "probative evidence of copying."  *Id.* at 94–96.  Taken together, the ALJ found these objective indicia "sufficient to rebut the prima facie case," explaining that "[t]he nature and volume of industry praise is unusual, particularly the praise published in a respected medical journal, and although the evidence of copying is not especially impressive, some degree of commercial success is evident from the KBS sales data and the testimony of ALC's chief financial officer."  *Id.* at 97.

In the Commission's Final Decision, the Commission agreed that Petitioner had established a *prima facie* case of obviousness for the '941 patent.  With respect to objective indicia, the Commission found that Patent Owner's "evidence of commercial success regarding the '941 patent claims [was] weak" and the Commission gave it "little weight."  Ex. 2004, 44.  However, the Commission found that "the evidence of 'industry praise' and 'copying' together, even without commercial success, [was] sufficient to overcome the *prima facie* showing of obviousness."  *Id.*[20]  Accordingly, the Commission found all of the claims challenged in the ITC proceeding—

---

[20] Chairman Johanson did not agree, noting, "[g]iven the strength of these findings [relating to the *prima facie* case], Chairman Johanson would not find the evidence of obviousness outweighed by the cited evidence of nonobviousness."  Ex. 2004, 44 n.29.

IPR2022-01560
Patent 9,420,956 B2

including claims 12, 16, 20, 22, and 23, which Petitioner had shown to be *prima facie* obvious—to be non-obvious.

With respect to the '731 patent, the ALJ found that claims 1, 12, and 16 were obvious based on AMON alone, and concluded that "[b]ecause anticipation is 'the epitome of obviousness,' claims 1, 12, and 16 are invalid, without regard to secondary considerations of non-obviousness." Ex. 2003, 126 (internal citation omitted). For claim 8, the ALJ found that Petitioner established a *prima facie* case of obviousness and that Patent Owner had not shown a nexus, thus, "no secondary considerations weigh against that claim's obviousness." *Id.* at 126–127.[21] In the Commission's Final Decision, the Commission determined that the ALJ's Initial Decision "erred in failing to consider evidence of secondary considerations" for claims 1, 12, and 16. Ex. 2004, 47. The Commission then determined that the "secondary considerations of 'industry praise' and 'copying' are sufficient to overcome the *prima facie* showing of obviousness for claims 1, 12, and 16 of the '731 patent for the same reasons as discussed with respect to the '941 patent." *Id.*

Finally, with respect to the '499 patent, the ALJ found that Petitioner had established a *prima facie* case of obviousness for claim 16, but that "the secondary considerations here also outweigh the other *Graham* factors, such that claim 16 would not have been obvious" for "[e]ssentially the same reasons as discussed above for claims 12, 16, 20, 22, and 23 of the '941 patent." Ex. 2003, 151. In so finding, the ALJ found that "KBS embodies claim 16, so [Patent Owner] is entitled to a presumption of nexus." *Id.* The

---

[21] The ALJ also found that Petitioner had not established a *prima facie* case of obviousness for claims 3, 5, 9, 10 and 15. Ex. 2003, 126.

IPR2022-01560
Patent 9,420,956 B2

Commission's Final Decision did not address the obviousness of the challenged claims of the '499 patent, but found that they were directed to patent ineligible subject matter. Ex. 2004, 37–40 (finding that claims 16 and 17 were directed to patent ineligible subject matter), 40–47 (addressing the Initial Decision's obviousness findings without addressing findings for the '499 patent).

b)    *Impact of the ITC's finding on this proceeding*

Having briefly summarized the ITC's findings, we next consider the legal effect of those findings in this proceeding. Simply put, the ITC decision has no preclusive effect. *Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1569 (Fed. Cir. 1996) (explaining that "Congress did not intend decisions of the ITC on patent issues to have preclusive effect"); *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1019 (Fed. Cir. 1987) (holding that the Federal Circuit's "appellate treatment of decisions of the Commission does not estop fresh consideration by other tribunals"); *see also* Director Vidal's June 21, 2022 Memorandum regarding Interim Procedure for Discretionary Denials in AIA Post-grant Proceedings with Parallel District Court Litigation, 6, accessible at https://www.uspto.gov/sites/default/files/documents/interim_proc_discretion ary_denials_aia_parallel_district_court_litigation_memo_20220621_.pdf ("Unlike district courts, the ITC lacks authority to invalidate a patent and its invalidity rulings are not binding on either the Office or a district court"). Accordingly, we are free to attribute to the ITC decision whatever persuasive value we consider justified.

IPR2022-01560
Patent 9,420,956 B2

c)    *Nexus*

Patent Owner contends that we should find a nexus between the challenged claims and KBS as a sanction for what it alleges is Petitioner's discovery misconduct.  PO Resp. 32.  Patent Owner also contends that it is entitled to a presumption of nexus.  *Id.* at 18, 24 n. 6.  We address each of Patent Owner's nexus contentions in turn.

(i)    *Finding nexus as a sanction*

Patent Owner contends that we should find a nexus as a sanction for Petitioner's alleged discovery misconduct.  *Id.* at 32.  Specifically, Patent Owner asserts that it could not "directly compare the KBS . . . to the claims of the '956 patent" because "[t]he evidence necessary to make such a showing was in Petitioner's possession and . . . [d]espite representations that it would produce the requested confidential information, Petitioner ultimately refused to do so."  PO Sur-reply 20–21.[22]  Further elaborating, Patent Owner explains that "Petitioner initially agreed to produce the evidence required by AliveCor," but then "changed course with just three business days remaining before the deadline for AliveCor's response."  *Id.* at 20.  Patent Owner argues that Petitioner's alleged discovery misconduct "merits sanctions," asserting, "[a]t minimum, the Board should hold that nexus between AliveCor's KBS as used in conjunction with Apple Watch and the challenged claims of the '956 patent has been established."  PO

---

[22] Patent Owner explains that KBS is "comprised both of the KardiaBand, an accessory to the Apple Watch, and the Apple Watch itself" and, "[a]s such, confidential information relating to both parties would be needed to compare the claims to the KBS."  PO Sur-reply 19–20.

IPR2022-01560
Patent 9,420,956 B2

Resp. 32.  We decline to find nexus between KBS and the challenged claims as a sanction for Petitioner's alleged discovery misconduct for several reasons.

First, Patent Owner did not move to compel production of the documents that it contends were necessary to prove nexus before requesting sanctions.  Although we recognize Patent Owner's efforts to resolve its discovery dispute without Board intervention, by raising this issue for the first time in its Patent Owner Response, Patent Owner deprived us of the opportunity to resolve what appears to be a simple discovery dispute though means short of sanctions.

Second, we have reviewed the discovery correspondence that Patent Owner contends evidence "delay tactics" and "gamesmanship, including misrepresentation that it would produce the requested documents."  Ex. 2011 (cited at PO Resp. 31–32; PO Sur-reply 20).  Although we agree that Petitioner could have responded to Patent Owner's discovery requests with greater alacrity, and more clearly articulated the documents it intended to produce in response to such requests, we are not persuaded that Petitioner's conduct during discovery rose to the level of sanctionable misconduct.

The first and second reasons discussed above provide sufficient basis to deny Patent Owner's request for sanctions.  In addition, we note a third reason: on this record, Patent Owner has not established that it would be entitled to the information it requests in discovery.  In particular, we question whether Patent Owner could have obtained the information at issue by other means.  *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, IPR2012-00001, Paper 26 at 6 (PTAB Mar. 5, 2013) (production by another of

IPR2022-01560
Patent 9,420,956 B2

"[i]nformation a party can reasonably figure out or assemble without a
discovery request would not be in the interest of justice."); *see, e.g.,
Dynamic Air Inc. v. M-I Drilling Fluids UK Ltd*., IPR2016-00260, Paper 39
(PTAB Nov. 30, 2016) (denying petitioner's request for additional
documents and deposition partly because petitioner did not show that it
could not obtain information about the state of the art and properties of drill
cuttings by other means).

Patent Owner asserts that "confidential information relating to both
parties would be needed to compare the claims to the KBS, including, for
example, functionality performed by the processor contained in the Apple
Watch." PO Sur-reply 20. But Petitioner asserts that Patent Owner could
have itself produced the information it contends is missing. Pet. Reply 24;
*see also* Ex. 2011, 1 (discovery correspondence where Petitioner asserted "it
appears you are requesting charts submitted in the ITC by AliveCor, not
Apple, regarding alleged domestic industry of the Kardiaband—an AliveCor
product"), 2 (discovery correspondence where Petitioner asserted "we're
unclear on why Apple would need to produce evidence of AliveCor's
KardiaBand system"). We struggle to understand how Patent Owner could
have sold KardiaBand, an accessory for Patent Owner's KBS product,
without maintaining any evidence of how KardiaBand worked in that
product. It may be, as Petitioner suggests, that Patent Owner "wanted the
ITC-produced versions of these documents as opposed to providing them
itself." Pet. Reply 24.[23] It may also be that Patent Owner is correct and

---

[23] Petitioner asserts that Patent Owner's motive for relying on the ITC
documents was to avoid "an independent determination from this Board as

IPR2022-01560
Patent 9,420,956 B2

Petitioner's confidential information is necessary to show how KBS works. Regardless, for purposes of imposing sanctions, the record is not sufficiently clear that Patent Owner would have been entitled to the documents it contends should have been produced.

For the reasons discussed above, we decline to find nexus between KBS and the challenged claims as a sanction for what Patent Owner contends is discovery misconduct by Petitioner.

    *(i)  Finding nexus based on the ITC's findings*

"In order to accord substantial weight to secondary considerations in an obviousness analysis, 'the evidence of secondary considerations must have a 'nexus' to the claims, *i.e.*, there must be 'a legally and factually sufficient connection' between the evidence and the patented invention.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Henny Penny Corp. v. Frymaster LLC,* 938 F.3d 1324, 1332 (Fed. Cir. 2019)).  The patentee bears the burden of showing nexus.  *Id.*  A patent owner is entitled to a presumption of nexus where it shows that the evidence supporting secondary considerations "is tied to a specific product and the product '*is* the invention disclosed and claimed'" or, put another way, the "product 'embodies the claimed features, and is coextensive with them.'" *Id.*  "A patentee may establish nexus absent the presumption by showing that the objective indicia are the 'direct result of the unique characteristics of the

_____

to the secondary consideration evidence."  Pet. Reply 24.  We do not impute such a motive and note that Patent Owner could just as plausibly have sought to make it easier for the Board to evaluate and weigh the ITC's findings.

IPR2022-01560
Patent 9,420,956 B2

claimed invention,' rather than a feature that was 'known in the prior art.'"
*Campbell Soup Co. v. Gamon Plus, Inc.,* 10 F.4th 1268, 1277 (Fed. Cir. 2021) (citation omitted).

Here, Patent Owner contends that it is entitled to a presumption of nexus.[24] More specifically, Patent Owner asserts that it is entitled to a presumption of nexus because the challenged claims are directed to the same subject matter as the claims of the '499 patent and because the ITC found a nexus between those claims and KBS. PO Resp., 24 ("[G]iven the shared subject matter of the challenged claims of the '956 patent and the claims of the '499 patent, a presumption of nexus applies to the claims of the '956 patent because the KBS practices these claims for the same reasons it practices the asserted claims of the '499 patent."). Patent Owner also asserts that it is entitled to a presumption of nexus based on Petitioner's admission that the claims if the '499 and '956 patents are substantively similar. *Id.* at 18 ("A presumption of nexus applies to the challenged claims of the '956 patent because, as Petitioner admits, the claims recite 'substantively identical' limitations as those recited by the '499 patent.").

Petitioner argues that Patent Owner "makes no attempt to actually prove nexus in this proceeding, instead relying on purported findings by the ITC with respect to nexus in a ***different*** proceeding involving ***different*** patents." Pet. Reply 15. Petitioner asserts that we should "reject [Patent Owner's] nexus-by-proxy attempts because [Patent Owner] failed to perform

---

[24] Patent Owner does not attempt to show that the objective indicia are a "direct result of the unique characteristics of the claimed invention." *See* PO Resp. 18–25 (discussing nexus without making this argument).

IPR2022-01560
Patent 9,420,956 B2

any actual analysis." *Id.* at 15–16.  According to Petitioner, Patent Owner "attempts to shirk its burden by piggy-backing on a supposed finding of nexus by the ITC as to certain claims of patents not involved here, and it would have this Board also defer to the ITC, and more, to reach the same conclusion on a different patent." *Id.* at 15.  We agree with Petitioner.

Patent Owner discusses the similarities between the claims of the '499 patent and the claims of the '956 patent at length.  PO Resp. 19–24.  But regardless of how similar the claims may be, similarity of the '956 and '499 patent claims only matters if we extend the findings of the ITC with respect to the '499 patent to this proceeding.  Petitioner's admission that "the claims of the '956 Patent recite many limitations substantively identical to claims of . . . the '499 patent" (Pet. 5) does not change this because Patent Owner's argument still ultimately relies on extending the ITC's findings to our proceeding.[25]  Thus, Patent Owner's argument for nexus requires us to defer to the ITC, asking us to find that there is a nexus because the ITC found a nexus for a different patent.

Although we do not defer to the ITC, we do consider whether the ITC's findings have persuasive value in this proceeding.  Our consideration of the persuasive value of the ITC's findings is, however, hindered by the fact that we do not have access to the same evidence as was before the ITC. Tr. 42:9–11 ("[Board]: Do we have all the evidence before us that was before the ITC?  [Patent Owner's Counsel]: No you don't.").  In particular,

---

[25] Petitioner did not concede that the claims of the '499 and '956 patents are the same, only that "many of the limitations" of the claims are the same. Pet. 5.

IPR2022-01560
Patent 9,420,956 B2

we do not have access to the information the ITC considered when it compared the claims of the '499 patent to KBS. Nonetheless, we consider the persuasive value of the ITC's findings in view of the record before us.

We begin by considering whether the ITC's finding supports that KBS embodies claims 1 and 12 of the challenged patent. We conclude that the ITC's findings are inconclusive at least with respect to the requirement of claims 1 and 12 for "determining an irregular heart rate variability." Ex. 1001, 25:46–58, 26:25–41. On the one hand, the ITC's Initial Determination found that "KBS embodies claims 16" of the '499 patent. Ex. 2003, 151. This supports that KBS determines HRV because claim 16 depends from claim 11, which includes claim language requiring a computer processor to "determine a heart rate variability." *Id.* at 129–130. On the other hand, the ITC found that KBS practiced only those claims of the '941 patent that do not require determining HRV. *Id.* at 93–94 ("[Patent Owner] has shown that KBS practices claims 12, 16, 20, 22, and 23 [of the '941 patent], and it is therefore entitled to a presumption of nexus . . . [b]ut KBS does not practice claims 13 or 19, which involve HRV, so there is no presumption of nexus."). This suggests that KBS does not, in fact, practice HRV.

Patent Owner asks us to disregard the ITC's findings with respect to claims 13 and 19 of the '941 patent because they were "not asserted as part of [Patent Owner's] domestic industry showing for the KBS, and thus, no argument was advanced that KBS practices those claims." PO Sur-reply 18. But we are not persuaded that the proof Patent Owner chose to offer in connection with domestic industry provides reason to discount the ITC's statement, made in connection with secondary considerations, that "KBS

IPR2022-01560
Patent 9,420,956 B2

does not practice claims 13 or 19, which involve HRV." Ex. 2003, 93–94.[26]
On the record before us, it is not clear whether the ITC found that KBS
determines HRV.  Thus, even if we were to adopt the ITC's finding as our
own, we cannot determine from the ITC's findings whether KBS embodies
the challenged claims, all of which require determining HRV.  Because
Patent Owner bears the burden of proof on this issue, this is fatal to its case.
*Fox Factory*, 944 F.3d at 1373.

In addition to the absence of evidence that KBS embodies the
challenged claims, the record lacks evidence that KBS is coextensive with
the claims.  We agree with Petitioner that Patent Owner "has not attempted
to prove that KBS is 'coextensive' with the claims."  Pet. Reply 20.  For this
additional reason, Patent Owner's comparison of the challenged claims to
claim 11 of the '499 patent does not establish a presumption of nexus.

For the reasons discussed above, we find that Patent Owner has not
carried its burden to establish a nexus between KBS and the challenged
claims.

---

[26] For similar reasons, we are not persuaded by Petitioner's argument that we
should disregard the ITC's findings of nexus for claim 11 of the '499 patent
because Petitioner "did not even challenge nexus with respect to the '499
patent," instead relying upon arguments that it didn't infringe and that its
claims were invalid as directed to patent ineligible subject matter.  Pet.
Reply 19.  In this regard, we note that we are considering the ITC's findings
for their persuasive value, not as creating a potential estoppel.

IPR2022-01560
Patent 9,420,956 B2

> *d)*    *Evidence of record in this case*

Patent Owner contends that objective indicia of industry praise and copying support the non-obviousness of the challenged claims.[27]  Although we have already determined that Patent Owner has not established a nexus, we nonetheless consider Patent Owner's evidence of industry praise and copying for completeness.

---

[27] It is not clear whether Patent Owner relies on commercial success as supporting non-obviousness.  In summarizing the ITC proceeding, Patent Owner asserts that the ITC "found evidence of commercial success."  PO Resp. 17.  But Patent Owner does not discuss commercial success in the portion of its Response addressing the evidence of record in this proceeding. *Id.* at 33–36.  To the extent Patent Owner relies on commercial success it is not persuasive at least because the ITC's Final Determination found that Patent Owner's "evidence of commercial success regarding the '941 patent claims [was] weak and [gave] it little weight."  Ex. 2004, 44; *see also* Ex. 2003 94–95 (finding that "KBS' profitability is not clear," that Patent Owner "principally relies on funding it received, as opposed to revenues or profits," and that "there is no clear nexus between the funding and KBS"). Further, the evidence cited in Patent Owner's Response (Exhibits 2009, 2010, 2017, and 2025) lacks context.  For example, Exhibits 2009 and 2010 provide only revenue and units sold, with no testimony explaining the data, no evidence of market share, and no evidence that KBS is coextensive with the claims of the '956 patent.  *In re Applied Materials Inc.*, 692 F.3d 1289, 1300 (Fed. Cir. 2012) ("the number of units sold without evidence of the market share is only weak evidence of commercial success"); *In re Youngblood*, 215 F.3d 1342, *11 (Fed. Cir. 1999) ("Because Youngblood provided no market share context, his evidence of commercial success is entitled to little weight"); *Chemours Co. FC v. Daikin Indus., Ltd.*, 4 F.4th 1370, 1378 (Fed. Cir. 2021) (noting that sales data in a relevant market may be sufficient without a showing of market share, provided there is a showing that the successful product is the invention claimed).

IPR2022-01560
Patent 9,420,956 B2

*(i)    Copying*

Copying may be considered as objective indicia of non-obviousness. *Iron Grip Barbell Co. v. USA Sports, Inc*., 392 F.3d 1317, 1325 (Fed. Cir. 2004). "Copying requires duplication of features of the patentee's work based on access to that work, lest all infringement be mistakenly treated as copying." *Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337, 1347–48 (Fed. Cir. 2013). Evidence of copying may include access and similarity to a patented product. *Iron Grip Barbell*, 392 F.3d at 1325. Copying may also be demonstrated by showing "access to an issued patent coupled with circumstantial evidence regarding changes to a competitor's design." *Liqwd, Inc. v. L'Oreal USA, Inc*., 941 F.3d 1133, 1138 (Fed. Cir. 2019) (emphasis omitted). "[A]ccess to published articles about a patented method" is also relevant to the analysis of copying as objective indicia of non-obviousness. *Id.* (emphasis omitted)

Patent Owner cites several documents as support that Apple's and AliveCor's products were similar. Ex. 2022 (excerpt from presentation comparing ████████████████████████████████████); Ex. 2023 (excerpt from document identifying ███████████████ ████████████████████████████ but noting that there the FDA has determined that ███████████████████████████████ ███████); Ex. 2024 (510K submission stating ███████████████ ███████████████████████████████████████████ ███████████████████████████). None of these documents, or any other document identified by Patent Owner, provides a detailed enough comparison of any Apple product to any AliveCor product to support that

IPR2022-01560
Patent 9,420,956 B2

one product is sufficiently similar to support an allegation of copying. Nor do any documents identified by Patent Owner provide evidence comparing an Apple product to the challenged claims. Exhibits 2023 and 2024 include general statements supporting that ████████████████████ ████████ which we assume to be the allegedly copied product. And Exhibit 2022 identifies ██████████████████████████ ██████████████████████████████████████ ████████ But general statements that products are "similar" and that they have common features are insufficient to establish copying, particular where the only apparent relation the common features share with the challenged claims is that the challenged claims include language about sensing or recording an electrocardiogram. *Institut Pasteur*, 738 F.3d at 1347–48 ("Copying requires duplication of features of the patentee's work.").

Patent Owner's other evidence of copying is similarly unpersuasive. Patent Owner contends that "Apple had ████████████████████ ████████████████████████████████████████ ████████████ PO Resp. 34 (citing Ex. 2017[28]; Ex. 2022). But the evidence Patent Owner cites as support provides insufficient context to support the full scope of Patent Owner's assertion. The deposition cited by Patent Owner supports that ██████████████████████████ ████████████████████████████████████ ████████████████████████████ Ex. 2018, 46:15–

---

[28] Patent Owner's Response cites Exhibit 2017. This appears to be a typographical error as Exhibit 2018 more closely aligns with the subject matter for which it was cited.

IPR2022-01560

Patent 9,420,956 B2

47:6.  Indeed, the deposition testimony is that the

█████████████████████████

███████████████████████████████ *Id.* at

47:13–22.  Patent Owner also cites Exhibit 2022 as supporting that

███████████████████████████████████

█████████████  PO Resp. 34.  This exhibit is comprised of two pages

that appear to be excerpted from a larger document.  One of the pages is

titled ████████████████████████████████

███████████████████████████████████

█████████  Ex. 2022, 1.  Absent further context or explanation as to

what this document is, it is not clear how it supports that █████████

███████████████████████████

Patent Owner argues that an Apple presentation ████████████

████████████████████████████ and, in

discussing certain risks associated with its device, identified proposed

solutions to mitigate those risks as ███████████████  PO Resp. 34–35

(citing Ex. 2022).  This is true.  But the proposed solutions that were

███████████████████████████████████

██████████████  Ex. 2022, 2.  This solution bears no apparent

relation to the challenged claims, none of which require ███████

████████

Patent Owner cites what it characterizes as "an email exchange

between ██████████████████████████████████

███████████████████████████████ as

supporting copying.  PO Resp. 34.  We do not agree.  The full

████████████ quote clarifies that ████████████████████

IPR2022-01560
Patent 9,420,956 B2

█████████ Ex. 2020 (████████████████████████
███████████████████████). This begs the questions: ██
██████████████████████████████████████████████
████████████████████████████ The record
evidence provides no answers to these questions. Absent such evidence, the
█████████████ email could just as easily support that there was no need to
copy AliveCor's technology (████████████████) as it could support
copying.

Finally, Patent Owner argues that "in multiple presentations and in
internal emails, Apple consistently looked to AliveCor's system during the
development of its own product" including in a document that "identified
AliveCor's technology as ███████████████ and in an email describing
████████████████████████████████████████████████

PO Resp. 34 (citing Exs. 2019, 2021). The document identifying an
AliveCor product as ████████████████ is a single page that appears to
have been excerpted from a larger document. It is titled ████████████
████████████████████████████████████████ in addition
to the AliveCor product. Patent Owner does not direct us to any evidence
providing context for this document, but based on our review, it appears
more likely that an AliveCor product was listed ████████████████████
███████████████████████████████████████████████
██████ As for the document mentioning ███████████████████
████████████████ we lack sufficient context to give this statement weight.
The statement was made in an email discussing ██████████████████████
████████████████████████████████████████████████

IPR2022-01560
Patent 9,420,956 B2

█████████ Ex. 2021.  Although one Apple employee considered t█████
████████████████████████████████████████████████████████████████

█████████████████████████████████ *Id.* (█████████████████

██████████████████████████████████████████████████████████

██████████████ ).  The record before us lacks information about what actions were taken in response to the request reflected in Exhibit 2021. Moreover, even if Apple ████████████████████████████████████████ ████████████████████████████ bears little apparent relation to the challenged claims.  Put another way, ████████████████████████ ████████████████ is not the same as copying the product itself.  In sum, the evidence Patent Owner cites as supporting that Apple "looked to AliveCor's system during development" does little to support an inference of copying.

### (ii)    Industry Praise

For industry praise, Patent Owner contends that "industry reviews characterized the KBS as 'an impressive feat of engineering' and a 'great product' that made the Apple Watch 'more useful.'"  PO Resp. 33 (citing Ex. 2005, 1, 4; Ex. 2006, 2).  Patent Owner also points out that KBS was "the first Apple Watch accessory to get FDA clearance as an ECG band accessory" and that it was the subject of a study that found that KBS's algorithm for atrial fibrillation detection could accurately differentiate between atrial fibrillation and sinus rhythm.  *Id.* (citing Ex. 2007, 1; Ex. 2008, Abstract).  According to Patent Owner, the ITC found this to be "strong evidence of industry praise."  *Id.* at 33–34 (citing Ex. 2003, 94; Ex. 2004, 43–44).

IPR2022-01560
Patent 9,420,956 B2

The "impressive feat of engineering" statement does not support that the claims of the '956 patent were nonobvious because the statement is directed to an element of KBS already known in the art—the sensor. Ex. 2005, 2 ("The KardiaBand sensor module is an impressive feat of engineering."); Ex. 1001, 7:1–5 (Specification of '956 patent, teaching that "[t]he wrist-worn biometric sensor 105 may comprise an activity monitor such as those available from Fitbit Inc. of San Francisco, Calif. or a Nike FuelBand available from Nike, Inc. of Oregon"); *see S. Alabama Med. Sci. Found. v. Gnosis S.P.A.*, 808 F.3d 823, 827 (Fed. Cir. 2015) (affirming a finding of no nexus where the patent owner "failed to connect the evidence of industry praise to the novel elements of the claims," given that "the praise was particularly directed to . . . an element already known in the prior art").

The remaining statements identified by Patent Owner as industry praise are directed generally to KBS. If Patent Owner had established a nexus between KBS and the challenged claims, we would give this evidence some weight. For example, we would give weight to the review stating that KBS is a "great product that makes another Apple device more useful" (Ex. 2005, 4) and to the statement that one doctor "found the Kardia device to be immensely helpful in the management of [their] patients before and after cardioversions" (Ex. 2006, 2). We address the impact giving weight to Patent Owner's evidence of industry praise would have *infra* (p. 61 n.29 and p. 71 n.31).

IPR2022-01560
Patent 9,420,956 B2

> e)    *Petitioner's obligation to address secondary considerations in the Petition*

Patent Owner argues that Petitioner knew about the ITC's decision before it filed the Petition but nonetheless did not address secondary considerations or otherwise address the ITC's decision.  PO Resp. 25–28. According to Patent Owner, the Petitioner failed to carry its burden to address all known patentability arguments.  *Id.* at 26.  Patent Owner thus asserts "[b]ecause the [P]etition failed to address the ITC's findings in the context of the grounds of challenge, the petition fails to satisfy the requirements of a *Graham* analysis, and therefore the Board should find that Petitioner has failed to meet its burden in establishing the obviousness of the challenged claims."  *Id.*

We do not find this argument persuasive because we do not find Patent Owner's evidence of secondary considerations persuasive of the non-obviousness of the challenged claims.  Patent Owner had the opportunity to fully develop its argument regarding secondary considerations during trial and, for the reasons discussed herein, we do not find Patent Owner's arguments persuasive.  We do not fault Petitioner for omitting discussion of secondary considerations in its Petition where the evidence of secondary considerations set forth on the full record is not persuasive of non-obviousness in the first place.  This is particularly true where, as here, Petitioner provides a reasonable basis for believing that the allegedly known evidence of secondary considerations did not apply to the challenged patent. Pet. Reply 25 ("[Petitioner] reasonably believed (and continues to believe) that none of the evidence cited by [Patent Owner] is relevant to the

IPR2022-01560
Patent 9,420,956 B2

Challenged Claims—which all recite a feature the ITC found not practiced by the KBS—namely, HRV.").

5.     Conclusion as to Ground 1

For the reasons set forth above, we find that Petitioner has shown by a preponderance of the evidence that the combination of Shmueli and Almen discloses or renders obvious the limitations recited in the challenged claims. We also find that Petitioner has shown by a preponderance of the evidence that one of ordinary skill in the art would have been motivated to combine the cited references with a reasonable expectation of success in arriving at the challenged claims. And we are not persuaded that, on the record before us, objective indicia weigh in favor of nonobviousness for the reasons discussed (*supra* § II.6), including that Patent Owner has not established nexus.[29] Having reviewed the argument and evidence of record, we find that Petitioner has shown by a preponderance of the evidence that claims 1, 4, 5, 7, and 9–13 are unpatentable as obvious in view of Shmueli and Almen.

*F.     Ground 2*

Ground 2 asserts that dependent claims 2, 3, 6, 8, and 14 would have been obvious over the combination of Shmueli, Almen, and Ong. More specifically, Petitioner contends that the POSA would have combined the

---

[29] Considering the strong evidence that the prior art teaches or suggests the claimed methods together with the evidence of industry praise, we find that even if Patent Owner had established a nexus, the challenged claims would still have been obvious to a person of ordinary skill in the art. *See Leapfrog Enterprises, Inc. v. Fisher-Price, Inc*., 485 F.3d 1157, 1162 (Fed. Cir. 2007) ("given the strength of the prima facie obviousness showing, the evidence on secondary considerations was inadequate to overcome a final conclusion" of obviousness).

teachings of Shmueli and Almen, as discussed in connection with Ground 1, to produce "a device that monitors HRV and triggers an ECG based on a detected HRV irregularity."  Pet. 46.  Petitioner contends that the POSA would have "further improved the proposed combination by implementing a scoring system as disclosed by Ong."  *Id.* (citing Ex. 1003 ¶ 131).

According to Petitioner, Ong discloses a "scoring method to more accurately determine a risk score related to cardiac diseases and events."  *Id.* at 45 (citing Ex. 1006 ¶¶ 5–6; Ex. 1003 ¶ 54).  Ong discloses a list of parameters that should be included in calculating the heart health score, including "at least one HRV parameter" and "at least one ECG parameter."  Ex. 1006 ¶ 6.  The scoring system uses an "ensemble-based scoring system, including: a plurality of weighted classifiers for providing a risk score calculation . . . based on past patient data in a database of accumulated past patient data."  *Id.*  Ong discloses that its "system can provide a prompt insight suitable for use in a hospital emergency department, ambulance, clinic, ward, intensive care unit (ICU) or home."  *Id.* ¶ 27.

Petitioner contends that the POSA would have "improved the proposed [Shmueli/Almen] combination by implementing a scoring system as disclosed by Ong in order to better inform patients regarding potential heart-related conditions and to provide the user with an easy-to-understand score to monitor his or her risks associated with heart conditions."  Pet. 46.  Supported by the testimony of Dr. Chaitman (Ex. 1003 ¶ 133), Petitioner asserts that the POSA would have recognized that Ong's scoring system would allow early stratification of risk and provide users "better information to evaluate their own health and to decide, for example, whether to consult a

IPR2022-01560
Patent 9,420,956 B2

doctor or whether to seek potentially-scarce emergency treatment at a hospital" (Pet. 47). And, Petitioner contends, the POSA "would have recognized that Ong's teaching of using multiple data inputs (notably ECG and HRV) as compared to a dataset of patients (analyzed with machine learning) would allow the device to provide the user with better, more accurate information." *Id.* at 48. Further, Petitioner points out that "the Shmueli-Almen combination already contemplates such a scoring system" because Almen discloses displaying data resulting from an HRV test on numerical, letter, or color-based scales "to indicate the quality of the user's HRV." *Id.* (citing Ex. 1005, 17:41–45).

Petitioner contends that "[i]mplementing Ong's scoring system in the Shmueli-Almen device would not have been difficult" because "doing so would merely involve implementing a method known to improve risk assessment in one context in a similar context." *Id.* at 49. According to Petitioner, "the Shmueli-Almen device has sensors for measuring both HRV and ECG" and "[t]hese are the same sensors Ong discloses would be used to gather the data for its scoring system." *Id.* (citing Ex. 1006 ¶ 6). Moreover, Petitioner asserts "these types of measurements were well known in the art" and thus, the POSA "would have to expend little, if any, effort modifying the Shmueli-Almen device in order to gather the data for a scoring system like that disclosed by Ong." *Id.* at 49–50. Indeed, according to Petitioner, Shmueli already discloses machine learning by teaching that "after an ECG was measured, 'the software program proceeds to element 50 to search for correlations between the SpO2 signal and the ECG signal to produce new detection parameters, or modify existing detection parameters, so as to

IPR2022-01560
Patent 9,420,956 B2

enhance the detection algorithms of the irregular heart conditions.'" *Id*. at 51 (citing Ex. 1004, 14). Petitioner contends that this disclosure refers to the use of machine learning, which adapts algorithms "based on a set of observed data." *Id*. (citing Ex. 1026, 538; Ex. 1003 ¶ 139; Ex. 1027, Abstract, 892; Ex. 1007, 52).

We agree with Petitioner that the combination of Shmueli, Almen, and Ong renders claims 2, 3, 6, 8, and 14 obvious. We address the contested matters below.

> 1.    <u>Arguments with respect to claims 2, 3, 6, and 8</u>

Claim 2 depends from claim 1 and recites that the method further comprises "generating a Heart Health Score based on said determined HRV value and on[e] or more of said sensed electrocardiogram, a determined presence of an arrhythmia, a number of premature beats, a frequency of said premature beats, and a Heart Rate Turbulence (HRT) value." Ex. 1001, 25:59–64. As discussed above, Petitioner contends that the additional limitations of claim 2 are rendered obvious by the combination of Shmueli, Almen, and Ong.

Patent Owner argues that the Petition "relied solely on Ong as allegedly disclosing the limitations of claim 2" and that "Ong generates its risk score based on an HRV derived from an ECG, making any generated risk score ***not*** based on the HRV value that was determined according to the [P]etition's mapping of Shmueli and Almen to claim 1, *i.e.,* the HRV value derived from Shmueli's ***PPG*** sensor." PO Sur-reply 9; *see also* PO Resp. 38 (arguing that "Ong's risk score, which is based on an HRV value determined through the sensed ECG, fails to meet the limitations of the claim"). Put

IPR2022-01560
Patent 9,420,956 B2

another way, Patent Owner argues that the Petitioner's mapping of how the prior art corresponds to claim 1 (which posits that HRV is measured by Shmueli's PPG) does not align with its mapping of how the art corresponds to claim 2 (which, according to Patent Owner, relies on HRV measured by Ong's ECG rather than the HRV measured by Shmueli's PPG).  We do not find this argument persuasive because we understand Petitioner's proposed combination to include HRV measured by Shmueli's PPG in its calculation of a heart health score.

Petitioner's contentions for claim 2 incorporate its contentions for claim 1.  Pet. 46.  For claim 1, Petitioner contends that the POSA would have used Shmueli's PPG sensor to monitor HRV.  *Id*. at 24 ("[I]n the Shmueli-Almen combination, Shmueli's PPG sensor is used to determine heart rate information, and the algorithms and calculations disclosed by Almen are used to calculate and monitor HRV.").  For claim 2, Petitioner begins by asserting "[a]s discussed previously [referencing its contentions for claim 1], a POSITA . . . would have combined the teachings of Shmueli and Almen, resulting in a device that monitors HRV and triggers an ECG based on a detected HRV irregularity."  *Id*. at 46.  In this assertion, "monitors HRV" refers to monitoring HRV using Shmueli's PPG sensor.

After referencing its contentions for claim 1, Petitioner asserts that the POSA would have "improved the proposed combination [which uses PPG to measure HRV] by implementing a scoring system as disclosed by Ong."  *Id.* Petitioner explains how the device suggested by Shmueli, Almen, and Ong would work as follows:

IPR2022-01560
Patent 9,420,956 B2

> As discussed above . . . , the Shmueli-Almen device has sensors
> for both measuring HRV and ECG.  These are the same sensors
> Ong discloses would be used to gather the data for its scoring
> system. . . .  Thus, a POSITA would have to expend little, if
> any, effort modifying the Shmueli-Almen device in order to
> gather the data for a scoring system like that disclosed by Ong.

*Id.* at 49–50.  Consistent with Petitioner's prior use of "monitor[ing] HRV"
to mean monitoring HRV using Shmueli's PPG sensor, and consistent with
the use of the plural "sensors" in the above passage from the Petition, we
understand Petitioner to assert that the device of the proposed combination
has a PPG sensor and an ECG sensor and that when adding Ong's scoring
system, the combined device would use these same sensors.  Implementing
Ong's scoring system in this manner, the proposed device would "generat[e]
a Heart Health Score based on said determined HRV value and . . . [a]
sensed electrocardiogram," thus meeting the requirements of claim 2.

   We recognize that Ong determines HRV using measurements derived
from an ECG rather than using PPG-derived HRV measurements.  Ex. 1006
¶ 138 ("From detected QRS complexes 126 in the ECG 120, the processed
RR intervals 136 can be obtained. The RR intervals 136 are used to calculate
the following HRV parameters.").  But, the evidence supports that it was
known that HRV could be derived from either ECG or PPG data.  Ex. 1032,
Abstract ("The results showed a high correlation (median 0.97) between the
ECG-derived RR intervals and PPG-derived peak-to-peak (PP) intervals. . . .
The time domain, frequency domain and Poincaré plot HRV parameters
computed using RR interval method and PP interval method showed no
significant differences ($p < 0.05$). The error analysis also showed
insignificant differences. . . .  Thus, HRV can also be reliably estimated from

IPR2022-01560
Patent 9,420,956 B2

the PPG based PP interval method."); Ex. 1040, Abstract ("Our results demonstrate that the parameters of PPGV [PPG variability] are highly correlated with the parameters of HRV. Thus, our results indicate that PPGV could be used as an alternative measurement of HRV."); Ex. 1003 ¶ 37 (testimony of Dr. Chaitman that "[b]y the Critical Date, it was known that HRV can be accurately determined by either ECG or PPG data"). Accordingly, Ong's disclosure of ECG-derived HRV measurements does not detract from Petitioner's proposed combination.

Patent Owner argues that Petitioner "fails to show that a POSA would have sought to use the PPG-derived HRV value as part of Ong's scoring system in the combined device." PO Resp. 43. More specifically, Patent Owner points to Dr. Efimov's testimony that HRV derived from ECG is more accurate and argues that "Petitioner fails to explain why a POSA would have dropped the more accurate ECG-derived HRV value from Ong's scoring system and used the less-accurate PPG-derived value instead." *Id.* (citing Ex. 2001 ¶¶ 32–41, 60, 109). We do not find this argument persuasive because Petitioner directs us to persuasive reasons to use PPG-derived HRV measurements as part of the heart health score in combined Shmueli/Almen/Ong device. *See, e.g.*, Pet. 48. For example, Dr. Chaitman credibly testifies that the POSA "would have understood that utilizing different types of data would minimize the potential for erroneous diagnoses" and that "utilizing HRV and ECG information would provide for better diagnoses than either alone." Ex. 1003 ¶ 134.[30] Moreover, Ong

---

[30] As discussed above, we understand "HRV" in this testimony to refer to the continuously-monitored HRV measurements provided by Shmueli's

specifically contemplates that its home use embodiments may include PPG data, supporting the use of PPG in its scoring system. Ex. 1006 ¶ 223 ("In home use, vital signs such as heart rate, respiratory rate, blood pressure, or SpO2 [i.e., PPG] readings can be taken and provided as input to the cardiac event assessment system. Further, to provide an even more accurate present diagnosis an ECG can be taken.").

Patent Owner argues that using HRV data from Shmueli's PPG sensor in a heart health score "contradicts the testimony of Petitioner's own expert." PO Sur-reply 11. Specifically, Patent Owner points to Dr. Chaitman's testimony that if two variables "have the same information" and were "closely related and highly correlated[,] you would chose the better of the two variables and drop the other out of the model." *Id.* at 11; Ex. 2012, 37:22–38:16. We do not find this persuasive because the PPG and ECG data in the Shmueli/Almen/Ong combination would be taken at different points in time and thus do not provide "the same information." Ex. 2012, 40:21–41:4 (explaining that in a continuously monitored patient "the HRV, you know, the values depending on the time that you're measuring it you might get different numbers").

### 2.    Arguments with respect to claim 14

Claim 14 depends from claim 12 and recites that the method further comprises "receiving heart rate information from a plurality of heart rate sensors coupled to a plurality of users." Ex. 1001, 26:45–47. Patent Owner argues that Petitioner "merely points to Ong's 'database of accumulated past

---

PPG. *See* Ex. 1003 ¶ 131 (describing the combined device as "monitor[ing] HRV" and "trigger[ing] an ECG based on a detected HRV irregularity.").

IPR2022-01560
Patent 9,420,956 B2

patient data'" and "does not explain how the 'past patient[s]' that make up the data constitute a 'plurality of users,' much less what those past patients are users of." PO Resp. 40 (alteration in original). According to Patent Owner, this is insufficient because Ong's "past patient data" is comprised of "patients presented to the ED [emergency department] of a hospital with undifferentiated and non-traumatic chest pain" not "users of a wearable computing device as recited in the claims." *Id.* at 41 (alteration in original). Along the same lines, Patent Owner argues that the heart rate information in Ong's "past patient data" was "derived from the hospital's 12-lead ECG" and that Petitioner failed to "explain how Ong's 'database of accumulated past patient data' includes heart rate information received from 'a plurality of heart rate sensors.'" *Id.* Further, according to Patent Owner, because Ong's risk score model is "trained based on data of patients complaining of chest pain in a hospital setting and recorded using a stationary 12-lead ECG, . . . a POSA would not have viewed [that risk score model] as applicable to detecting different conditions (*e.g.*, atrial fibrillation) based on a different data set (*i.e.*, PPG data captured by a wearable computing device)." *Id.* at 44 (citing Ex. 2001 ¶ 111). Patent Owner's arguments are unavailing.

The Petition asserts that it would have been obvious to implement Ong's scoring system in the Shmueli/Almen device. Pet. 46–52. In explaining how Ong's risk scores would be implemented in the Shmueli/Almen device, Petitioner asserts: "A POSITA would have recognized that ***storing information related to other users*** (such as the database) could be implemented in the memory on the device." *Id*. at 50

70

(emphasis added). We understand the phrase "other users" in this statement to refer to other users of the Shmueli/Almen wearable device.

We recognize that, after explaining why the POSA would have been motivated to implement Ong's risk scores in the Shmueli/Almen device (*id.* at 47–49), and how such risk scores would be implemented (*id.* at 49–52), the Petition cites Ong for the limitations recited in claim 14. However, in doing so, the Petition relies on the *idea* of generating a database of past patient data (as taught by Ong) rather than on incorporating Ong's *actual database* of past patient data derived from the hospitals 12-lead ECG:

> As explained in the specification of the '956 patent, this limitation relates to generating a set of population data that, perhaps among other things, can be used to train a machine learning model. ***This same functionality is disclosed by Ong***, as Ong discloses that it trains a machine learning model by receiving heart rate and other information from past patients in order to generate a "database of accumulated past patient data" and train a machine-learning algorithm based on that model.

*Id.* at 57 (internal citation omitted) (emphasis added). Put another way, to establish obviousness, Petitioner relies on the functionality of Ong's database rather than on bodily incorporating Ong's database itself. *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) (explaining that "[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference," but rather "what the combined teachings of those references would have suggested"). Indeed, the citations to Ong in the Petition are not to a specific patient data set, but to broad disclosures relating principally to how Ong's ensemble scoring system works, what types of information it uses, and what benefits it provides. Pet. 45–57 (citing Ex. 1006 ¶¶ 2, 4–6, 26, 87, 88, 89, 92, 96, 144,

IPR2022-01560
Patent 9,420,956 B2

148); *see also id*. at 51 (arguing that the POSA would have "been able to implement machine-learning to determine a score based on **a** database of previous patients . . . as disclosed by Ong," not that the POSA would have been able to incorporate Ong's database) (emphasis added).

### 3.    Conclusion as to Ground 2

For the reasons set forth above, we find that Petitioner has shown by a preponderance of the evidence that the combination of Shmueli, Almen, and Ong teaches or suggests the limitations of the methods and systems recited in the challenged claims.  We also find that Petitioner has demonstrated by a preponderance of the evidence that one of ordinary skill in the art would have been motivated to combine the cited references with a reasonable expectation of success in arriving at the challenged claims.  And we are not persuaded that, on the record before us, objective indicia weigh in favor of nonobviousness for the reasons discussed (*supra* § II.4), including that Patent Owner has not established nexus.[31]  Having reviewed the argument and evidence of record, we find that Petitioner has shown by a preponderance of the evidence that claims 2, 3, 6, 8, and 14 are unpatentable as obvious in view of Shmueli, Almen, and Ong.

---

[31] Considering the strong evidence that the prior art teaches or suggests the claimed methods and systems together with the evidence of industry praise, we find that even if Patent Owner had established a nexus, the challenged claims would still have been obvious to a person of ordinary skill in the art. *See Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) ("given the strength of the prima facie obviousness showing, the evidence on secondary considerations was inadequate to overcome a final conclusion" of obviousness).

IPR2022-01560
Patent 9,420,956 B2

G.    *Ground 3*

Ground 3 asserts that dependent claims 14–17 would have been obvious over the combination of Shmueli, Almen, and Asl.  More specifically, Petitioner contends, as discussed in connection with Ground 1, that the Shmueli/Almen device "monitors HRV data to detect the presence of an irregular heart condition, including an arrhythmia, and trigger an ECG measurement when such irregularities are detected."  Pet. 59.  According to Petitioner, a POSA "would have recognized that using machine-learning algorithms designed to analyze ECG readings, and determine what heart maladies may be indicated, would improve such a device."  *Id.* (citing Ex. 1003 ¶ 154).

Petitioner asserts that Asl discloses an "effective cardiac arrhythmia classification algorithm using the heart rate variability (HRV) signal."  *Id.* at 58 (citing Ex. 1007, 1).  More specifically, Petitioner describes Asl as disclosing "an algorithm trained according to machine learning that is able to analyze HRV data and determine whether an arrhythmia is occurring, and if so, what type of arrhythmia is occurring, including an atrial fibrillation."  *Id.* (citing Ex. 1007, 2; Ex. 1003 ¶ 58).

Petitioner contends that the POSA would have been "motivated to utilize Asl's machine-learning trained algorithm for detecting and classifying arrhythmias as a further improvement to the Shmueli-Almen combination."  *Id.* at 58–59.  According to Petitioner, the purpose of the Shmueli/Almen device would be to "allow a user to monitor his or her own heart rate and gather useful information that can be used to diagnose heart conditions."  *Id.* at 59.  Petitioner asserts that the POSA "would have

IPR2022-01560
Patent 9,420,956 B2

recognized that using machine-learning algorithms designed to analyze ECG readings, and determine what heart maladies may be indicated, would improve such a device." *Id.* (citing Ex. 1003 ¶ 154); *see also id.* at 60 (explaining that the Shmueli/Almen device would have been designed to detect arrhythmias and that the POSA "would have recognized that using a machine learning algorithm trained and tested on specific arrhythmia data to detect different kinds of arrhythmias (such as that disclosed by Asl) would allow it to do so more effectively") (internal citation omitted).  Finally, Petitioner contends that the POSA "would specifically have been motivated to use the algorithm disclosed by Asl as it was trained on and is designed to use HRV data—the same data collected and analyzed by Shmueli-Almen for detecting the presence of irregular heart activity such as an arrhythmia." *Id.* at 60.

Petitioner contends that implementing Asl's algorithm would "simply involve implementing the algorithm already disclosed in Asl into the system already taught by Shmueli-Almen—something that was well within the ability of a skilled artisan at the time—for example by tasking a team member to do so or by hiring a software engineer to apply the state of the art." *Id.* at 61.

### 1.    Arguments with respect to the "plurality of users"

Claim 14 depends from claim 12 and further recites the step of "receiving heart rate information from a plurality of heart rate sensors coupled to a plurality of users."  Ex. 1001, 26:45–47.  Claims 15–17 depend from claim 14 and, thus, also require this step.  Patent Owner argues that Petitioner maps the "plurality of users" recited in these claims to the "patient

IPR2022-01560
Patent 9,420,956 B2

data set used in Asl (*i.e.*, the ECG signals obtained through the MIT-BIH Arrhythmia Database and the Creighton University Ventricular Tachyarrhythmia Database)" but "fails to explain how a POSA would have understood the ECG signals provided by Asl's academic databases to represent a 'plurality of users' as recited in the claims." PO Resp. 45–46. We agree.

Patent Owner is correct that Petitioner maps the plurality of users specifically to patients in Asl's database. Pet. 62 (Petitioner's discussion of claim 14, asserting "Asl specifically discloses receiving data from a plurality of users in academic databases" and citing evidence that Asl's "algorithm was trained based on databases from 'the MIT-BIH Arrhythmia Database' and the 'Creighton University Ventricular Tachyarrhythmia Database'"); 62–63 (Petitioner's discussion of claim 15, explaining "as discussed with respect to claim 14, the model was trained in response to receiving data from a plurality of users, i.e.[,] the stored heart rate data in the academic databases"). Patent Owner is also correct that Petitioner offers no explanation of what the patients comprising these databases are users of. Dr. Chaitman's testimony similarly offers no explanation on what the patients in Asl's databases are users of, largely parroting the language of the Petition. Ex. 1003 ¶ 159. This alone renders Petitioner's showing for claims 14–17 deficient.

Although Petitioner's failure of proof renders it unnecessary to construe the term "user" to reach our decision, considering the plain meaning of the term "plurality of users" in the context of the claim makes even more clear that Petitioner's showing for claims 14–17 is deficient.

IPR2022-01560
Patent 9,420,956 B2

Claim 12 makes clear that a "user" is someone using a wearable computing device. Ex. 1001, 26:27–29 (claim 12, reciting "receiving heart rate information from a heart rate sensor located on a surface of a wearable computing device worn by a user"). As discussed above, claim 14 depends from claim 12 and further requires "receiving heart rate information from . . . a plurality of users." *Id.* at 26:45–47. Thus, as Patent Owner explains, "the heart rate information is not received from just any 'set of population data,' it is received from a ***specific*** set of population—users." PO Resp. 40. More specifically, in the context of the claim as a whole, the "plurality of users" are users of a wearable computing device as recited in claim 12. *Id.* (making this argument).

The parties seem to agree that "users," as recited in claim 14, are users of the wearable device. Tr. 15:4–11 (Petitioner's counsel explaining that there is no need to construe the term "plurality of users" because "the only dispute is whether [Asl's] patients are users" and, in Petitioner's view, "there are users wearing these devices that are used to train the machine learning structures in both Ong and Asl"), *id.* at 15:12–24 ("[Board]: Just to make sure I understand your position, is it your position that in the combination, the users would be users of a wearable device? [Petitioner's Counsel]: Absolutely . . . In the combination, you have the Shmueli device in the Almen combination using the HRV. So you have the Shmueli watch. The users, the people that you're trying to classify their heart activity, are the people wearing those devices. So, of course you would take the information from those users, put it into these databases that are used to train machine learning structures in both Ong or Asl."), 38:1–10 ("[Board] . . . Do we need

76

IPR2022-01560
Patent 9,420,956 B2

to construe the term plurality of users? [Patent Owner's Counsel]: I don't
think so. . . .  If you look at that term in context of the independent claim,
they are users of the wearable computing device or the mobile computing
device depending on which claim you look at.  So I don't think construction
is necessary, but that's because our interpretation is based on the plain
language of the claims.").

Considering claims 14–17 in this light, Petitioner's failure of proof is
even more clear because there is no evidence supporting that the patients in
Asl's databases—which were compiled in the 1980's (Ex. 1007, 53; Ex.
2001 ¶ 100)—were users of a wearable computing device.

H.     Ground 4

Ground 4 asserts that dependent claims 18–21 would have been
obvious over the combination of Shmueli, Almen, and Osorio.  More
specifically, Petitioner contends, as discussed in connection with Ground 1,
that the Shmueli/Almen device "monitors a users' HRV data for irregular
heart activity (such as arrhythmia) and triggers an ECG measurement upon
detection."  Pet. 67.  According to Petitioner, Osorio teaches that "utilizing
an activity level can improve detection and be used to avoid 'false
diagnoses.'"  *Id.* (citing Ex. 1008 ¶ 29).  Thus, Petitioner asserts, a POSA
"would have been motivated to supplement the Shmueli-Almen device with
Osorio's teaching regarding activity level, as doing so would allow Shmueli-
Almen to better determine if an irregularity is occurring."  *Id.* (citing Ex.
1003 ¶ 166).

Supplementing the Shmueli-Almen device in this manner would,
according to Petitioner, require incorporating "(a) hardware elements used

IPR2022-01560
Patent 9,420,956 B2

for measuring activity level, such as Osorio's activity sensors 212 (e.g., motion sensors) and (b) software-related techniques for processing sensed data to determine an activity level of a patient, such as those performed by Osorio's activity level module 250." *Id.* at 68 (citing Ex. 1003 ¶ 167). Because the devices of Shmueli and Osorio are similar, Petitioner asserts, the POSA would have "viewed Osorio's activity level sensor 212 as being readily able to be incorporated into Shmueli's heart monitoring device." *Id.* at 69 (citing Ex. 1003 ¶ 168). Thus, Petitioner asserts, the POSA would have had a reasonable expectation of success in so modifying the Shmueli-Almen device to additionally monitor activity level. *Id.* at 68.

We conclude, after considering the arguments and evidence in this proceeding, that Petitioner has established sufficiently that the combination of Shmueli, Almen, and Osorio render claims 18–21 obvious. Petitioner provides an element-by-element comparison of the asserted art to the challenged claims. *Id.* Patent Owner presents no arguments with respect to Ground 4 that have not been discussed above. *See* PO Resp. 53 (addressing Ground 4 by relying on arguments presented for claim 12). Having reviewed the argument and evidence of record, we find that Petitioner has shown by a preponderance of the evidence that claims 18–21 are unpatentable as obvious over Shmueli, Almen, and Osorio.

### III.    MOTIONS TO SEAL

Patent Owner and Petitioner have each filed motions to seal. Paper 18 (Patent Owner Motion to Seal.

Patent Owner moves to seal portions of its Patent Owner's Response as well as Exhibits 2001, 2009, 2010, and 2017–2025. PO Mot. 1–4. Patent

IPR2022-01560
Patent 9,420,956 B2

Owner also moves for entry of a "Joint Protective Order" (Ex. 2026). And Patent Owner moves to seal portions of its Demonstratives for oral argument. PO 2nd Mot. 1–3. Petitioner moves to seal Exhibit 1045 as well as portions of Petitioner's Reply to Patent Owner's Response. Pet. Mot. 1–3. None of these motions is opposed.

The Board recognizes "a strong public policy for making all information filed in a quasi-judicial administrative proceeding open to the public, especially in an inter partes review which determines the patentability of claims in an issued patent and therefore affects the rights of the public." *Garmin Int'l v. Cuozzo Speed Techs., LLC*, IPR2012-00001, Paper 34 at 1–2 (PTAB Mar. 14, 2013). Except as otherwise ordered by the Board, the record of an *inter partes* review shall be made available to the public. 35 U.S.C. § 316(a)(1); 37 C.F.R. § 42.14.

The moving party bears the burden of showing that the relief requested should be granted. 37 C.F.R. § 42.20(c). The standard for granting a motion to seal is "for good cause." 37 C.F.R. § 42.54(a).

Patent Owner contends that good cause exists to seal the exhibits that are the subject of its motion because they contain "sensitive, non-public information with respect to both Patent Owner and Petitioner." PO Mot. 1–4; PO 2nd Mot. 1–3. Patent Owner's counsel also certifies that "the information sought to be sealed by this Motion to Seal has not, to their knowledge, been published or otherwise made public." PO Mot. 3. Petitioner's motion seeks to seal deposition testimony and briefing discussing the same information targeted by Patent Owner's motion. It

IPR2022-01560
Patent 9,420,956 B2

affirms that "the information sought to be sealed is truly confidential and a concrete harm would result upon public disclosure." Pet. Mot. 3.

More specifically, Patent Owner contends good cause exists because it "relates to information that has been designated confidential and is subject to a protective order in a proceeding before the International Trade Commission (ITC)." PO Mot. 4.

The information the parties seek to seal includes: KardiaBand revenues and unit shipments (Ex. 2009), AliveCor's revenues by product (Ex. 2010), deposition testimony relating to AliveCor sales (Ex. 2017), deposition testimony relating to Apple's product development (Ex. 2018), an Apple document entitled ███████████████████████████ (Ex. 2019), an Apple email discussing █████████ (Ex. 2020), an Apple email discussing a ███████████████ (Ex. 2021), an Apple document entitled ███████████ (Ex. 2022), two Apple documents that appear to be related to an ████████████████████ (Exs. 2023 and 2024), and deposition testimony regarding AliveCor's KardiaBand product (Ex. 2025).

Having considered the exhibits and Patent Owner's unopposed argument, we determine that Patent Owner has shown good cause to seal the exhibits in question. The exhibits appear to include confidential information, which both parties have an interest in keeping private. We find that such interest outweighs the public's need for access to that information. Accordingly, we grant Patent Owner's motion to seal Exhibits 2009, 2010, and 2017–2025. These exhibits are, thus, sealed subject to further order from the Board. For the same reasons, we grant the parties' motions to seal

IPR2022-01560
Patent 9,420,956 B2

the confidential versions of Patent Owner's Response (Paper 19 (redacted public version provided in Paper 21)), Petitioner's Reply (Paper 23 (redacted public version provided in Paper 25)), Dr. Efimov's Deposition (Ex. 1045 (includes redacted and public versions)), Dr. Efimov's Declaration (Ex. 2001 (includes redacted and public versions), and Petitioner's Demonstratives (Paper 33 (redacted public version provided in Paper 34)).

We have also considered Patent Owner's unopposed motion for a protective order, which motion is granted. The proposed changes to the Board's Default Protective Order are shown in Exhibit 2027. Those changes appear to be justified under the circumstances because, as Patent Owner explains, they provide "additional protections consistent with the ITC protective order governing the same confidential information in Investigation No. 337–TA-1266." PO Mot. 3. The Joint Protective Order (Exhibit 2026) is, therefore, entered and will control access to confidential materials in this proceeding absent a further order from the Board modifying such access.

## IV.    CONCLUSION

For the reasons discussed above, we find that Petitioner's has established, by a preponderance of the evidence, that claims 1–14 and 18–21 of the '956 patent would have been obvious over the cited art. We find that Petitioner has not established by a preponderance of the evidence that claim 15–17 would have been obvious over the cited art. We grant Patent Owner's and Petitioner's Motions to Seal.

In Summary:

IPR2022-01560
Patent 9,420,956 B2

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1, 4, 5, 7, 9–13 | 103 | Shmueli, Almen | 1, 4, 5, 7, 9–13 | |
| 2, 3, 6, 8, 14 | 103 | Shmueli, Almen, Ong | 2, 3, 6, 8, 14 | |
| 14–17 | 103 | Shmueli, Almen, Asl | | 14–17 |
| 18–21 | 103 | Shmueli, Almen, Osorio | 18–21 | |
| **Overall Outcome** | | | 1–14, 18–21 | 15–17 |

IPR2022-01560
Patent 9,420,956 B2

## V.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that the Petitioner has proved by a preponderance of the evidence that claims 1–14 and 18–21 of U.S. Patent No. 9,420,956 B2 are unpatentable;

FURTHER ORDERED that Petitioner has not proved by a preponderance of the evidence that claims 15–17 of U.S. Patent No9,420,956 B2 are unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Seal (Paper 18), Petitioner's Motion to Seal (Paper 24), and Patent Owner's 2nd Motion to Seal (Paper 32) are *granted*, and Exhibits 2001, 2009, 2010, and 2017–2025, and the confidential versions of Patent Owner's Response (Paper 19), Petitioner's Reply (Paper 23), Dr. Efimov's Deposition (Ex. 1045), and Petitioner's Demonstratives (Paper 33) are sealed;

FURTHER ORDERED that the Joint Protective Order (Ex. 2026) is entered; and

FURTHER ORDERED that, within ten (10) days of this Decision, the parties will meet and confer and submit an agreed-to, public-version of the Decision and of the Hearing Transcript (Paper 35) with redactions as appropriate.

ORDERED that parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2022-01560
Patent 9,420,956 B2

FOR PETITIONER:

Walter Renner
Jeremy Monaldo
FISH & RICHARDSON P.C.
axf-ptab@fr.com
jjm@fr.com

FOR PATENT OWNER:

Michael Rosato
Matthew Argenti
Tasha Thomas
Yahn Lin Chu
WILSON SONSINI GOODRICH & ROSATI
mrosato@wsgr.com
margenti@wsgr.com
tthomas@wsgr.com
ychu@wsgr.com

*Apple, Inc. v. AliveCor, Inc.*,

IPR2022-01562, Paper 37

(P.T.A.B. April 8, 2024)

("'415 Decision")

PUBLIC VERSION

Trials@uspto.gov                                                          Paper 37
571-272-7822                                                    Date: April 08, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

ALIVECOR, INC.,
Patent Owner.

———————————

IPR2022-01562
Patent 10,159,415 B2

———————————

Before JEFFREY N. FREDMAN, ERIC C. JESCHKE, and
DAVID COTTA, *Administrative Patent Judges.*

COTTA, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-01562
Patent 10,159,415 B2

## I.    INTRODUCTION

On September 26, 2022, Apple Inc. ("Petitioner")[1] filed a Petition to institute *inter partes* review of claims 1–20 of U.S. Patent No. 10,159,415 B2 (Ex. 1001, "the '415 patent"). Paper 2 ("Pet." or "Petition"). AliveCor, Inc. ("Patent Owner")[2] filed a Preliminary Response. Paper 8. Taking into account the arguments and evidence presented, we determined that the information presented in the Petition established that there was a reasonable likelihood that Petitioner would prevail in demonstrating unpatentability of at least one challenged claim of the '415 patent, and we instituted this *inter partes* review as to all challenged claims. Paper 10.

After institution, Patent Owner filed a Patent Owner Response (Paper 19, "PO Resp."); Petitioner filed a Reply to the Patent Owner Response (Paper 23, "Pet. Reply"); Patent Owner filed a (corrected) Sur-reply (Paper 35, "PO Sur-reply").[3] In addition, Patent Owner and Petitioner each filed motions to seal. Paper 18 (Patent Owner Motion to Seal ("PO Mot.")); Paper 24 (Petitioner's Motion to Seal ("Pet. Mot.")); Paper 32 (Patent Owner's Second Motion to Seal) ("PO 2nd Mot.").

An oral hearing was held on January 10, 2024, and a transcript of the hearing is included in the record. Paper 35 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of claims

---

[1] Petitioner identifies itself as the real party-in-interest. Pet. 73.
[2] Patent Owner identifies itself as the real party-in-interest. Paper 4, 1.
[3] Patent Owner's Response and Petitioner's Reply were filed under seal. Patent Owner provided a redacted public version of its Response in Paper 21 and Petitioner provided a redacted public version of its Reply in Paper 25.

IPR2022-01562
Patent 10,159,415 B2

1–20 of the '415 patent.  For the reasons discussed below, we hold that
Petitioner has demonstrated by a preponderance of the evidence that claims
1–9 and 11–19 are unpatentable, but that Petitioner has not demonstrated by
a preponderance of the evidence that claims 10 and 20 are unpatentable.  In
addition, for the reasons discussed below, we grant the parties' motions to
seal.

    *A.*    *Related Matters*

Petitioner states that it is "not aware of any disclaimers, reexamination
certificates or petitions for *inter partes* review for the '415 patent" and that it
"is further not aware of any active litigation alleging infringement or non-
infringement of the '415 patent."  Pet. 81.

Patent Owner identifies the following IPRs as having been requested
by Petitioner Apple Inc. against AliveCor patents: IPR2022-00872 (U.S.
Patent No. 8,509,882); IPR2022-00873 (U.S. Patent No. 10,342,444);
IPR2022-01173 (U.S. Patent No. 11,103,175); IPR2022-01297 (U.S. Patent
No. 8,301,232); IPR2022-01186 (U.S. Patent No. 9,649,042); and IPR2022-
01560 (U.S. Patent No. 9,420,956).  Paper 9, 1–2.  Patent Owner does not
indicate whether or how any of the patents challenged in these proceedings
are related to the '415 patent.  *See generally id*.

Petitioner asserts that "[t]he '415 Patent is in the same family as
patents the Board is considering" and that "the claims of the '415 Patent
recite many limitations substantively identical to claims of U.S. Patent No.
9,572,499," which was challenged in IPR2021-00970.  Pet. 5.  We further
note that the '415 patent is related by a chain of continuation applications to
U.S. Patent Nos. 9,420,956 and 10,595,731, at issue in IPR2022-01560 and

3

IPR2022-01562
Patent 10,159,415 B2

IPR2021-00971, respectively.  Ex. 1001, code (63); IPR2022-01560, Ex.
1001, code (21); IPR2021-00971, Ex. 1001, code (63).

> B.    *Technological Background*

Electrocardiography measures "the electrical activity of the heart,
which can be indicative of underlying heart disease."  Ex. 1003 ¶ 29
(Chaitman Decl.).  "In conventional clinical practice, ECG
[electrocardiograms] and telemetry are used to diagnose cardiac
arrhythmias."  *Id.* ¶ 31.

An ECG represents "electrical activity of the heart based on
depolarization and repolarization of the atria and ventricles, which typically
show up as five distinct waves on [an] ECG readout –    P-wave, Q-wave,
R-wave, S-wave, and T-wave."  *Id.* ¶ 30.  "An R-R interval represents a time
elapsed between successive R-waves of a QRS complex[4] of the ECG that
occur between successive heart beats."  *Id.*  "If [the] R-R interval durations
over a time period are close to one another in value, then ventricular rhythm
is understood to be 'regular.'  In contrast, if there are significant variations in
the R-R interval durations over a time period, then the ventricular rhythm is
understood to be 'irregular.'"  *Id.* (internal citations omitted).

"Photoplethysmography (PPG) is a simple noninvasive optical
technique" that uses a "light source to illuminate subcutaneous tissue and a
photo detector with spectral characteristics matching those of the light
source" to "monitor[] beat-to-beat relative blood volume changes in the

---

[4] "A QRS complex is a combination of the Q, R, and S waves occurring in
succession and represents the electrical impulse of a heartbeat as it spreads
through the ventricles during ventricular depolarization."  Ex. 1003 ¶ 30.

IPR2022-01562
Patent 10,159,415 B2

microvascular bed of peripheral tissues." *Id.* ¶ 32.  According to Petitioner's expert, Dr. Chaitman, the "information derived from RR intervals of ECG can also be derived from the pulse period [PP] of a PPG reading." *Id.* ¶ 33. PPG is "sometimes . . . referred to as blood oxygen saturation, pulse oximeter, oximetry, and SpO2." *Id.* ¶ 32.

Heart rate variability ("HRV") is defined as "the variation of RR intervals with respect to time and reflects beat-to-beat heart rate (HR) variability." *Id.* ¶ 36.  It "can be accurately determined based on either ECG data or PPG data." *Id.* ¶ 37.  With respect to the former, this involves measuring RR intervals. *Id.* ¶ 37.  According to Dr. Chaitman, "HRV analysis is an important tool in cardiology to help diagnose various types of arrhythmia." *Id.* ¶ 36.

C.     *The '415 patent*

The '415 patent discloses that "[a]rrhythmia is a cardiac condition in which the electrical activity of the heart is irregular or is faster (tachycardia) or slower (bradycardia) than normal." Ex. 1001, 1:33–35.  "Atrial fibrillation is the most common cardiac arrhythmia" and occurs when "electrical conduction through the ventricles of [the] heart is irregular and disorganized." *Id.* at 1:37–40.  The '415 patent explains that atrial fibrillation is associated with "palpitations, shortness of breath, fainting, chest, pain or congestive heart failure" as well as "atrial clot formulation . . . and stroke." *Id.* at 1:40–44.

Patients with arrhythmia or atrial fibrillation are often "monitored for extended periods of time to manage the disease." *Id.* at 1:53–55.  "Current ambulatory electrocardiography devices such as Holter monitors, however,

IPR2022-01562
Patent 10,159,415 B2

are typically bulky and difficult for subjects to administer without the aid of a medical professional." *Id.* at 1:59–62. Such monitoring devices can "impede the activities of the subject, including their natural movement, bathing, and showering." *Id.* at 1:65–67. Further, once such devices generate an ECG, it must be sent to the patient's physician for analysis, with the result that "many patients do not receive feedback in an expedient manner." *Id.* at 2:2–2:7.

The '415 patent discloses "a cardiac disease and/or rhythm management system . . . [that] allows a user to conveniently document their electrocardiograms (ECG) and other biometric data and receive recommendation(s) and/or goal(s) generated by the system or by a physician in response to the documented data." *Id.* at 2:12–18. The system "can be loaded onto a local computing device of the user," such as a head-worn computing device (like the Google Glass), a wrist-worn computing device (like a smart watch), a tablet computer, or a smart phone. *Id.* at 2:18–31. The '415 patent teaches that its system can be used to continuously record "parameters such as heart rate (HR), heart rate variability (R-R variability or HRV), and heart rate turbulence (HRT)." *Id.* at 2:50–54. "These parameters and further parameters may be analyzed to detect and/or predict one or more of atrial fibrillation, tachycardia, bradycardia, bigeminy, trigeminy, or other cardiac conditions." *Id.* at 2:54–57.

IPR2022-01562
Patent 10,159,415 B2

Figure 1 of the '415 patent is reproduced below.



*FIG. 1*

Figure 1, above, "shows a system for cardiac disease and rhythm management." *Id.* at 5:41–42. System 100 includes local computing device 101 that can be "a computing device worn on the body" such as a smart watch or smartphone. *Id.* at 6:41–49. Local computing device 101 is in wired or wireless communication with handheld ECG monitor 103, wrist-worn biometric sensor 105, another biometric device (such as a personal

IPR2022-01562
Patent 10,159,415 B2

scale or a blood pressure monitor 107), another local computing device 109

(such as a personal computer of the user), and a remote server or cloud-

based service 113. *Id.* at 6:31–7:45. Local computing devices 101 and 109

both communicate with remote server or cloud-based service 113 through

internet 111. *Id.* at 7:27:45. "Other users," including the user's physician,

"may access the patient data through the remote server or cloud-based

service 113." *Id.* at 7:46–51.

Figure 14, reproduced below, shows an embodiment of a body-worn

device. *Id*. at 6:13–15.



Figure 14, shows "smart watch 1400 which includes at least one heart rate

monitor 1402 and at least one activity monitor 1404," such as an

accelerometer. *Id*. at 24:61–63. Analysis of signals from these monitors can

be used to "determine if heart rate and activity measurements represent an

advisory condition for recording an ECG," and trigger signals for recording

an ECG if an advisory condition is detected. *Id*. at 25:1–7.

IPR2022-01562
Patent 10,159,415 B2

Figure 10, reproduced below, shows another embodiment employing a body-worn device. *Id*. at 5:63–65.



Figure 10 illustrates "a method for monitoring a subject to determine when to record an electrocardiogram (ECG)." *Id*. at 23:15–17. According to the Specification:

> In FIG. 10, a subject is wearing a continuous heart rate monitor (configured as a watch 1010, including electrodes 1016), shown in step 1002. The heart rate monitor transmits (wirelessly 1012) heart rate information that is received by the smartphone 1018, as shown in step 1004. The smartphone includes a processor that may analyze the heart rate information 1004, and when an irregularity is determined, may indicate 1006 to the subject that an ECG should be recorded.

*Id*. at 23:17–25. In some embodiments, the ECG device is "present in a smart watch band or a smart phone." *Id*. at 25:31–32. "The ECG, heart rate, and rhythm information can be displayed on the computer or smartphone, stored locally for later retrieval, and/or transmitted in real-time to a web server." *Id*. at 25:43–46.

IPR2022-01562
Patent 10,159,415 B2

### D.    *Challenged Claims*

The '415 patent includes 20 claims, all of which are challenged in the

Petition.  Claims 1 and 11 are independent claims and read as follows:

1.    A method of determining a presence of an arrhythmia of a first user, said method comprising:

sensing a heart rate of said first user with a heart rate sensor coupled to said first user;

transmitting said heart rate of said first user to a mobile computing device, wherein said mobile computing device is configured to sense an electrocardiogram;

determining, using said mobile computing device a heart rate variability of said first user based on said transmitted heart rate of said first user; and

alerting said first user to sense an electrocardiogram of said first user, using said mobile computing device, in response to an irregularity in said heart rate variability.

11.    A system for determining the presence of an arrhythmia of a first user, comprising a heart rate sensor coupled to said first user;

a mobile computing device comprising a processor, wherein said mobile computing device is coupled to said heart rate sensor, and wherein said mobile computing device is configured to sense an electrocardiogram of said first user;

a non-transitory computer readable medium encoded with a computer program including instructions executable by said processor to cause said processor to receive a heart rate of said first user from said heart rate sensor, determine a heart rate variability of said first user based on said heart rate of said first user, and alert said first user to record an electrocardiogram using said mobile computing device.

Ex. 1001, 26:23–35, 27:1–15.

10

IPR2022-01562
Patent 10,159,415 B2

   *E.    Asserted Grounds of Unpatentability*

   Petitioner asserts three grounds of unpatentability in the Petition

(Pet. 1), which are provided in the table below:

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 11, 12 | 103 | Shmueli,[5] Almen[6] |
| 3–7, 13–17 | 103 | Shmueli, Almen, Osorio[7] |
| 8–10, 18–20 | 103 | Shmueli, Almen, Asl[8] |

   Petitioner relies on the declaration of Dr. Bernard R. Chaitman (Ex.

1003), among other evidence.  Patent Owner relies on the declaration of Dr.

Igor Efimov (Ex. 2001), among other evidence.

II.   ANALYSIS

   *A.    Legal Standards*

   "In an [*inter partes* review], the petitioner has the burden from the

onset to show with particularity why the patent it challenges is

unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed.

Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review

---

[5] Shmueli et al., International Publication No. WO 2012/140559 A1,
published Oct. 18, 2012 (Ex. 1004, "Shmueli").
[6] U.S. Patent No. 7,460,899 B2, issued Dec. 2, 2008 (Ex. 1005, "Almen").
[7] U.S. Patent Publication No. 2014/0275840 A1, published Sept. 18, 2014
(Ex. 1008, "Osorio").
[8] Asl, B.M., et al., *Support vector machine-based arrhythmia classification
using reduced features of heart rate variability signal*, 44 ARTIFICIAL
INTELLIGENCE IN MEDICINE 51–64 (2008) (Ex. 1007, "Asl").

IPR2022-01562
Patent 10,159,415 B2

petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")).

To show obviousness under 35 U.S.C. § 103, the differences between the subject matter sought to be patented and the prior art must be such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which that subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) secondary considerations of nonobviousness when presented. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

"[W]hen a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." *Id.* at 417 (quoting *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282 (1976)). But in analyzing the obviousness of a combination of prior art elements, it can also be important to identify a reason that would have prompted one of skill in the art "to combine . . . known elements in the fashion claimed by the patent at issue." *Id.* at 418. A precise teaching directed to the specific subject matter of a challenged claim is not necessary to establish obviousness. *Id.* Rather, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 420.

IPR2022-01562
Patent 10,159,415 B2

Accordingly, a party that petitions the Board for a determination of unpatentability based on obviousness must show that "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016). Under the proper inquiry, "obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007).

> B.    *Level of Ordinary Skill in the Art*

In determining the level of skill in the art, we consider the problems encountered in the art, the art's solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field. *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986).

Petitioner asserts:

> Consistent with what the Board has previously found, a person of ordinary skill in the art of the '415 patent is "a multidisciplinary team comprising persons with advanced degrees in electrical engineering, mechanical engineering, biomedical engineering, computer science, and/or cardiology." *See* Paper 10, IPR2021-00970 (PTAB December 8, 2021).[9] A person of ordinary skill in the art could comprise a member of such a team, such as a[] cardiologist, with at least a

---

[9] IPR2021-00970 relates to U.S. Patent No. 9,572,499. *See* Pet. 5.

IPR2022-01562
Patent 10,159,415 B2

> combination of a Bachelor's Degree (or similar higher degree)
> in an academic area emphasizing health science, or a related
> field, and two or more years or work experience with cardiac
> monitoring technologies.

Pet. 6. Patent Owner does not offer a definition of the person of ordinary skill in the art ("POSA" or "POSITA"). PO Resp. 3.

Consistent with Petitioner's proposal, we find that a POSA would be a member of an interdisciplinary team including persons with backgrounds in electrical engineering, mechanical engineering, biomedical engineering, computer science, and/or cardiology, and having at least two years of relevant work experience designing, using, or analyzing data from, cardiac monitoring devices.[10] This definition is generally consistent with the level of skill reflected in the specification and in the cited prior art. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (explaining that specific findings regarding ordinary skill level are not required "where the prior art itself reflects an appropriate level and a need for testimony is not shown") (quoting *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed. Cir. 1985)).

### C.    Claim Construction

We interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2021). Under this standard, we construe the claim "in accordance with the ordinary and customary meaning of such

---

[10] This definition is identical to the definition we applied in the *inter partes* review challenging U.S. Patent No. 9,572,499, which claims similar subject matter. *See* IPR2021-00970, Paper 43 at 25 (PTAB Dec. 6, 2022) (Final Written Decision).

IPR2022-01562
Patent 10,159,415 B2

claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.*

Petitioner does not identify any claim terms that require construction. *See generally* Pet. Patent Owner also does not identify any claim terms that require construction, but argues that "Petitioner's attempts to map the prior art to the challenged claims are at odds with their plain language." PO Resp. 3. Patent Owner provides one example: "certain dependent claims that recite receiving heart rate and heart rate variability from a 'second user.'" *Id.* According to Patent Owner, "Petitioner provides no explanation as to why its positions on unpatentability comport with the plain and ordinary meaning of this term." *Id.*

We address the "second user" limitation, *infra* (§ II.G.2) and, for purposes of this Decision, do not find it necessary to expressly construe this claim term. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))); *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011) ("[C]laim terms need only be construed 'to the extent necessary to resolve the controversy.'"). Nor do we find it necessary to construe any other claim terms. *Id.*

    D.    *Overview of the Asserted Prior Art*

    1.    <u>Shmueli</u>

Shmueli is an international application published on October 18, 2012. Ex. 1004, code (43). Petitioner asserts that Shmueli is prior art under

IPR2022-01562
Patent 10,159,415 B2

35 U.S.C. § 102(a)(1).  Pet. 1.  Shmueli, titled "Pulse Oximetry
Measurement Triggering ECG Measurement," addresses "[s]olutions . . . for
monitoring infrequent events of irregular ECG."  Ex. 1004, 2.[11]  According
to Shmueli, "[t]he present invention preferably performs measurements of
intermittent irregular heart-related events without requiring the fixed wiring
of the ECG device to the patient."  *Id.* at 8.

Shmueli discloses body-worn cardiac monitoring devices "equipped
with two types of sensing devices: an oximetry ($SpO_2$) measuring unit and
an ECG measuring unit."  *Id.* at 9.[12]  Shmueli's Figures 1A and 1B,
reproduced below, exemplify one embodiment (annotations by Petitioner in
red):

---

[11] Throughout this Decision, we refer to native pagination wherever it is
available.  For clarity with respect to citations to Shmueli, we understand the
native pagination to be the numbers at the top of each page.
[12] As used by Shmueli, "the terms 'oxygen saturation in the blood', 'blood
oxygen saturation', 'pulse oximeter', oximetry, SpO2, $SpO_2$, and
photoplethysmography have the same meaning and may be used
interchangeably, except for those places where a difference between such
terms is described."  Ex. 1004, 7.

16

IPR2022-01562
Patent 10,159,415 B2



Pet. 7–8.  Figures 1A and 1B show two views of a wrist-mount heart monitoring device having three ECG electrodes 14 and a PPG sensor 13. Ex. 1004, 6, 9–10.  Figure 1A shows two of the ECG electrodes, 14/16, on the face of the device.  *Id.* at 9.  Figure 1B shows a third ECG electrode, 14/15, along with PPG sensor 13, on the back of the device.  *Id.*  Petitioner annotates each of Figures 1A and 1B with arrows identifying the ECG electrodes.  Pet. 7–8.  Petitioner has also annotated Figure 1B with an arrow identifying PPG sensor 13.  *Id.*  In connection with these devices, Shmueli discloses

> a method for triggering measurement of electrocardiogram (ECG) signal of a subject, the method including the steps of: continuously measuring SpO2 at least one of a wrist and a finger of the subject, detecting an irregular heart condition from the SpO2 measurement, notifying the subject to perform an ECG measurement, and initiating ECG measurement at least partially at the wrist.

Ex. 1004, 2; *see id.* at code (57).

Shmueli explains that "[d]eriving heart beat rate from oximetry, as well as other artifacts of the heart activity and blood flow, is . . . known in

IPR2022-01562
Patent 10,159,415 B2

the art," as are various body-worn oximetry devices. *Id.* at 8. Shmueli further explains that the use of oximetry in combination with ECG measurements is also known in the art. *Id.* Shmueli states, for example, that "US patent No. 7,598,878 (Goldreich) describes a wrist mounted device equipped with an ECG measuring device and a $SpO_2$ measuring device." *Id.* However, Shmueli notes "Goldreich does not teach interrelated measurements of ECG and $SpO_2$" and, thus, does not "enable a patient to perform ECG measurement as soon as an irregular heart activity develops and without requiring the ECG to be constantly wired to the patient." *Id.* According to Shmueli:

> The present invention resolves this problem by providing a combined oximetry and electrocardiogram measuring system and a method in which the oximetry measurement is performed continuously and/or repeatedly, and the ECG measurement is triggered upon detection of an intermittent irregular heart-related events . . . without requiring the fixed wiring of the ECG device to the patient.

*Id.* Consistent with this disclosure, Shmueli's claims:

> 1.     A method for triggering measurement of electrocardiogram (ECG) signal of a subject, the method comprising the steps of:
>        continuously measuring $SpO_2$ at least one of a wrist and a finger of said subject;
>        detecting an irregular heart condition from said $SpO_2$ measurement;
>        notifying said subject to perform an ECG measurement; and
>        initiating ECG measurement at least partially at said wrist.

*Id.* at 16.

IPR2022-01562
Patent 10,159,415 B2

Shmueli Figure 7 is reproduced below:



"Fig. 7 is a simplified flow chart of a software program preferably executed by the processor of the wrist-mounted heart monitoring device." *Id.* at 7; *see also id.* at 12–13 (further describing the steps of the software program illustrated in Figure 7).

2.    Almen

Almen is a U.S. patent issued on December 2, 2008.  Ex. 1005, code (45).  Petitioner contends that Almen is prior art under 35 U.S.C. § 102(a)(1).  Pet. 1–2.  Almen "relates generally to monitoring heart rate variability [HRV] using a wrist worn monitor."  Ex. 1005, 1:13–14.  Almen explains that "[h]eart rate variability refers to the variability of the time interval between heartbeats and may be mathematically defined as the one-sigma standard deviation of the heart rate about the mean heart rate value"

19

IPR2022-01562
Patent 10,159,415 B2

and that "[a] heart rate variability test is a reflection of a person's current health status." *Id.* at 1:18–22.

Almen discloses "a wrist worn or arm worn heart rate variability monitor that is capable of detecting certain cardiovascular conditions such as arrhythmia." *Id.* at 2:54–58. With Almen's device, a user can "choose to have an HRV test performed using an input button," causing "[a]n HRV test [to] be performed in as little as ten seconds." *Id.* at 4:59–62. The user will "be able to easily view information gathered by the internal device on [Almen's] device's display." *Id.* at 6:65–66. By using "HRV test data," the device can detect or assist in "diagnosing various heart maladies and/or conditions," including arrhythmias and atrial fibrillation. *Id.* at 7:26–32. By using "pattern recognition and pre-event milestone recognition based on the HRV test results," the device can also "alert the user" of an upcoming event or an event in progress. *Id.* at 7:54–59. Data from the device may be transferred to the user's physician or health care professional "so that they may take appropriate action or obtain information that will assist in the diagnosis of any condition that may exist." *Id.* at 8:3–7.

Almen discloses that via "pulse oximetry, an infra-red sensor may be used to obtain or measure the heart rate." *Id.* at 6:3–4; *see also id.* at 9:19–22 ("To pick up heartbeats, and thus measure the rate, it is contemplated that a variety and/or a plurality of sensors may be advantageously deployed, using optic, pressure, ultrasonic, and[] electrical means."), 10:29–31 ("Other embodiments may use an optical sensor to detect . . . heart rate variability."). Almen further discloses that its monitor can also detect heart rate via at least

IPR2022-01562
Patent 10,159,415 B2

one sensor that detects electrical signals generated by the heart, such as "electrocardiograph (ECG) signals." *Id.* at 8:62–9:1.

3.    Osorio

Osorio is a U.S. Patent Publication published on September 18, 2014. Ex. 1008, code (43). Petitioner asserts that Osorio is prior art under 35 U.S.C. § 102(a)(2). Pet. 2. Osorio "relates to medical device systems and methods capable of detecting a pathological body state of a patient, which may include epileptic seizures, and responding to the same." Ex. 1008 ¶ 2. Although broadly referencing "a pathological body state," Osorio repeatedly exemplifies such conditions in terms of detecting epileptic events. *See*, *e.g.*, *id.* ¶ 37 (referencing values that may "be indicative of a certain pathological state (e.g., epileptic seizure)"), ¶ 46 ("In one embodiment, the pathological state is an epileptic event, e.g., an epileptic seizure."), ¶ 56 ("HRV range may be taken as an indication of an occurrence of a pathological state, e.g., an epileptic seizure."), ¶ 66 ("The dynamic relationship between non-pathological HRVs and activity levels may be exploited to detect pathological states such as epileptic seizures . . . .").

Consistent with the broad disclosure and narrow exemplification in the body of its specification, Osorio's claim 1 is directed to "[a] method for detecting a pathological body state of a patient," whereas claim 7 limits the pathological state to an epileptic event. *Id.* at claim 1, claim 7; *compare id.* at claim 14, *with* claim 17 (similarly limiting a pathological state to an epileptic event).

According to Osorio, the disclosed methods, systems, and related devices, detect a pathological state of a patient by determining when a body

IPR2022-01562
Patent 10,159,415 B2

data variability value, or "BDV," is outside of a "value range," and where the threshold levels of that range vary in response to the patient's physical activity (measured by, e.g., an accelerometer) or mental/emotional state. *See, e.g.*, *id.* at code (57), ¶¶ 3–8, 28, 33, 35.  In this respect, Osorio states that "false negative and false positive detections of pathological events may be reduced by dynamically determining pathological or non-pathological ranges for particular body indices based on activity type and level or other variables (e.g., environmental conditions)."  *Id.* ¶ 36.

Osorio's Figure 1 is reproduced below.



FIG. 1

IPR2022-01562
Patent 10,159,415 B2

Figure 1 shows a schematic representation of medical device system 100, including kinetic sensor(s) 212 and body signal sensor(s) 282 connected to medical device 200 by leads 211 and 281, respectively. *Id.* ¶ 33. "[A]ctivity sensor(s) 212 may each be configured to collect at least one signal from a patient relating to an activity level of the patient," and include, for example, an accelerometer, an inclinometer, a gyroscope, or an ergometer. *Id.* Figure 1 also shows a current body data variability (BDV) module 265, which "may comprise an $O_2$ saturation variability (O2SV) module 330 configured to determine O2SV from $O_2$ saturation data," and "an HRV module 310 configured to determine HRV from heart rate data." *Id.* ¶¶ 10, 53, Fig. 2C. Osorio discloses that "medical device system 100 may be fully or partially implanted, or alternatively may be fully external." *Id.* ¶ 33.

IPR2022-01562
Patent 10,159,415 B2

Figure 8, reproduced below, shows one embodiment of Osorio's monitoring method.



FIG. 8

Figure 8 shows that an activity level is determined at 810, and a non-pathological BDV range is determined at 820 based on the activity level. *Id.* ¶ 77. A current BDV is determined at 840 and compared to the non-pathological BDV range at 850. *Id.* ¶ 78. If the current BDV is outside the non-pathological range, then a pathological state is determined at 860 and a further action, such as warning, treating, or logging the occurrence and/or severity of the pathological state, is taken at 870. *Id.*

According to Osorio, body indices that may be the subject of BDV monitoring include:

> heart rhythm variability, a heart rate variability (HRV), a respiratory rate variability (RRV), a blood pressure variability

24

IPR2022-01562
Patent 10,159,415 B2

> (BPV), a respiratory rhythm variability, respiratory sinus
> arrhythmia, end tidal $CO_2$ concentration variability, power
> variability at a certain neurological index frequency band (e.g.,
> beta), an EKG morphology variability, a heart rate pattern
> variability, an electrodermal variability (e.g., a skin resistivity
> variability or a skin conductivity variability), a pupillary
> diameter variability, a blood oxygen saturation variability, a
> kinetic activity variability, a cognitive activity variability,
> arterial pH variability, venous pH variability, arterial-venous
> pH difference variability, a lactic acid concentration variability,
> a cortisol level variability, or a catecholamine level variability.

*Id.* ¶ 43; *see also id.* ¶ 42 (similar), ¶¶ 45–46 (monitoring heart rate for

episodes of tachycardia and bradycardia). "In one embodiment, the severity

[of a pathological state] may be measured by a magnitude and/or duration of

a pathological state such as a seizure, a type of autonomic change associated

with the pathological state (e.g., changes in heart rate, breathing rate, brain

electrical activity, the emergence of one or more cardiac arrhythmias, etc.)."

*Id.* ¶ 71.

    With respect to HRV, in particular, Osorio teaches: "By monitoring

the patient's activity level, HR, and HRV, it is possible to determine when

the patient's HRV falls outside the non-pathological ranges as the patient's

activity levels change over time." *Id.* ¶ 66. Osorio's Figure 4A, reproduced

below, shows heart rate variability as a function of activity level. *See id.*

¶ 58.

IPR2022-01562
Patent 10,159,415 B2



FIG. 4A

Figure 4A plots a patient's heart rate (HR) on the Y-axis and a patient's activity level on the X-axis. *Id.* at Fig. 4A. Markers A1 though A4 represent increasing activity from a sleep state (A1) through vigorous activity (A4). *Id.* Boundary lines 410 and 420, respectively, represent the upper and lower limits of non-pathological heart rate, and include representative ranges R1 through R4. *Id.* According to Osorio,

> the upper and lower bounds of the non-ictal[13] HR region increase as activity level increases (e.g., from a sleep state to a resting, awake state) and reach their highest values for strenuous exertion. In addition, the width of the non-pathological HR ranges narrows as activity levels and heart rates increase, which is consistent with the known reduction in HRV at high levels of exertion. When the patient is in a non-pathological state (e.g., when an epileptic patient is not having a

---

[13] "Ictal" refers to the active, middle stage of a seizure and corresponds with intense electrical brain activity. Ex. 3001 (accessed on April 10, 2023 at https://epilepsyfoundation.org.au/understanding-epilepsy/seizures/seizure-phases/).

IPR2022-01562
Patent 10,159,415 B2

> seizure), for a particular activity level the patient's HRV should
> fall within a non-pathological HRV range associated with that
> activity level.

*Id.* ¶ 58.

Osorio further presents Figure 11 as "depict[ing] pathological and non-pathological BDV (e.g., HRV) value ranges." *Id.* ¶¶ 23, 91. In that illustration, Osorio shows that HRV values falling below 0.5 bpm and above 4 bpm are always pathological when activity level is low (e.g., resting or walking), whereas intermediate HRV values (0.5–4 bpm) may be pathological when considered in light of the patient's activity level. *Id.* Osorio further notes that the boundaries between normal and pathological may be adjusted based on an individual's physiology. "For example, in an epilepsy patient also suffering from tachycardia, and having base resting heart rate of 100-110 bpm, a decline in heart rate to 70 bpm may be indicative of a seizure slowing down the heart rate, even though a heart rate of 70 bpm is generally 'normal' across a typical population." *Id.* ¶ 45.

4.    Asl

Asl is a 2008 journal article titled "Support vector machine-based arrhythmia classification using reduced features of heart rate variability signal." Ex. 1007, 51. Petitioner contends that Asl is prior art under 35 U.S.C. § 102(a)(1). *Id.*; Pet. 2. Asl "presents an effective cardiac arrhythmia classification algorithm using the heart rate variability (HRV) signal." Ex. 1007, 51. Fifteen different features are extracted from an input HRV signal "by means of linear and nonlinear methods." *Id.* The algorithm can "identify six different and more frequently occurring types of cardiac arrhythmia." *Id.* at 52. The HRV data used in Asl's study "is generated

IPR2022-01562
Patent 10,159,415 B2

from the ECG signals provided by the MIT-BIH Arrhythmia Database." *Id.*
at 53.

## E.    *Ground 1*

Petitioner asserts that claims 1, 2, 11 and 12 are unpatentable as
obvious over the combination of Shmueli and Almen.  Petitioner contends
that the combination of Shmueli and Almen discloses or renders obvious
each element of claims 1, 2, 11 and 12 and sets forth an element-by-element
comparison of the asserted art to the challenged claims.  Pet. 7–48.
According to Petitioner, Shmueli discloses a wrist-worn "heart-monitoring
device" that "performs 'oximetry measurement[s]' 'continuously and/or
repeatedly,' and 'trigger[s] an ECG measurement . . . upon detection of an
intermittent irregular heart-related event.'" *Id.* at 13 (citing Ex. 1004, 10)
(alterations in original).  Petitioner contends that Shmueli's oximetry
measurements include heart rate and that a POSA would have understood
that HRV was "a well-known way to calculate heart rate measurements to
monitor a user's heart health." *Id.* at 14 (citing Ex. 1004, 10; Ex. 1003 ¶ 69).
Petitioner also relies on Almen as disclosing HRV as "a way to monitor an
'individual's current health status' and 'detect[] certain cardiovascular
conditions such as an arrhythmia . . . and monitoring treatment of same.'"
*Id.* (citing Ex. 1005, 2:11–14, 2:53–58) (first alteration in original).
Petitioner thus asserts:

> given Almen's explicit teaching that HRV can be used to detect
> irregular heart-related events, given that Shmueli already
> discloses monitoring heart rate, and given Shmueli's explicitly-
> stated goal of triggering ECG upon detection of an irregular
> heart-related event, a skilled artisan would have readily
> recognized that implementing monitoring HRV as a trigger for

IPR2022-01562
Patent 10,159,415 B2

> an ECG in Shmueli would have been beneficial to achieving the
> stated goals of Shmueli.

*Id.*

In addition, Petitioner points to Almen's teaching to use an alarm to prompt users to obtain "information that will assist in the diagnosis of any condition that may exist" when its "device identifies an abnormal cardio event or the onset of such an event." *Id.* (citing Ex. 1005, 7:65–8:7). Petitioner contends that the POSA would have readily understood that "taking an ECG at the onset of an abnormal cardio event as indicated by an abnormal HRV measurement would be one example of information that could be gathered to better assist diagnosis." *Id.* at 14–15 (citing Ex. 1003 ¶ 71 (Dr. Chaitman's testimony to that effect, further explaining that the POSA would seek to take an ECG as close in time as possible to a detected abnormal heart event)).

Patent Owner contends that Ground 1 fails because: 1) Almen does not disclose the use of optical sensors, derivation of HRV, and detection of arrhythmia together, 2) Almen is directed to monitoring HRV as it relates to respiratory and sleep conditions, whereas Shmueli is directed to measurements taken during normal everyday activities, and 3) Almen's disclosure is unreliable because many of the conditions it lists as detectable cannot be detected using HRV. PO Resp. 6–13. In addition, Patent Owner provides a separate argument for claims 2 and 12, asserting that Petitioner combines multiple embodiments from Shmueli to arrive at limitations recited in these claims. *Id.* at 35–36. Finally, Patent Owner argues that objective indicia supports that the challenged claims would not have been obvious. *Id.* at 13–35.

IPR2022-01562
Patent 10,159,415 B2

We conclude, after considering the arguments and evidence in this proceeding, that Petitioner has established sufficiently that the combination of Shmueli and Almen discloses or renders obvious each element of claims 1, 2, 11, and 12. We address the contested matters below.

> 1.  Almen's Disclosure of Optical Sensors, HRV, and Detection of Arrhythmia

Patent Owner argues that the Petition selectively relies on separate disclosures in Almen to support its position, arguing:

> [T]o the extent Almen may disclose certain aspects of the combination, such as the use of "optical sensors" (which Petitioner maps to PPG sensors generally and equates to Shmueli's SpO2 sensor specifically), derivation of HRV, and detection of an arrhythmia, at no point does Almen disclose implementing these features together, let alone implementing them in a system that is comparable to Shmueli's.

PO Resp. 7–8 (citing Ex. 2001 ¶ 57); *see also* PO Sur-reply 4 ("Petitioner . . . cherry-pick[s] disclosures from Almen to derive an alleged suggestion to the POSA to obtain HRV from heart rate information obtained by a PPG sensor for arrhythmia."). According to Patent Owner, "the instances where Almen mentions arrhythmia do not state that an optical sensor (or more particularly a PPG sensor) could be used for such detection." PO Resp. 9 (citing Ex. 1005, 2:54–85, 7:26–53). And, Patent Owner asserts, "while Almen discloses a number of different sensor types that might be used to derive HRV and, separately, a laundry list of medical conditions that might potentially be detected based on HRV, it never states that optical sensor-based HRV data can be used to detect arrhythmia, let alone atrial fibrillation." *Id.* at 9–10 (citing Ex. 1005, 7:26–53; Ex. 2001 ¶¶ 61–62). We do not find these arguments persuasive.

IPR2022-01562
Patent 10,159,415 B2

Petitioner contends that Almen provides motivation to monitor HRV as a trigger for an ECG.  Pet. 14.  According to Petitioner, Almen supports this motivation by disclosing "HRV . . . as a way to monitor an 'individual's current health status' and 'detect[] certain cardiovascular conditions such as arrhythmia . . . and monitor[] treatment of same" and by disclosing a device that prompts a user to obtain information that will assist in diagnosis when it identifies an abnormal cardio event as indicated by an abnormal HRV measurement.  *Id.* at 14–15, 30–31 (second alteration in original).  The record supports this.

Almen expressly discloses using HRV to detect arrhythmia.  Ex. 1005, 2:53–58 ("Another object of the present invention is to provide a wrist worn or arm worn heart rate variability monitor that is capable of detecting certain cardiovascular conditions such as arrhythmia and the onset of myocardial infarction."), 7:26–53 ("Using HRV test data, the inventive device may be capable of detecting and/or assisting in diagnosing various heart maladies and/or conditions.  Exemplary conditions that may be detected or diagnosed comprise . . . Arrhythmias [and] . . . Atrial Fibrillation.").  And Almen expressly discloses that HRV can be detected using optical sensors.  *Id.* at 9:17–22 ("To properly calculate HRV, a medically accurate measure of instantaneous and average heart rate must be determined.  To pick up heartbeats, and thus measure the rate, it is contemplated that a variety and/or a plurality of sensors may be advantageously deployed, using optic, pressure, ultrasonic, and, electrical means."), 10:28–30 ("Other embodiments may use an optical sensor to detect the heart beat and measure heart rate variability. . . . The optical

IPR2022-01562
Patent 10,159,415 B2

sensor may measure optical variations in tissue characteristics due to subcutaneous blood flow that may correlate with heart rate."). We find that the POSA would have understood from these disclosures that arrhythmia can be detected using an optical sensor.

Dr. Chaitman testifies that Shmueli's PPG sensor is an example of a known optical sensor that could be used to measure HRV. Ex. 1003 ¶¶ 50–52 (describing Almen's disclosure of measuring HRV using optical sensors and then explaining, "[o]ne such optical sensor known in the art is an infra-red pulse oximetry sensor that, like the sensor disclosed in Shmueli, 'picks up the pulsatile flow of blood through local capillaries.'"). We credit this testimony.

The evidence thus supports that the POSA would have understood that Shmueli's PPG sensor could have been used to measure HRV and that HRV could have been used to detect arrhythmia. Considering this evidence together with Shmueli's teaching to continuously take oximetry measurements and then take an ECG "upon detection of an intermittent irregular heart-related event" (Ex. 1004, 8), we agree with Petitioner and Dr. Chaitman that it would have been obvious to use HRV measurements as a trigger for taking an ECG. *See* Ex. 1003 ¶ 70 (testimony of Dr. Chaitman that "although a PPG can be easily measured, an ECG provides more precise diagnostic parameters of the electrical activity of the heart and enhances the diagnostic capability to capture certain cardiac conditions").

2.    Almen's disclosure of monitoring sleep patterns

Patent Owner contends that "[a]t its core, Almen is directed to monitoring sleep patterns and detecting conditions relating to sleep, such as

IPR2022-01562
Patent 10,159,415 B2

sleep apnea." PO Resp. 8. Based on this characterization, Patent Owner argues that "Petitioner fails to show that a POSA would have sought to apply that teaching [i.e., Almen's disclosure of using an optical sensor to detect arrhythmia] to a system like Shmueli's, given the differing uses of Almen and Shmueli." *Id.* at 12. According to Patent Owner, "the particular implementations described by Almen involve circumstances where the user is at rest with minimal motion (thereby, achieving more accurate data for HRV calculations . . . )" whereas "Shmueli is concerned with measurements being made during normal, everyday activities of the user, with the goal of detecting intermittent and transient cardiac events." *Id.* at 12–13. Patent Owner argues that "Petitioner fails to grapple with these distinct uses and thus fails to show why a POSA would have viewed deriving HRV from PPG data as a solution in a device like Shmueli's in view of Almen's distinct teachings." *Id.* at 13. We do not find this argument persuasive.

Shmueli and Almen are both directed to wrist-worn devices that monitor heart health, and both references have the same goal of detecting irregular heart conditions. Ex. 1004, 4 ("According to yet another aspect of the present invention there is provided a wrist-mounted physiological parameters measuring device including: an SpO2 measuring unit attached to a wrist of a subject . . . and a processor . . . where the processor is operative to detect an irregular heart condition from the SpO2 measurement"); Ex. 1005, 2:53–58 ("Another object of the present invention is to provide a wrist worn or arm worn heart rate variability monitor that is capable of detecting certain cardiovascular conditions such as arrhythmia and the onset of myocardial infarction and monitoring treatment of same."). Both references

IPR2022-01562
Patent 10,159,415 B2

disclose using optical sensors to monitor heart beat rate. Ex. 1004, 8
(teaching that "[d]eriving heart beat rate from oximetry" is "known in the
art" and disclosing "a method in which the oximetry measurement is
performed continuously and/or repeatedly, and [an] ECG measurement is
triggered upon detection of an intermittent irregular heart-related event.");
Ex. 1005, 9:17–22 ("To pick up heartbeats, and thus measure the rate, it is
contemplated that a variety and/or a plurality of sensors may be
advantageously deployed, using optic, pressure, ultrasonic, and, electrical
means."). We agree with Petitioner and Dr. Chaitman that Shmueli and
Almen are sufficiently related that the POSA would have considered the
teachings of Almen as applicable to Shmueli and, more specifically, sought
to apply HRV measurements derived from PPG data in Shmueli's device.
*See* Ex. 1003 ¶¶ 66–78 (Dr. Chaitman's testimony explaining how and why
the POSA would have applied Almen's HRV teachings in Shmueli's
device).

We recognize that almost all of Almen's embodiments, and the focus
of its disclosure, relate to monitoring during sleep. However, the Almen
reference is not limited to these teachings. *In re Mills*, 470 F.2d 649, 651
(CCPA 1972) ("[A] reference is not limited to the disclosure of specific
working examples."); *In re Chapman*, 357 F.2d 418, 424 (CCPA 1966) ("A
reference can be used for all it realistically teaches, and is not limited to the
disclosures in its specific illustrative examples."). For example, Almen
discloses that its device "monitors an individual's heart rate variability while
the user is either at rest or asleep ***or physically active*** and records the results
for up to 24 hours." Ex. 1005, 8:33–36 (emphasis added); *see also id.* at

IPR2022-01562
Patent 10,159,415 B2

2:59–63 ("Another object of the present invention is to provide a wrist worn or arm worn heart rate variability monitor that is capable of ***recording heart rate and expressing cardio work load in relation to exercise*** and calorie expenditure through heart rate data.") (emphasis added).  At least in these embodiments, Almen's users cannot be distinguished from Shmueli's users on the basis that they are at rest.  For this reason, we are not persuaded by Patent Owner's argument that the POSA would not have sought to combine Shmueli and Almen because they have different applications.

Even if Almen's disclosure were somehow limited to sleep monitoring, it would still have been obvious to apply Almen's HRV teachings to Shmueli.  As Dr. Chaitman explains, "incorporating Almen's teachings regarding calculating HRV and using HRV for the detection of cardiac disease would result in a device better capable of accomplishing the joint goals of [Shmueli and Almen]."  Ex. 1003 ¶ 67; *see also id.* ¶¶ 73–78.  And Shmueli already gathers the data from which HRV is calculated.  Ex. 1005, 9:17–18 ("To properly calculate HRV, a medically accurate measure of instantaneous and average heart rate must be determined."); Ex. 1004, 12 (disclosing that in Shmueli's device, a software program "derive[s] from the $SpO_2$ measurement physiological parameters such as pulse rate, pulse amplitude, pulse shape, rate of blood flow, etc."); *see also* Ex. 1004, 8 (disclosing that heart beat rate and "other artifacts of the heart activity and blood flow" can be measured using oximetry").  As Dr. Chaitman credibly testifies, given that Shmueli already discloses determining heart beat rate, "all that would be required to implement Almen's teachings concerning HRV in the Shmueli heart monitor would be additional software

35

IPR2022-01562
Patent 10,159,415 B2

implementing the algorithms and/or calculations taught by Almen."  Ex.
1003 ¶ 75.

Patent Owner points to the testimony of Dr. Chaitman that he would
expect HRV measurements in a group of people who were 20 years old to
have "less motion artifact" and therefore better "fidelity of the signal" than a
group of people with Parkinson's disease.  PO Resp. 9 (citing Ex. 2012,
27:21–28:22).  It is not clear to what extent the "motion artifact" in
Parkinson's patients would apply to the users of Shmueli's device, some of
whose day-to-day routine may involve periods of relative inactivity.  But,
even accepting the premise that movement consistent with day-to-day
activities diminishes the fidelity of HRV measurements, we do not draw
from Dr. Chaitman's Parkinson's testimony the conclusion that Patent
Owner suggests—i.e., that the POSA would have sought to implement HRV
only in sleeping patients.  *Id*. at 12–13.  That HRV can be measured more
accurately when users are still or sleeping does not mean that the POSA
would not have taken HRV measurements under less optimal conditions,
such as, during day-to-day activities.  *Cf. In re Mouttet*, 686 F.3d 1322, 1334
(Fed. Cir. 2012) ("[J]ust because better alternatives exist in the prior art does
not mean that an inferior combination is inapt for obviousness purposes.").
This is particularly true here because Shmueli already relies on heart beat
rate and the proposed Shmueli/Almen device would use the HRV
measurement as a trigger for a more accurate ECG measurement.

For these reasons, we are not persuaded by Patent Owner's argument
that Petitioner fails to show that a POSA would have sought to apply

IPR2022-01562
Patent 10,159,415 B2

Almen's teachings "to a system like Shmueli's, given the differing uses of
Almen and Shmueli." PO Resp. 12.

3.     Reliability of Almen's Disclosure

Almen discloses that "[u]sing HRV test data, [its] device may be
capable of detecting and/or assisting in diagnosing various heart maladies
and/or conditions." Ex. 1005, 7:26–28. Almen then provides a long list of
different conditions that its device may detect or assist in diagnosing,
including arrhythmia and atrial fibrillation. *Id.* at 7:28–53. Patent Owner
argues that the list includes "conditions that even Dr. Chaitman
acknowledges would not be detectable using HRV." PO Resp. 11. As an
example, Patent Owner points out that Almen's list includes "bundle branch
block," a condition "defined based on the QRS duration, which can only be
obtained through an ECG." *Id.* In addition, Patent Owner cites the
testimony of Dr. Efimov that "most of the cardiac conditions listed by
Almen cannot be diagnosed based on HRV and/or PPG, but require[] more
advanced alternative methods." Ex. 2001 ¶ 62 (internal citation omitted)
(cited at PO Resp. 11). Patent Owner contends that the POSA would have
viewed Almen's disclosure with skepticism and that "[t]his skepticism
undermines Petitioner's claims that a POSA would have picked out a
specific teaching from Almen to derive HRV for arrhythmia detection using
a PPG sensor." PO Sur-reply 5. We do not find this argument persuasive.

Almen summarizes its invention as being a "wrist-worn or arm band
worn heart rate variability monitor." Ex. 1005, 2:11–12. Almen's
disclosure of HRV is, thus, not an isolated specific teaching that the POSA
would need to pick out from within a larger disclosure; it is central to

IPR2022-01562
Patent 10,159,415 B2

Almen's invention. We find that the POSA would have readily identified HRV monitoring from Almen's disclosure. The POSA would have also readily connected Almen's HRV monitoring device with the detection of arrhythmia because Almen identifies arrhythmia detection as an "object of the present invention." *Id.* at 2:54–58 (identifying arrhythmia detection as an object of the invention); *see also* 2:33–3:4 (identifying a relatively limited number of additional objects of the invention, including: detecting sleep apnea, detecting sudden infant death syndrome, communicating with internal devices, monitoring heart rate in relation to exercise, assisting in sleep avoidance, and assisting in timed rest).

We recognize the evidence that certain of the other conditions that Almen identifies its device as capable of detecting may not be detectable using HRV. Ex. 2001 ¶ 62 (Dr. Efimov's testimony identifying conditions listed in Almen but not detectable by HRV); Ex. 2012, 47:11–49:18 (Dr. Chaitman's testimony acknowledging that bundle branch block, which is listed in Almen, can only be obtained through ECG), 49:22–52:2 (Dr. Chaitman's testimony that Almen's disclosure of conditions that can be detected is "ambitious" and that detecting aortic aneurysm, for example, "would be a bit of a stretch"). Although the POSA may have looked upon Almen's "ambitious" disclosure that its device could diagnose certain conditions with some degree of skepticism, we are not persuaded that such skepticism would extend to Almen's disclosure of using HRV to detect arrhythmia for several reasons.

First, as discussed above, HRV is central to Almen's device and detecting arrhythmia is one of the objects of Almen's invention. Ex. 1005,

IPR2022-01562
Patent 10,159,415 B2

2:11–12, 2:54–58.  We find that the POSA would not have been skeptical

that Almen's device could achieve one of the objects of its invention.  *Cf. In*

*re Sasse*, 629 F.2d 675, 681 (CCPA 1980) (holding that prior art patent was

presumed to be enabled); *see also In re Antor Media Corp.*, 689 F.3d 1282,

1288 (Fed. Cir. 2012) (holding that presumption of enablement extends to

printed publications).

Second, the evidence of record supports that by December of 2013 –

when the earliest application in the '415 patent's priority chain was filed

(Ex. 1001, code (60)) – heart rate variability was, in the words of Patent

Owner's expert, "well-developed" (Ex. 1044, 1294:21–1298:7 (testimony of

Dr. Efimov).  Petitioner's expert, Dr. Chaitman, testifies that HRV analysis

is "an important tool in cardiology used to diagnose various types of

arrhythmias."  Ex. 1003 ¶ 36 (citing Ex. 1028, a 2004 article entitled

"Automatic arrhythmia detection based on time and time-frequency analysis

of heart rate variability," disclosing an "automatic arrhythmia detection

system, which is based on heart rate features only," and teaching that HRV

analysis became "a critical tool in cardiology for the diagnosis of heart

diseases"); *see also* Ex. 1039, Abstract (2006 article also cited by Dr.

Chaitman, disclosing that "HR variation analysis . . . has become a popular

noninvasive tool for assessing the activities of the autonomic nervous

system").  Further, the evidence supports that it was known that HRV could

be derived from either ECG or PPG data.  Ex. 1003 ¶ 37 (testimony of Dr.

Chaitman supported by citation to articles).  Given this background

knowledge regarding the state of the art, we do not find Patent Owner's

position that the POSA would have been skeptical that Almen's wrist-worn

IPR2022-01562
Patent 10,159,415 B2

HRV monitor could have been used to detect arrhythmia adequately supported.

Third, Almen's disclosure of a wrist-worn HRV monitor and of using its device to detect arrhythmia is consistent with the disclosure in Shmueli. As discussed above, Shmueli discloses a method where an "oximetry measurement is performed continuously and repeatedly, and [an] ECG measurement is triggered upon detection of an intermittent irregular heart-related event." Ex. 1004, 8. We agree with Petitioner and Dr. Chaitman that the POSA would have understood "intermittent irregular heart-related event" to include an arrhythmia. Pet. 8; Ex. 1003 ¶¶ 45–46 (Dr. Chaitman's well-supported testimony on this point). Shmueli's disclosure of using oximetry to detect arrhythmia lends credence to the notion that Almen's wrist-worn HRV monitor could have achieved its stated goal of detecting arrhythmia. This is particularly true given the evidence that the POSA would have understood "oximetry measurements" to "include measurements of, for example, heart beat rate" and that the POSA "would have understood HRV to be a well-known way to assess potential irregularities in heart rate measurements to monitor a user's heart health." Pet. 13; Ex. 1003 ¶ 69 (Dr. Chaitman's credible testimony on this point); Ex. 1004, 8 (Shmueli's disclosure that "[d]eriving heart beat rate from oximetry, as well as other artifacts of the heart activity and blood flow, is also known in the art").

For these reasons, we find that although the POSA may have looked upon Almen's "ambitious" disclosure that its device could diagnose certain conditions with some degree of skepticism, such skepticism would not extend to Almen's disclosure of using HRV to detect arrhythmia.

IPR2022-01562
Patent 10,159,415 B2

### 4.    Combining multiple embodiments

Claims 2 and 12 depend from claims 1 and 11 respectively, and further recite that the "heart rate sensor comprises one or more of a patch wristband and an armband." Ex. 1001, 26:36–38, 27:16–18.  Patent Owner argues that, in connection with claims 2 and 12, Petitioner maps the heart rate sensor to Figures 1A and 1B of Shmueli, where the PPG heart rate sensor is integrated into the back of a wrist-worn device.  PO Resp. 35–36. According to Patent Owner, this is a problem because, in connection with claims 1 and 11, Petitioner mapped the heart rate sensor to "a specific embodiment of Shmueli in which the PPG sensor is 'mounted on the inner side of a ring or a clip worn on (e.g., coupled to) a finger." *Id.*  As a result, Patent Owner argues, Petitioner's showing for claims 2 and 12 is deficient because it does not address the "transmitting" limitation[14] for the embodiment where the PPG sensor is integrated into the back of a wrist-worn device rather than mounted on a ring. *Id.*; PO Sur-reply 6–9.  We do not find this argument persuasive because the Petition's showing for claim 1 is not limited to Shmueli's ring embodiment.

In addressing "sensing" limitation of claim 1,[15] the Petition clearly relies on both the watch and the ring embodiments. Pet. 23–25. Specifically, the Petition reproduces Shmueli's Figures 1A and 1B (which Petitioner describes as "clearly show[ing] that the PPG sensor is on the back

---

[14] "[T]ransmitting said heart rate of said first user to a mobile computing device" (the "transmitting limitation").

[15] "[S]ensing a heart rate of said first user with a heart rate sensor coupled to said first user" (the "sensing limitation").

IPR2022-01562
Patent 10,159,415 B2

surface of the embodiment of the wearable device") and Figure 5 (which Petitioner describes as disclosing that the PPG sensor "can be mounted on the inner side of a ring"). *Id.* Then, in addressing the "transmitting" limitation, the Petition relies upon Shmueli's Figure 6 (reproduced below, as annotated in the Petition).



*Id.* at 27. Figure 6 is "a simplified block diagram of [Shmueli's] heart monitoring device." Ex. 1004, 7. Figure 6 shows, among other things, an oximetry sensor (13) connected to an oximetry measuring unit (30), a memory unit (28), and a processor (29), all of which are annotated in red by Petitioner. *Id.* at 11. In Figure 6, the memory unit (28) and processor (29) are also connected to ECG contact sensors (14) and ECG measuring unit (31). *Id.* In connection with its discussion of Shmueli's Figure 6, the Petition asserts that Shmueli's mobile computing device "receives data from the sensors." Pet. 28. The statement that Shmueli's device "receives data from the sensors" clearly applies not just to Shmueli's ring-based PPG sensor, but to all of Shmueli's sensors.

42

IPR2022-01562
Patent 10,159,415 B2

After discussing how the processor in Shmueli receives information from its sensors, the Petition turns to Almen. The Petition reproduces Figure 1 of Almen, an embodiment where sensors are integrated into a band and monitor body of a watch. *Id.* at 29; Ex. 1005, Fig. 1, 8:43–61. The Petition then states that "[t]he watch receives data sensed by the sensors." Pet. 29. The statement that Almen's watch "receives data sensed by the sensors" clearly relates to Almen's band and monitor body sensors, not to a ring-based PPG sensor. Indeed, Almen does not disclose a ring sensor.

The Petition concludes its discussion of the "transmitting" limitation, by asserting that "both references teach that data received from sensors is transmitted to and analyzed by a generic processor executing instructions stored in memory on a mobile device" and that "the combination would do the same." *Id.* at 30. Again, this statement is not limited to ring-based sensors and clearly asserts that sensors – whether ring-based or otherwise – transmit data to a generic processor.

It is true that the Petition discusses Shmueli's ring-based sensor and explains that, when the PPG sensor is "mounted on the inner side of a ring[,] . . . the ring is connected to the mobile computing device via a wire, and data is transmitted from the sensor on the ring to the mobile computing device via that wire." *Id.* at 28–29. But we do not read this discussion as limiting Petitioner's assertions for claim 1 to ring-based sensors. To the contrary, the Petition clearly relies on both. Because Petitioner's assertions for claim 1 and 11 encompass sensors like those in Figures 1A and 1B of Shmueli, we are not persuaded by Patent Owner's argument that Petitioner's mapping for

IPR2022-01562
Patent 10,159,415 B2

claims 2 and 12 does not align with its mapping for claim 1 and 11 or that Petitioner's showing for claims 2 and 12 is otherwise deficient.

## 5. Objective indicia of non-obviousness

Patent Owner contends that objective indicia demonstrate the non-obviousness of the challenged claims.  Much of Patent Owner's argument focuses on the findings of the International Trade Commission ("ITC") with respect to three related patents, U.S. Patent Nos. 9,572,499 ("the '499 patent"), 10,595,731 ("the '731 patent"), 10,638,941 ("the '941 patent") in *In the Matter of Certain Wearable Electronic Devices with ECG Functionality and Components Thereof*, Investigation No. 337-TA-1266.[16] Accordingly, we begin our analysis with a brief summary of the ITC proceeding.  We then consider the impact of the ITC's findings on this case.  Next, we consider Patent Owner's evidence of nexus and the evidence of record in this case.  Finally, we consider whether Petitioner had an obligation to address secondary considerations in its Petition.

---

[16] The '499 and '731 patents are part of the same patent family as the challenged '415 patent.  The '941 patent is not part of the same family, but involves similar subject matter.  Ex. 1001 codes (21) and (63) ('415 patent); Ex. 1010, codes (21) and (63) ('499 patent); Ex. 1048, codes (21) and (63) ('941 patent); IPR2021-00971 Ex. 1001 code (63) ('731 patent).

IPR2022-01562
Patent 10,159,415 B2

> a)     *The ITC's findings with respect to objective indicia of non-obviousness*

Before the ITC, Petitioner argued that the '449, '731, and '941 patents would have been obvious over the combination of AMON,[17] Almen, and Kotzin.[18]  Ex. 2003, 71–97, 115–126, 146–151.[19]

With respect to the '941 patent, in its Initial Determination, the Administrative Law Judge (ALJ) found that Petitioner had established a *prima facie* case of obviousness for claims 12, 13, 16, 18–20, 22, and 23.[20] *Id.* at 71–92.  The ALJ then considered objective indicia of non-obviousness, finding that Patent Owner had "shown that KBS [Patent Owner's KardiaBand product] practices claims 12, 16, 20, 22 and 23 and is therefore entitled to a presumption of nexus" but that "KBS does not practice claims 13 or 19, which involve HRV, so there is no presumption of nexus." *Id.* at 93–94.  After finding a nexus with KBS, the ALJ found that the evidence of failure by others and of long-felt need did "not weigh in favor of obviousness," but that Patent Owner offered "evidence of commercial success," "strong evidence of industry praise," and "probative evidence of copying." *Id.* at 94–96.  Taken together, the ALJ found these objective

---

[17] AMON is an article entitled *AMON: A Wearable Multiparameter Medical Monitoring and Alert System* published in December 2004.  PO Resp. 14 n.2 (citing Ex. 2003, 60).

[18] Kotzin is an international patent application WO 2004/012033, published in February 2004.  PO Resp. 14 n.3 (citing Ex. 2003, 60).

[19] Petitioner also argued that each these patents was invalid as directed to patent ineligible subject matter.  Ex. 2003, 61–71, 113–115, 141–146.

[20] The ALJ found that Petitioner had not established a *prima facie* case with respect to claim 21.  Ex. 2003, 93.

IPR2022-01562
Patent 10,159,415 B2

indicia "sufficient to rebut the prima facie case," explaining that "[t]he nature and volume of industry praise is unusual, particularly the praise published in a respected medical journal, and although the evidence of copying is not especially impressive, some degree of commercial success is evident from the KBS sales data and the testimony of ALC's chief financial officer." *Id.* at 97.

In the Commission's Final Decision, the Commission agreed that Petitioner had established a *prima facie* case of obviousness for the '941 patent. With respect to objective indicia, the Commission found that Patent Owner's "evidence of commercial success regarding the '941 patent claims [was] weak" and the Commission gave it "little weight." Ex. 2004, 44. However, the Commission found that "the evidence of 'industry praise' and 'copying' together, even without commercial success, [was] sufficient to overcome the *prima facie* showing of obviousness." *Id.*[21] Accordingly, the Commission found all of the claims challenged in the ITC proceeding— including claims 12, 16, 20, 22, and 23, which Petitioner had shown to be *prima facie* obvious—to be non-obvious. *Id.* at 42.

With respect to the '731 patent, the ALJ found that claims 1, 12, and 16 were obvious based on AMON alone, and concluded that "[b]ecause anticipation is 'the epitome of obviousness,' claims 1, 12, and 16 are invalid, without regard to secondary considerations of non-obviousness." Ex. 2003,

---

[21] Chairman Johanson did not agree, noting "[g]iven the strength of these findings [relating the *prima facie* case], Chairman Johanson would not find the evidence of obviousness outweighed by the cited evidence of nonobviousness." Ex. 2004, 44 n.29.

IPR2022-01562
Patent 10,159,415 B2

126 (internal citation omitted).  For claim 8, the ALJ found that Petitioner
established a *prima facie* case of obviousness and that Patent Owner had not
shown a nexus, thus, "no secondary considerations weigh against that
claim's obviousness." *Id.* at 126–127.[22]  In the Commission's Final
Decision, the Commission determined that the ALJ's Initial Decision "erred
in failing to consider evidence of secondary considerations" for claims 1, 12,
and 16.  Ex. 2004, 47.  The Commission then determined that the "secondary
considerations of 'industry praise' and 'copying' are sufficient to overcome
the *prima facie* showing of obviousness for claims 1, 12, and 16 of the '731
patent for the same reasons as discussed with respect to the '941 patent."  *Id.*

Finally, with respect to the '499 patent, the ALJ found that Petitioner
had established a *prima facie* case of obviousness for claim 16, but that "the
secondary considerations here also outweigh the other *Graham* factors, such
that claim 16 would not have been obvious" for "[e]ssentially the same
reasons as discussed above for claims 12, 16, 20, 22, and 23 of the '941
patent."  Ex. 2003, 151.  In so finding, the ALJ found that "KBS embodies
claim 16, so [Patent Owner] is entitled to a presumption of nexus."  *Id.*  The
Commission's Final Decision did not address the obviousness of the
challenged claims of the '499 patent, but found that they were directed to
patent ineligible subject matter.  Ex. 2004, 37–40 (finding that claims 16 and
17 were directed to patent ineligible subject matter), 40–47 (addressing the
Initial Decision's obviousness findings without addressing findings for the
'499 patent).

---

[22] The ALJ also found that Petitioner had not established a *prima facie* case
of obviousness for claims 3, 5, 9, 10 and 15.  Ex. 2003, 126.

IPR2022-01562
Patent 10,159,415 B2

> *b)*    *Impact of the ITC's finding on this proceeding*

Having briefly summarized the ITC's findings, we next consider the legal effect of those findings in this proceeding.  Simply put, the ITC decision has no preclusive effect.  *Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1569 (Fed. Cir. 1996) (explaining that "Congress did not intend decisions of the ITC on patent issues to have preclusive effect"); *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1019 (Fed. Cir. 1987) (holding that the Federal Circuit's "appellate treatment of decisions of the Commission does not estop fresh consideration by other tribunals"); *see also* Director Vidal's June 21, 2022 Memorandum regarding Interim Procedure for Discretionary Denials in AIA Post-grant Proceedings with Parallel District Court Litigation, 6, accessed at https://www.uspto.gov/sites/default/files/documents/interim_proc_discretion ary_denials_aia_parallel_district_court_litigation_memo_20220621_.pdf ("Unlike district courts, the ITC lacks authority to invalidate a patent and its invalidity rulings are not binding on either the Office or a district court").  Accordingly, we are free to attribute to the ITC decision whatever persuasive value we consider justified.

> *c)*    *Nexus*

Patent Owner contends that we should find a nexus between the challenged claims and KBS as a sanction for what it alleges is Petitioner's discovery misconduct.  PO Resp. 30–31.  Patent Owner also contends that it is entitled to a presumption of nexus.  *Id.* at 17–18, 23.  We address each of Patent Owner's nexus contentions in turn.

IPR2022-01562
Patent 10,159,415 B2

### (i) Finding nexus as a sanction

Patent Owner contends that we should find a nexus as a sanction for Petitioner's alleged discovery misconduct. *Id.* at 30–31. Specifically, Patent Owner asserts that it could not "directly compare the KBS . . . to the claims of the '415 patent" because "[t]he evidence necessary to make such a showing was in Petitioner's possession and . . . [d]espite representations that it would produce the requested confidential information, Petitioner ultimately refused to do so." PO Sur-reply 17.[23] Further elaborating, Patent Owner explains that "Petitioner initially agreed to produce the evidence required by [Patent Owner]," but then "changed course with just three business days remaining before the deadline for [Patent Owner's] response." *Id.* Patent Owner argues that Petitioner's alleged discovery misconduct "merits sanctions," asserting, "[a]t minimum, the Board should hold that nexus between AliveCor's KBS as used in conjunction with Apple Watch and the challenged claims of the '415 patent has been established." PO Resp. 30–31. We decline to find nexus between KBS and the challenged claims as a sanction for Petitioner's alleged discovery misconduct for several reasons.

First, Patent Owner did not move to compel production of the documents that it contends were necessary to prove nexus before requesting sanctions. Although we recognize Patent Owner's efforts to resolve its

---

[23] Patent Owner explains that KBS is "comprised both of the KardiaBand, an accessory to the Apple Watch, and the Apple Watch itself" and, "[a]s such, confidential information relating to both parties would be needed to compare the claims to the KBS." PO Sur-reply, 16.

IPR2022-01562
Patent 10,159,415 B2

discovery dispute without Board intervention, by raising this issue for the first time in its Patent Owner Response, Patent Owner deprived us of the opportunity to resolve what appears to be a simple discovery dispute though means short of sanctions.

Second, we have reviewed the discovery correspondence that Patent Owner contends evidence "delay tactics" and "gamesmanship, including misrepresentation that it would produce the requested documents." Ex. 2011 (cited at PO Resp. 37–38; PO Sur-reply 21). Although we agree that Petitioner could have responded to Patent Owner's discovery requests with greater alacrity, and more clearly articulated the documents it intended to produce in response to such requests, we are not persuaded that Petitioner's conduct during discovery rose to the level of sanctionable misconduct.

The first and second reasons discussed above provide sufficient basis to deny Patent Owner's request for sanctions. In addition, we note a third reason: on this record, Patent Owner has not established that it would be entitled to the information it requests in discovery. In particular, we question whether Patent Owner could have obtained the information at issue by other means. *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, Case IPR2012-00001, Paper 26 at 6 (PTAB Mar. 5, 2013) (precedential) (explaining that production by another of "[i]nformation a party can reasonably figure out or assemble without a discovery request would not be in the interest of justice."); *see, e.g., Dynamic Air Inc. v. M-I Drilling Fluids UK Ltd.*, IPR2016-00260, Paper 39 (PTAB Nov. 30, 2016)(denying petitioner's request for additional documents and deposition partly because

50

IPR2022-01562
Patent 10,159,415 B2

petitioner did not show that it could not obtain information about the state of
the art and properties of drill cuttings by other means).

Patent Owner asserts that "confidential information relating to both
parties would be needed to compare the claims to the KBS, including, for
example, functionality performed by the processor contained in the Apple
Watch."  PO Sur-reply 16–17.  But Petitioner asserts that Patent Owner
could have itself produced the information it contends is missing.  Pet. Reply
24; *see also* Ex. 2011, 1 (discovery correspondence where Petitioner
asserted "it appears you are requesting charts submitted in the ITC by
AliveCor, not Apple, regarding alleged domestic industry of the
Kardiaband—an AliveCor product"), 2 (discovery correspondence where
Petitioner asserted "we're unclear on why Apple would need to produce
evidence of AliveCor's KardiaBand system").  We struggle to understand
how Patent Owner could have sold KardiaBand, an accessory for Patent
Owner's KBS product, without maintaining any evidence of how
KardiaBand worked in that product.  It may be, as Petitioner suggests, that
Patent Owner "wanted the ITC-produced versions of these documents as
opposed to providing them itself."  Pet. Reply 23.[24]  It may also be that
Patent Owner is correct and Petitioner's confidential information is
necessary to show how KBS works.  Regardless, for purposes of imposing

---

[24] Petitioner asserts that Patent Owner's motive for relying on the ITC
documents was to avoid "an independent determination from this Board as
to the secondary consideration evidence."  Pet. Reply 23–24.  We do not
impute such a motive and note that Patent Owner could just as plausibly
have sought to make it easier for the Board to evaluate and weigh the ITC's
findings.

IPR2022-01562
Patent 10,159,415 B2

sanctions, the record is not sufficiently clear that Patent Owner would have been entitled to the documents it contends should have been produced.

For the reasons discussed above, we decline to find nexus between KBS and the challenged claims as a sanction for what Patent Owner contends is discovery misconduct by Petitioner.

### (ii)    Finding nexus based on the ITC's findings

"In order to accord substantial weight to secondary considerations in an obviousness analysis, 'the evidence of secondary considerations must have a 'nexus' to the claims, *i.e.*, there must be 'a legally and factually sufficient connection' between the evidence and the patented invention.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Henny Penny Corp. v. Frymaster LLC,* 938 F.3d 1324, 1332 (Fed. Cir. 2019)).  The patentee bears the burden of showing nexus.  *Id.*  A patent owner is entitled to a presumption of nexus where it shows that the evidence supporting secondary considerations "is tied to a specific product and the product '*is* the invention disclosed and claimed'" or, put another way, the "product 'embodies the claimed features, and is coextensive with them.'" *Id.*  "A patentee may establish nexus absent the presumption by showing that the objective indicia are the 'direct result of the unique characteristics of the claimed invention,' rather than a feature that was 'known in the prior art.'" *Campbell Soup Co. v. Gamon Plus, Inc.,* 10 F.4th 1268, 1277 (Fed. Cir. 2021) (citation omitted).

IPR2022-01562
Patent 10,159,415 B2

Here, Patent Owner contends that it is entitled to a presumption of nexus.[25] More specifically, Patent Owner asserts that it is entitled to a presumption of nexus because the challenged claims are directed to the same subject matter as the claims of the '499 patent and because the ITC found a nexus between those claims and KBS. PO Resp., 24 ("[G]iven the shared subject matter of the challenged claims of the '415 patent and the claims of the '499 patent, a presumption of nexus applies to the claims of the '415 patent because the KBS practices these claims for the same reasons it practices the asserted claims of the '499 patent."). Patent Owner also asserts that it is entitled to a presumption of nexus based on Petitioner's admission that the claims if the '499 and '956 patents are substantively similar. *Id.* at 17 ("A presumption of nexus applies to the challenged claims of the '415 patent because, as Petitioner admits, the claims recite 'substantively identical' limitations as those recited by the '499 patent.").

Petitioner argues that Patent Owner "makes no attempt to actually prove nexus in this proceeding, instead relying on purported findings by the ITC with respect to nexus in a ***different*** proceeding involving ***different*** patents." Pet. Reply 14. Petitioner asserts that we should "reject [Patent Owner's] nexus-by-proxy attempts because [Patent Owner] failed to perform any actual analysis." *Id.* at 15. According to Petitioner, Patent Owner "attempts to shirk its burden by piggy-backing on a supposed finding of nexus by the ITC as to certain claims of patents not involved here, and it

---

[25] Patent Owner does not attempt to show that the objective indicia are a "direct result of the unique characteristics of the claimed invention." *See* PO Resp. 13–35 (discussing nexus without making this argument).

IPR2022-01562
Patent 10,159,415 B2

would have this Board also defer to the ITC, and more, to reach the same conclusion on a different patent." *Id.* at 14. We agree with Petitioner.

Patent Owner discusses the similarities between the claims of the '499 patent and the claims of the '415 patent at length. PO Resp. 17–23. But regardless of how similar the claims may be, similarity of the '415 and '499 patent claims only matters if we extend the findings of the ITC with respect to the '499 patent to this proceeding. Petitioner's admission that "the claims of the '415 Patent recite many limitations substantively identical to claims of . . . the '499 patent" (Pet. 5) does not change this because Patent Owner's argument still ultimately relies on extending the ITC's findings to our proceeding.[26] Thus, Patent Owner's argument for nexus requires us to defer to the ITC, asking us to find that there is a nexus because the ITC found a nexus for a different patent.

Although we do not defer to the ITC, we do consider whether the ITC's findings have persuasive value in this proceeding. Our consideration of the persuasive value of the ITC's findings is, however, hindered by the fact that we do not have access to the same evidence as was before the ITC. Tr. 42:9–11 ("[Board]: Do we have all the evidence before us that was before the ITC? [Patent Owner's Counsel]: No you don't."). In particular, we do not have access to the information the ITC considered when it compared the claims of the '499 patent to KBS. Nonetheless, we consider the persuasive value of the ITC's findings in view of the record before us.

---

[26] Petitioner did not concede that the claims of the '499 and '415 patents are the same, only that "many of the limitations" of the claims are the same. Pet. 5.

IPR2022-01562
Patent 10,159,415 B2

We begin by considering whether the ITC's finding supports that KBS embodies claims 1 and 11 of the challenged patent.  We conclude that the ITC's findings are inconclusive at least with respect to the requirement of claims 1 and 11 for determining "heart rate variability."  Ex. 1001, 26:30–32, 27:12–13.  On the one hand, the ITC's Initial Determination found that "KBS embodies claims 16" of the '499 patent.  Ex. 2003, 151.  This supports that KBS determines HRV because claim 16 depends from claim 11, which includes claim language requiring a computer processor to "determine a heart rate variability."  *Id.* at 129–130.  On the other hand, the ITC found that KBS practiced only those claims of the '941 patent that do not require determining HRV.  *Id.* at 93–94 ("[Patent Owner] has shown that KBS practices claims 12, 16, 20, 22, and 23 [of the '941 patent], and it is therefore entitled to a presumption of nexus . . . [b]ut KBS does not practice claims 13 or 19, which involve HRV, so there is no presumption of nexus.").  This suggests that KBS does not, in fact, practice HRV.

Patent Owner asks us to disregard the ITC's findings with respect to claims 13 and 19 of the '941 patent because they were "not asserted as part of [Patent Owner's] domestic industry showing for the KBS, and thus, no argument was advanced that KBS practices those claims."  PO Sur-reply 14–15.  But we are not persuaded that the proof Patent Owner chose to offer in connection with domestic industry provides reason to discount the ITC's statement, made in connection with secondary considerations, that "KBS does not practice claims 13 or 19, which involve HRV."  Ex. 2003, 93–94.[27]

---

[27] For similar reasons, we are not persuaded by Petitioner's argument that we should disregard the ITC's findings of nexus for claim 11 of the '499 patent

IPR2022-01562
Patent 10,159,415 B2

On the record before us, it is not clear whether the ITC found that KBS determines HRV.  Thus, even if we were to adopt the ITC's finding as our own, we cannot determine from the ITC's findings whether KBS embodies the challenged claims, all of which require determining HRV.  Because Patent Owner bears the burden of proof on this issue, this is fatal to its case. *Fox Factory*, 944 F.3d at 1373.

In addition to the absence of evidence that KBS embodies the challenged claims, the record lacks evidence that KBS is coextensive with the claims.  We agree with Petitioner that Patent Owner "has not attempted to prove that KBS is 'coextensive' with the claims."  Pet. Reply 19.  For this additional reason, Patent Owner's comparison of the challenged claims to claim 11 of the '499 patent does not establish entitlement to a presumption of nexus.

For the reasons discussed above, we find that Patent Owner has not carried its burden to establish a nexus between KBS and the challenged claims.

> *d)    Evidence of record in this case*

Patent Owner contends that objective indicia of industry praise and copying support the non-obviousness of the challenged claims.[28]  Although

---

because Petitioner "did not even challenge nexus with respect to the '499 patent," instead relying upon arguments that it didn't infringe and that its claims were invalid as directed to patent ineligible subject matter.  Pet. Reply 18.  In this regard, we note that we are considering the ITC's findings for their persuasive value, not as creating a potential estoppel.

[28] It is not clear whether Patent Owner relies on commercial success as supporting non-obviousness.  In summarizing the ITC proceeding, Patent Owner asserts that the ITC "found evidence of commercial success."  PO

IPR2022-01562
Patent 10,159,415 B2

we have already determined that Patent Owner has not established a nexus,

we nonetheless consider Patent Owner's evidence of industry praise and

copying for completeness.

### (i)    Copying

Copying may be considered as objective indicia of non-obviousness.

*Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d. 1317, 1325 (Fed. Cir.

2004).  "Copying requires duplication of features of the patentee's work

based on access to that work, lest all infringement be mistakenly treated as

copying." *Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*,

---

Resp. 17.  But Patent Owner does not discuss commercial success in the
portion of its Response addressing the evidence of record in this proceeding.
*Id.* at 33–36.  To the extent Patent Owner relies on commercial success it is
not persuasive at least because the ITC's Final Determination found that
Patent Owner's "evidence of commercial success regarding the '941 patent
claims [was] weak and [gave] it little weight."  Ex. 2004, 44; *see also* Ex.
2003, 94–95 (finding that "KBS' profitability is not clear," that Patent
Owner "principally relies on funding it received, as opposed to revenues or
profits," and that "there is no clear nexus between the funding and KBS").
Further, the evidence cited in Patent Owner's Response (Exhibits 2009,
2010, 2017, and 2025) lacks context.  For example, Exhibits 2009 and 2010
provide only revenue and units sold, with no testimony explaining the data,
no evidence of market share, and no evidence that KBS is coextensive with
the claims of the '415 patent .  *In re Applied Materials Inc*., 692 F.3d 1289,
1300 (Fed. Cir. 2012) ("the number of units sold without evidence of the
market share is only weak evidence of commercial success"); *In re
Youngblood*, 215 F.3d 1342, *11 (Fed. Cir. 1999) ("Because Youngblood
provided no market share context, his evidence of commercial success is
entitled to little weight"); *Chemours Co. FC v. Daikin Indus., Ltd.*, 4 F.4th
1370, 1378 (Fed. Cir. 2021) (noting that sales data in a relevant market may
be sufficient without a showing of market share, provided there is a showing
that the successful product is the invention claimed).

IPR2022-01562
Patent 10,159,415 B2

738 F.3d 1337, 1347–48 (Fed. Cir. 2013).  Evidence of copying may include access and similarity to a patented product.  *Iron Grip Barbell*, 392 F.3d at 1325.  Copying may also be demonstrated by showing "access to an issued patent coupled with circumstantial evidence regarding changes to a competitor's design."  *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1138 (Fed. Cir. 2019).  "[A]ccess to published articles about a patented method" is also relevant to the analysis of copying as objective indicia of non-obviousness. *Id.*

Patent Owner cites several documents as support that Apple's and AliveCor's products were similar.  Ex. 2022 (excerpt from presentation comparing ███████████████████████████████████████; Ex. 2023 (excerpt from document identifying ████████████████ ██████████████████████████████ but noting that there the FDA has determined ████████████████████████████████ ███████████); Ex. 2024 (510K submission stating ████████████████ █████████████████████████████████████████████████████ ████████████████████████████).  None of these documents, or any other document identified by Patent Owner, provides a detailed enough comparison of any Apple product to any AliveCor product to support that one product is sufficiently similar to support an allegation of copying.  Nor do any documents provided by Patent Owner provide evidence comparing an Apple product to the challenged claims.  Exhibits 2023 and 2024 include general statements supporting that ██████████████████████████ █████████ which we assume to be the allegedly copied product.  And Exhibit 2022 identifies ███████████████████████████████████████

IPR2022-01562
Patent 10,159,415 B2

█████████████████████████████████████████████████

████████ But general statements that products are "similar" and that they have common features are insufficient to establish copying, particular where the only apparent relation the common features share with the challenged claims is that the challenged claims include language about sensing or recording an electrocardiogram. *Institut Pasteur*, 738 F.3d at 1347–48 ("Copying requires duplication of features of the patentee's work.").

Patent Owner's other evidence of copying is similarly unpersuasive. Patent Owner contends that "Apple had ████████████████████ ██████████████████████████████████████████████ ████████████████ PO Resp. 32 (citing Ex. 2017[29]; Ex. 2022). But the evidence Patent Owner cites as support provides insufficient context to support the full scope of Patent Owner's assertion. The deposition cited by Patent Owner supports that ████████████████████████████ ██████████████████████████████████████ ████████████████████████████ Ex. 2018, 46:15– 47:6. Indeed, the deposition testimony is that ████████████████ ███████████████████████████████████████ *Id.* at 47:13–22. Patent Owner also cites Exhibit 2022 as supporting that ██████████████████████████████████████ ████████████████ PO Resp. 32. This exhibit is comprised of two pages that appear to be excerpted from a larger document. One of the pages is

---

[29] Patent Owner's Response cites Exhibit 2017. This appears to be a typographical error as Exhibit 2018 more closely aligns with the subject matter for which it was cited.

IPR2022-01562

Patent 10,159,415 B2

titled

███████████████████████████████████████

███████████████████████████████████████

████████████ Ex. 2022, 1.  Absent further context or explanation as to

what this document is, it is not clear how it supports that ████████████

███████████████████████████████████████

    Patent Owner argues that an Apple presentation ████████████████

██████████████████████████████████████ and, in

discussing certain risks associated with its device, identified proposed

solutions to mitigate those risks as ████████████████ PO Resp. 33

(citing Ex. 2022).  This is true.  But the proposed solutions that were

███████████████████████████████████████

████████████████ Ex. 2022, 2.  This solution bears no apparent

relation to the challenged claims, none of which require █████████

█████████

    Patent Owner cites what it characterizes as "an email exchange

between ████████████████████████████████████

██████████████████████████████████ as

supporting copying.  PO Resp. 32.  We do not agree.  The full

████████████ quote clarifies that ████████████████████

████████████ Ex. 2020 (████████████████████████

████████████████████████████).  This begs the questions: ████

███████████████████████████████████████

█████████████████████████████████ The record

evidence provides no answers to these questions.  Absent such evidence, the

████████████ email could just as easily support that there was no need to

IPR2022-01562
Patent 10,159,415 B2

copy AliveCor's technology (███████████████) as it could support copying.

Finally, Patent Owner argues that "in multiple presentations and in internal emails, Apple consistently looked to AliveCor's system during the development of its own product" including in a document that "identified AliveCor's technology as ███████████████ and in an email describing ████████████████████████████████████████████████████

PO Resp. 32–33 (citing Exs. 2019, 2021). The document identifying an AliveCor product as ███████████████ is a single page that appears to have been excerpted from a larger document. It is titled ███████████ ████████████████████████████████████████ in addition to the AliveCor product. Patent Owner does not direct us to any evidence providing context for this document, but based on our review it appears more likely that an AliveCor product was listed ████████████████████ ████████████████████████████████████████████ ██████ As for the document mentioning ████████████████ ████████████████ we lack sufficient context to give this statement weight. The statement was made in an email discussing ████████████████ ████████████████████████████████████████████████ ██████████ Ex. 2021. Although one Apple employee considered ████ ████████████████████████████████████████████████ ████████████████████████████. *Id.* (████████████████ ████████████████████████████████████████████ ██████████████████). The record before us lacks information about what actions were taken in response to the request reflected in Exhibit 2021.

61

IPR2022-01562

Patent 10,159,415 B2

Moreover, even if Apple ███████████████████████████████

██████████████████████████ bears little apparent relation to the

challenged claims.  Put another way, ██████████████████████

██████████████████ is not the same as copying the product itself.  In sum,

the evidence Patent Owner cites as supporting that "looked to AliveCor's

system during development" does little to support an inference of copying.

### (ii)    Industry Praise

For industry praise, Patent Owner contends that "industry reviews

characterized the KBS as 'an impressive feat of engineering' and a 'great

product' that made the Apple Watch 'more useful.'"  PO Resp. 31 (citing

Ex. 2005, 1, 4; Ex. 2006, 2).  Patent Owner also points out that KBS was

"the first Apple Watch accessory to get FDA clearance as an ECG band

accessory" and that it was the subject of a study that found that KBS's

algorithm for atrial fibrillation detection could accurately differentiate

between atrial fibrillation and sinus rhythm.  *Id.* at 31–32(citing Ex. 2007, 1;

Ex. 2008, Abstract).  According to Patent Owner, the ITC found this to be

"strong evidence of industry praise."  *Id.* at 32 (citing Ex. 2003, 94; Ex.

2004, 43–44).

The "impressive feat of engineering" statement does not support that

the '415 patent was nonobvious because it is directed to an element of KBS

already known in the art—the sensor.  Ex. 2005, 2 ("The KardiaBand sensor

module is an impressive feat of engineering."); Ex. 1001, 7:12–15

(Specification of '415 patent, teaching that "[t]he wrist-worn biometric

sensor 105 may comprise an activity monitor such as those available from

Fitbit Inc. of San Francisco, Calif. or a Nike FuelBand available from Nike,

IPR2022-01562
Patent 10,159,415 B2

Inc. of Oregon."); *See S. Alabama Med. Sci. Found. v. Gnosis S.P.A.*, 808
F.3d 823, 827 (Fed. Cir. 2015) (affirming a finding of no nexus where the
patent owner "failed to connect the evidence of industry praise to the novel
elements of the claims," given that "the praise was particularly directed to ...
an element already known in the prior art").

The remaining statements identified by Patent Owner as industry
praise are directed generally to KBS.  If Patent Owner had established a
nexus between KBS and the challenged claims, we would give this evidence
some weight.  For example, we would give weight to the review stating that
KBS is a "great product that makes another Apple device more useful" (Ex.
2005, 4) and to the statement that one doctor "found the Kardia device to be
immensely helpful in the management of [their] patients before and after
cardioversions" (Ex. 2006, 2).  We address the impact giving weight to
Patent Owner's evidence of industry praise would have, *infra* ( n.30).

> e)    *Petitioner's obligation to address secondary*
> *considerations in the Petition*

Patent Owner argues that Petitioner knew about the ITC's decision
before it filed the Petition but nonetheless did not address secondary
considerations or otherwise address the ITC's decision.  PO Resp. 24–27.
According to Patent Owner, the Petitioner failed to carry its burden to
address all known patentability arguments.  *Id.* at 24.  Patent Owner thus
asserts "[b]ecause the [P]etition failed to address the ITC's findings in the
context of the grounds of challenge, the petition fails to satisfy the
requirements of a *Graham* analysis, and therefore the Board should find that

IPR2022-01562
Patent 10,159,415 B2

Petitioner has failed to meet its burden in establishing the obviousness of the challenged claims." *Id.*

We do not find this argument persuasive because we do not find Patent Owner's evidence of secondary considerations persuasive of the non-obviousness of the challenged claims. Patent Owner had the opportunity to fully develop its argument regarding secondary considerations during trial and, for the reasons discussed herein, we do not find Patent Owner's arguments persuasive. We do not fault Petitioner for omitting discussion of secondary considerations in its Petition where the evidence of secondary considerations set forth on the full record is not persuasive of non-obviousness in the first place. This is particularly true where, as here, Petitioner provides a reasonable basis for believing that the allegedly known evidence of secondary considerations did not apply to the challenged patent. Pet. Reply 24 ("[Petitioner] reasonably believed (and continues to believe) that none of the evidence cited by [Patent Owner] is relevant to the Challenged Claims—which all recite a feature the ITC found not practiced by the KBS—namely, HRV.").

### 6.    Conclusion as to Ground 1

For the reasons set forth above, we find that Petitioner has shown by a preponderance of the evidence that the combination of Shmueli and Almen discloses or renders obvious the limitations of the methods and systems recited in the challenged claims. We also find that Petitioner has shown by a preponderance of the evidence that one of ordinary skill in the art would have been motivated to combine the cited references with a reasonable expectation of success in arriving at the challenged claims. And we are not

IPR2022-01562
Patent 10,159,415 B2

persuaded that, on the record before us, objective indicia weigh in favor of nonobviousness for the reasons discussed *supra* § II.5, including that Patent Owner has not established nexus.[30]  Having reviewed the argument and evidence of record, we find that Petitioner has shown by a preponderance of the evidence that claims 1, 2, 11, and 12 are unpatentable as obvious in view of Shmueli and Alemn.

    *F.*    *Ground 2*

    Ground 2 asserts that dependent claims 3–7 and 13–17 would have been obvious over the combination of Shmueli, Almen, and Osorio.  More specifically, Petitioner contends, as discussed in connection with Ground 1, that the Shmueli/Almen device "monitors HRV data for irregular heart activity (such as arrhythmia) and triggers an ECG measurement upon detection."  Pet. 51.  According to Petitioner, Osorio teaches that "utilizing an activity level can improve detection and be used to avoid 'false diagnoses.'"  *Id.* (citing Ex. 1008 ¶ 29).  Thus, Petitioner asserts, a POSA "would have been motivated to supplement the Shmueli-Almen device with Osorio's teaching regarding activity level, as doing so would allow Shmueli-Almen to better determine if an irregularity is occurring."  *Id.* (citing Ex. 1003 ¶ 146).

---

[30] Considering the strong evidence that the prior art teaches or suggests the claimed methods and systems together with the evidence of industry praise, we find that even if Patent Owner had established a nexus, the challenged claims would still have been obvious to a person of ordinary skill in the art. *See Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) ("given the strength of the prima facie obviousness showing, the evidence on secondary considerations was inadequate to overcome a final conclusion" of obviousness).

IPR2022-01562
Patent 10,159,415 B2

Supplementing the Shmueli-Almen device in this manner would, according to Petitioner, require incorporating "(a) hardware elements used for measuring activity level, such as Osorio's activity sensors 212 (e.g., motion sensors) and (b) software-related techniques for processing sensed data to determine an activity level of a patient, such as those performed by Osorio's activity level module 250." *Id.* at 52 (citing Ex. 1003 ¶ 141). Because the devices of Shmueli and Osorio are similar, Petitioner asserts, the POSA would have "viewed Osorio's activity level sensor 212 as being readily able to be incorporated into Shmueli's heart monitoring device." *Id.* at 53 (citing Ex. 1003 ¶ 148). Thus, Petitioner asserts, the POSA would have had a reasonable expectation of success in modifying the Shmueli-Almen device to additionally monitor activity level. *Id.*

We a conclude, after considering the arguments and evidence in this proceeding, that Petitioner has established sufficiently that the combination of Shmueli, Almen, and Osorio renders claims 3–7 and 13–17 obvious. Petitioner provides an element-by-element comparison of the asserted art to the challenged claims. *Id.* at 48–71. Patent Owner presents no arguments with respect to Ground 2 that have not been discussed above. *See* PO Resp. 36–37 (addressing Ground 2 by relying on arguments presented for claims 1 and 11). Having reviewed the argument and evidence of record, we find that Petitioner has shown by a preponderance of the evidence that claims 3–7 and 13–17 are unpatentable as obvious over Shmueli, Almen, and Osorio.

G.    *Ground 3*

Ground 3 asserts that dependent claims 8–10 and 18–20 would have been obvious over the combination of Shmueli, Almen, and Asl. Petitioner

IPR2022-01562
Patent 10,159,415 B2

contends, as discussed in connection with Ground 1, that the Shmueli/Almen device "monitors HRV data to detect the presence of an irregular heart condition, including an arrhythmia, and trigger an ECG measurement when such irregularities are detected." Pet. 73. According to Petitioner, a POSA "would recognize that using machine-learning algorithms designed to analyze ECG readings, and determine what heart maladies may be indicated, would improve such a device." *Id.* (citing Ex. 1003 ¶ 154).

Petitioner asserts that Asl discloses an "effective cardiac arrhythmia classification algorithm using the heart rate variability (HRV) signal." *Id.* at 72 (citing Ex. 1007, 1). More specifically, Petitioner describes Asl as disclosing "an algorithm trained according to machine learning that is able to analyze HRV data and determine whether an arrhythmia is occurring, and if so, what type of arrhythmia is occurring, including an atrial fibrillation." *Id.* (citing Ex. 1007, 2; Ex. 1003 ¶¶ 55–56).

Petitioner contends that the POSA would have been "motivated to utilize Asl's machine-learning trained algorithm for detecting and classifying arrhythmias as a further improvement to the Shmueli-Almen combination." *Id.* at 73. According to Petitioner, the purpose of the Shmueli/Almen device would be to "allow a user to monitor his or her own heart rate, and gather useful information that can be used to diagnose heart conditions." *Id.* Petitioner asserts that the POSA "would recognize that using machine-learning algorithms designed to analyze ECG readings, and determine what heart maladies may be indicated, would improve such a device." *Id.* (citing Ex. 1003 ¶ 180); *see also id.* at 74 (explaining that the Shmueli/Almen device would have been designed to detect arrhythmias and

IPR2022-01562
Patent 10,159,415 B2

that the POSA "would have recognized that using a machine learning algorithm trained and tested on specific arrhythmia data to detect different kinds of arrhythmias (such as that disclosed by Asl) would allow it to do so more effectively") (internal citation omitted).

Further, Petitioner points to Shmueli's teaching that "after an ECG was measured, 'the software program proceeds to element 50 to search for correlations between the SpO2 signal and the ECG signal to produce new detection parameters, or modify existing detection parameters, so as to enhance the detection algorithms of the irregular heart conditions.'" *Id.* (citing Ex. 1004, 14). Petitioner contends that this disclosure refers to the use of machine learning, which adapts algorithms "based on a set of observed data." *Id.* Finally, Petitioner contends that the POSA "would specifically have been motivated to use the algorithm disclosed by Asl as it was trained on and is designed to use HRV data—the same data collected and analyzed by Shmueli-Almen for detecting the presence of irregular heart activity such as an arrhythmia." *Id.* at 74–75.

Petitioner contends that implementing Asl's algorithm would "simply involve implementing the algorithm already disclosed in Asl into the system already taught by Shmueli-Almen—something that was well within the ability of a skilled artisan at the time—for example by tasking a team member to do so or by hiring a software engineer to apply the state of the art." *Id.* at 75.

We conclude, after considering the arguments and evidence in this proceeding, that Petitioner has established sufficiently that the combination of Shmueli, Almen, and Asl renders claims 8, 9, 18, and 19 obvious.

IPR2022-01562
Patent 10,159,415 B2

However, we find that Petitioner has not carried its burden to establish that claims 10 and 20 would have been obvious.  We address Patent Owner's arguments below.

> 1.    Arguments with respect to claims 8, 9, 18, and 19

Patent Owner argues that "Petitioner fails to establish that a POSA would have been motivated to modify Shmueli and Almen in view of Asl." PO Resp. 40.  According to Patent Owner, "Asl's algorithm is specifically configured to process carefully selected and classified clinical ***ECG*** signals." *Id.* at 43 (citing Ex. 2001 ¶ 107).  Patent Owner contends that this is a problem because, in Petitioner's proposed combination, Asl's unmodified algorithm would be applied to HRV data derived from PPG measurements. *Id.* at 41–42.  Patent Owner details differences between measurements of HRV taken by PPG and measurements taken by ECG and then argues that "Petitioner fails to establish that a POSA would have been motivated to apply Asl's trained algorithm to Shmueli's PPG data because Asl relies on training its algorithm based on features extracted from ECG data." *Id.* at 42–43 (citing Ex. 2001 ¶¶ 104–108).  We do not find this argument persuasive.

As Petitioner explains, "[Patent Owner] is wrong that [Petitioner's] combination is limited strictly to calculating HRV from PPG."  Pet. Reply 9–10.  In explaining how and why the POSA would implement Asl's algorithm in the proposed Shmueli/Almen device, the Petition states:

> Shmueli already discloses that ***after an ECG is measured***, "the software program proceeds to element 50 to search for correlations between the SpO2 signal and the ECG signal to produce new detection parameters, or modify existing detection

69

IPR2022-01562
Patent 10,159,415 B2

> parameters, so as to enhance the detection algorithms of the irregular heart conditions." APPLE-1004, 14. A POSITA would have found it obvious that ***this disclosure covers machine learning***, which "focuses on algorithms capable of learning and/or adapting their structure (e.g., parameters) based on a set of observed data" and was well known before the '956 patent APPLE-1026, 538; APPLE-1027, Abstract, 892; APPLE-1007, 2. Thus, to the extent a POSITA wanted to design a device to detect arrhythmias—something which the Shmueli-Almen device is intended to do—a POSITA would have recognized that using a machine learning algorithm trained and tested on specific arrhythmia data to detect different kinds of arrhythmias (such as that disclosed by Asl, see APPLE-1007, 3) would allow it to do so more effectively. APPLE-1003, ¶181.
>
> A POSITA would specifically have been motivated to use the algorithm disclosed by Asl as it was trained on and is designed to use HRV data—***the same data collected and analyzed by Shmueli-Almen*** for detecting the presence of irregular heart activity such as an arrhythmia. . . .
>
> A POSITA also would have had a reasonable expectation of success in using a machine learning algorithm to detect arrhythmia in this way. Indeed, doing so would simply involve ***implementing the algorithm already disclosed in Asl into the system already taught by Shmueli-Almen***.

Pet. 74–75 (emphasis added). Thus, the Petition identifies Shmueli as teaching a machine learning step that occurs *after* Shmueli's ECG. The Petition then asserts that it would have been obvious to implement Asl's algorithm into the system "already taught by Shmueli-Almen" and analyze the "same data collected and analyzed by Shmueli-Almen." *Id.* In short, the Petition proposes to use Asl's algorithm on ECG data.

Patent Owner disputes this, arguing that Petitioner's assertion "ignores the case set forth in the petition, which mapped the claimed heart data to heart rate data gathered by Shmueli's PPG sensor, mapped the

IPR2022-01562
Patent 10,159,415 B2

claimed determined HRV value to the HRV value derived from Shmueli's

PPG-based heart data, and proposed applying Asl's algorithm to that

monitored data." PO Sur-reply 12. We recognize that the Petition includes

the statement that "in the proposed combination, the algorithm from Asl

would be used with Shmueli-Almen to detect arrhythmias based on the

monitored HRV data" (Pet. 76) and that "monitored HRV data" is used in

the Petition to refer to PPG-sensed data. However, given the Petition's clear

discussion of employing machine learning after taking an ECG, we do not

see this statement as limiting the data analyzed by Asl's algorithm in the

proposed combination to PPG-sensed data.[31]

---

[31] Even if Petitioner's proposed combination were limited to applying Asl's
algorithm to Shmueli's PPG measurements, the evidence supports that this
would have been obvious. Asl's algorithm relies solely on HRV. Ex. 1007,
Abstract ("A main advantage of the proposed algorithm, compared to the
approaches which use the ECG signal itself is the fact that it is *completely*
based on the HRV.") (emphasis added). And the evidence supports that
HRV can be accurately determined by PPG and ECG. *See, e.g.,* Ex. 1032,
Abstract ("The results showed a high correlation (median 0.97) between the
ECG-derived RR intervals and PPG-derived peak-to-peak (PP) intervals. . . .
The time domain, frequency domain and Poincaré plot HRV parameters
computed using RR interval method and PP interval method showed no
significant differences (p < 0.05). The error analysis also showed
insignificant differences. . . Thus, HRV can also be reliably estimated from
the PPG based PP interval method."); Ex. 1040, Abstract ("Our results
demonstrate that the parameters of PPGV [PPG variability] are highly
correlated with the parameters of HRV. Thus, our results indicate that
PPGV could be used as an alternative to HRV."); Ex. 1003 ¶ 37 (testimony
of Dr. Chaitman that "[b]y the Critical Date, it was known that HRV can be
accurately determined by either ECG or PPG data."). Accordingly, even if
Petitioner's combination were limited to applying Asl's algorithm to PPG
measurements, we would not find persuasive Patent Owner's argument (PO

IPR2022-01562
Patent 10,159,415 B2

Patent Owner argues that "the ECG signals in Asl's databases were curated and filtered under ideal conditions, thus representing highly clean signals." PO Resp. 44 n.9. Supported by the testimony of Dr. Efimov, Patent Owner asserts that "a POSA would not have considered the algorithm's accuracy in detecting arrhythmias with respect to these ideal signals to be applicable to ECG signals obtained under real-world conditions using a wrist-worn device as even these signals would exhibit different patterns than what Asl's algorithm was trained on." *Id.*; Ex. 2001 ¶ 110 (Dr. Efimov's testimony to the same effect). We do not find Patent Owner's argument or Dr. Efimov's testimony persuasive because Asl teaches that an advantage of its algorithm is that "it is completely based on the HRV (R-R interval) signal which can be extracted from even a very noisy ECG signal with relatively high accuracy." Ex. 1007, 51–52. This supports that Asl's algorithm would be effective even using ECG signals that are not taken under ideal conditions.

    2.    <u>Arguments with respect to claims 10 and 20</u>

Claims 10 and 20 each recite the use of a machine learning algorithm that "stores heart rate and heart rate variability data associated with arrhythmias in a second user and determines said presence of said arrhythmia in said first user based on said stored heart and heart rate variability data associated with arrhythmias in said second user." Ex. 1001, 26:62–67, 28:21–26. Patent Owner argues that Petitioner points to two of

---

Resp. 40–45) or Dr. Efimov's testimony (Ex. 2001 ¶¶ 101–111), that the POSA would not have been motivated to apply Asl's algorithm to PPG measurements. *See In re Keller*, 642 F.2d 413, 425 (CCPA 1981).

IPR2022-01562
Patent 10,159,415 B2

Asl's databases as satisfying the requirement for storing data relating to a "second user" but "fails to fully address the language of claims 10 and 20 and fails to explain how data contained in Asl's academic databases constitute heart rate data obtained from 'a second user' as recited in the claims." PO Resp. 39. More specifically, Patent Owner argues that Petitioner "fails to explain how the data stored in [Asl's] academic databases was derived from a plurality of 'users' and what they are users of." *Id.*

Petitioner responds that "[i]n the proposed combination of Shmueli-Almen in view of Asl, . . . the data would be gathered from users of the Shmueli-Almen device, so it is unclear what AliveCor believes is missing." Pet. Reply 9. This is not persuasive and we decline to considerate it because it is a new argument that conflicts with what Petitioner asserted in the Petition. Namely, Petitioner asserted that the "second user" recitation in claims 10 and 20 was satisfied by patients in Asl's existing database. With respect to claims 10 and 20, the Petition asserts:

> The proposed combination renders this claim obvious. APPLE-1003, ¶192- 193. Asl specifically teaches receiving data from a plurality of users *in academic databases*, received from a plurality of heart rate sensors attached to those users, that specifically relates to arrhythmias. See APPLE-1007, 3 (explaining that the algorithm was trained based on databases from "the MIT-BIH Arrhythmia Database" and the "Creighton University Ventricular Tachyarrhythmia Database"). In one implementation of the Shmueli-Almen-Asl combination, ***this data from the database (i.e., data of at least one "second user")*** would be used to detect arrhythmias in the wearer of the device (i.e., the "first user")—as previously discussed.

Pet. 80 (emphasis added). This assertion plainly maps the "second user" to patients in Asl's two databases. And, as Patent Owner explains, Petitioner

IPR2022-01562
Patent 10,159,415 B2

offers no explanation of what the patients comprising these databases are users of. Dr. Chaitman's testimony similarly offers no explanation of what the patients in Asl's databases are users of, largely parroting the language of the Petition. Ex. 1003 ¶¶ 193, 196. This alone renders Petitioner's showing for claims 10 and 20 deficient.

Although Petitioner's failure of proof renders it unnecessary to construe the term "user" to reach our decision, considering the plain meaning of the term "plurality of users" in the context of the claim makes even more clear that Petitioner's showing for claims 10 and 20 is deficient.

Claims 1 and 11 make clear that a "user" is someone using a mobile computing device. Ex. 1001, 26:23–35 (claim 1, reciting a "method of determining a presence of an arrhythmia of a first user" including the steps of using a "mobile computing device" to "determine . . . a heart rate variability" and sense an ECG using the mobile computing device "in response to an irregularity in said heart rate variability"), 27:1–15 (claim 11, reciting a system comprising a "mobile computing device" with a processor that performs steps similar to those recited in claim 1). Claims 10 and 20 ultimately depend from claims 1 and 11 and, as discussed above, further recite the use of a machine learning algorithm that "stores heart rate and heart rate variability data associated with arrhythmias in a second user and determines said presence of said arrhythmia in said first user based on said stored heart and heart rate variability data associated with arrhythmias in said second user." *Id.* at 26:62–67, 28:21–26. Thus, the "stored heart rate and heart variability data" is not just any heart rate and variability data, it is data received from a specific source – a "second user." Further, as Patent

74

IPR2022-01562
Patent 10,159,415 B2

Owner explains, "just as the 'first user' is a user of a mobile computing device as recited in claims 1 and 11, the 'second user' is a user of a mobile computing device recited in claims 1 and 11." PO Resp. 39.

The parties seem to agree that "users," as recited in claims 10 and 20, are users of the mobile computing device. Tr. 15:4–11 (Petitioner's counsel explaining that there is no need to construe the term "plurality of users" in the related '956 patent because "the only dispute is whether [Asl's] patients are users" and, in Petitioner's view, "there are users wearing these devices that are used to train the machine learning structures in both Ong and Asl."), *id.* at 15:12–24 ("[Board]: Just to make sure I understand your position, is it your position that in the combination, the users would be users of a wearable device? [Petitioner's Counsel]: Absolutely . . . The users, the people that you're trying to classify their heart activity, are the people wearing those devices. So, of course you would take the information from those users, put it into these databases that are used to train machine learning structures in both Ong or Asl."), 38:1–10 ("[Board] . . . Do we need to construe the term plurality of users? [Patent Owner's Counsel]: I don't think so. . . . If you look at that term in context of the independent claim, they are users of the wearable computing device or the mobile computing device depending on which claim you look at. So I don't think construction is necessary, but that's because our interpretation is based on the plain language of the claims.").

Considering claims 10 and 20 in this light, Petitioner's failure of proof is even more clear because there is no evidence supporting that the patients

IPR2022-01562
Patent 10,159,415 B2

in Asl's databases—which were compiled in the 1980's (Ex. 1007, 53; Ex. 2001 ¶ 100)—were users of a mobile computing device.

### 3.    Conclusion as to Ground 3

For the reasons set forth above, we find that Petitioner has shown by a preponderance of the evidence that the combination of Shmueli, Almen, and Asl teaches or suggest the limitations of the methods and systems recited in challenged claims 8, 9, 18, and 19.  We also find that Petitioner has demonstrated by a preponderance of the evidence that one of ordinary skill in the art would have been motivated to combine the cited references with a reasonable expectation of success in arriving at the challenged claims.  And we are not persuaded that, on the record before us, objective indicia weigh in favor of nonobviousness for the reasons discussed (*supra* § II.5), including that Patent Owner has not established nexus.[32]  Having reviewed the argument and evidence of record, we find that Petitioner has shown by a preponderance of the evidence that claims 8, 9, 18, and 19 are unpatentable as obvious in view of Shmueli, Almen, and Asl.

For the reasons set forth above, we find that Petitioner has not carried its burden to establish that claims 10 and 20 are unpatentable over the combination of Shmueli, Almen, and Asl because Petitioner fails to explain

---

[32] Considering the strong evidence that the prior art teaches or suggests the claimed methods and systems together with the evidence of industry praise, we find that even if Patent Owner had established a nexus, the challenged claims would still have been obvious to a person of ordinary skill in the art. *See Leapfrog*, 485 F.3d at 1162 ("given the strength of the prima facie obviousness showing, the evidence on secondary considerations was inadequate to overcome a final conclusion" of obviousness).

IPR2022-01562
Patent 10,159,415 B2

how the data stored in Asl's academic databases was derived from a second user and what Asl's patients are users of.

## III.    MOTIONS TO SEAL

Patent Owner and Petitioner have each filed motions to seal. Paper 18 (Patent Owner Motion to Seal ("PO Mot.")); Paper 24 (Petitioner's Motion to Seal ("Pet. Mot.")); Paper 32 (Patent Owner's Second Motion to Seal) ("PO 2nd Mot.").

Patent Owner moves to seal portions of its Patent Owner's Response as well as Exhibits 2001, 2009, 2010, and 2017–2025. PO Mot. 1–4. Patent Owner also moves for entry of a "Joint Protective Order" (Ex. 2026). And Patent Owner moves to seal portions of its Demonstratives for oral argument. PO 2nd Mot. 1–3. Petitioner moves to seal Exhibit 1046 as well as portions of Petitioner's Reply to Patent Owner's Response. Pet. Mot. 1–3. None of these motions is opposed.

The Board recognizes "a strong public policy for making all information filed in a quasi-judicial administrative proceeding open to the public, especially in an inter partes review which determines the patentability of claims in an issued patent and therefore affects the rights of the public." *Garmin Int'l v. Cuozzo Speed Techs., LLC*, IPR2012-00001, Paper 34 (PTAB Mar. 14, 2013), at 1–2. Except as otherwise ordered by the Board, the record of an *inter partes* review shall be made available to the public. 35 U.S.C. § 316(a)(1); 37 C.F.R. § 42.14.

The moving party bears the burden of showing that the relief requested should be granted. 37 C.F.R. § 42.20(c). The standard for granting a motion to seal is "for good cause." 37 C.F.R. § 42.54(a).

IPR2022-01562
Patent 10,159,415 B2

Patent Owner contends that good cause exists to seal the exhibits that are the subject of its motion because they contain "sensitive, non-public information with respect to both Patent Owner and Petitioner."  PO Mot. 1–4; PO 2nd Mot. 1–3.  Patent Owner's counsel also certifies that "the information sought to be sealed by this Motion to Seal has not, to their knowledge, been published or otherwise made public."  PO Mot. 3.  Petitioner's motion seeks to seal deposition testimony and briefing discussing the same information targeted by Patent Owner's motion.  It affirms that "the information sought to be sealed is truly confidential and a concrete harm would result upon public disclosure."  Pet. Mot. 2.

More specifically, Patent Owner contends good cause exists because it "relates to information that has been designated confidential and is subject to a protective order in a proceeding before the International Trade Commission (ITC)."  PO Mot. 3.

The information the parties seek to seal includes: KardiaBand revenues and unit shipments (Ex. 2009), AliveCor's revenues by product (Ex. 2010), deposition testimony relating to AliveCor sales (Ex. 2017), deposition testimony relating to Apple's product development (Ex. 2018), an Apple document entitled ███████████████████████ (Ex. 2019), an Apple email discussing ██████████ (Ex. 2020), an Apple email discussing a ██████████████ (Ex. 2021), an Apple document entitled █████████████ (Ex. 2022), two Apple documents that appear to be related to ███████████████████ (Exs. 2023 and 2024), and deposition testimony regarding AliveCor's KardiaBand product (Ex. 2025).

IPR2022-01562
Patent 10,159,415 B2

Having considered the exhibits and Patent Owner's unopposed argument, we determine that Patent Owner has shown good cause to seal the exhibits in question. The exhibits appear to include confidential information which both parties have an interest in keeping private. We find that such interest outweighs the public's need for access to that information. Accordingly, we grant Patent Owner's motion to seal Exhibits 2009, 2010, and 2017–2025. These exhibits are, thus, sealed subject to further order from the Board. For the same reasons, we grant the parties' motions to seal the confidential versions of Patent Owner's Response (Paper 19 (redacted public version provided in Paper 21)), Petitioner's Reply (Paper 23 (redacted public version provided in Paper 25)), Dr. Efimov's Deposition (Ex. 1046 (includes redacted and public versions)), Dr. Efimov's Declaration (Ex. 2001 (includes redacted and public versions), and Petitioner's Demonstratives (Paper 33 (redacted public version provided in Paper 34)).

We have also considered Patent Owner's unopposed motion for a protective order, which motion is granted. The proposed changes to the Board's Default Protective Order are shown in Exhibit 2027. Those changes appear to be justified under the circumstances because, as Patent Owner explains, they "additional protections consistent with the ITC protective order governing the same confidential information in Investigation No. 337–TA-1266." PO Mot. 3. The Joint Protective Order (Exhibit 2026) is, therefore, entered and will control access to confidential materials in this proceeding absent a further order from the Board modifying such access.

IPR2022-01562
Patent 10,159,415 B2

## IV.    CONCLUSION

For the reasons discussed above, we find that Petitioner's has established, by a preponderance of the evidence, that claims 1–9 and 11–19 of the '415 patent would have been obvious over the cited art.  We find that Petitioner has not established by a preponderance of the evidence that claim 10 and 20 would have been obvious over the cited art.  We grant Patent Owner's and Petitioner's Motions to Seal.

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 11, 12 | 103 | Shmueli, Almen | 1, 2, 11, 12 | |
| 3–7, 13–17 | 103 | Shmueli, Almen, Osorio | 3–7, 13–17 | |
| 8–10, 18–20 | 103 | Shmueli, Almen, Asl | 8, 9, 18, 19 | 10, 20 |
| **Overall Outcome** | | | 1–9, 11–19 | 10, 20 |

## V.    ORDER

In consideration of the foregoing, it is hereby:

IPR2022-01562
Patent 10,159,415 B2

ORDERED that the Petitioner has proved by a preponderance of the evidence that claims 1–9 and 11–19 of U.S. Patent No. 10,159,415 B2 are unpatentable;

FURTHER ORDERED that Petitioner has not proved by a preponderance of the evidence that claims 10 and 20 of U.S. Patent No. 10,159,415 B2 are unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Seal (Paper 18), Petitioner's Motion to Seal (Paper 24), and Patent Owner's 2nd Motion to Seal (Paper 32) are *granted*, and Exhibits 2001, 2009, 2010, and 2017–2025, and the confidential versions of Patent Owner's Response (Paper 19), Petitioner's Reply (Paper 23), Dr. Efimov's Deposition (Ex. 1046), and Petitioner's Demonstratives (Paper 33) are sealed;

FURTHER ORDERED that the Joint Protective Order (Ex. 2026) is entered; and

FURTHER ORDERED that, within ten (10) days of this Decision, the parties will meet and confer and submit an agreed-to, public-version of the Decision and of the Hearing Transcript (Paper 35) with redactions as appropriate.

ORDERED that parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2022-01562
Patent 10,159,415 B2

FOR PETITIONER:

Walter Renner
Jeremy Monaldo
FISH & RICHARDSON P.C.
axf-ptab@fr.com
jjm@fr.com


FOR PATENT OWNER:

Michael Rosato
Matthew Argenti
Tasha Thomas
Yahn Lin Chu
WILSON SONSINI GOODRICH & ROSATI
mrosato@wsgr.com
margenti@wsgr.com
tthomas@wsgr.com
ychu@wsgr.com